THE STANLEY WORKS ISRAEL LTD.
f/k/a ZAG INDUSTRIES, LTD.,

          Plaintiff,

v.

500 GROUP, INC. and PAOLO TIRAMANI,

          Defendants.

3:17-cv-01765 (CSH)

**AUGUST 1, 2018**

## RULING ON MOTION TO DISMISS

**HAIGHT, Senior District Judge:**

The Stanley Works Israel Ltd., f/k/a ZAG Industries, Ltd. ("Plaintiff"), an Israeli limited liability company, brings this diversity action against Defendants 500 Group, Inc., a New York corporation, and Paolo Tiramani, a citizen of Nevada (collectively, "Defendants"). Plaintiff and Defendant 500 Group were parties to certain product license agreements that related generally to patent rights owned by 500 Group. Plaintiff's claims against Defendants arise from a dispute over monies paid pursuant to a settlement agreement between the parties.

Defendants now move pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the Amended Complaint for failure to state a claim upon which relief can be granted, Doc. 26. Plaintiff has resisted the motion, Doc. 29, and Defendants have filed a reply brief, Doc. 32. This Ruling resolves Defendants' motion.

## I. BACKGROUND

The following facts are derived from Plaintiff's Amended Complaint, and are assumed true

1

for the purposes of this motion.

Plaintiff and Defendant 500 Group were parties to certain product license agreements and a letter agreement (collectively, the "License Agreements"), which related generally to patent rights owned by 500 Group. Amended Complaint, Doc. 24 ¶ 7. The License Agreements were silent on the tax treatment of royalty payments made under their terms. *Id.* ¶ 8. However, under Israeli law, Plaintiff was required to withhold certain percentages of such royalty payments to 500 Group, and to then remit that amount to the Israeli tax authority to satisfy 500 Group's tax obligations in Israel. *Id.* Therefore, during the term of the License Agreements, with 500 Group's consent and agreement, Plaintiff withheld the appropriate amounts from 500 Group's royalty payments, and remitted the tax to the Israeli tax authority. *Id.*

Disputes between the parties relating to the License Agreements arose; these disputes resulted in a demand for arbitration. *Id.* ¶ 9. The disputes were then negotiated and the parties ultimately reached a settlement. *Id.* ¶ 10. Plaintiff and 500 Group entered into a Settlement Agreement on March 31, 2017, which provided, among other things, that Plaintiff would pay a sum of ten million dollars to Defendant 500 Group. *Id.* ¶¶11-12. The parties agreed that of this total, six million dollars constituted payment for Plaintiff's purchase of 500 Group's patent rights; the remaining four million dollars constituted royalty payments to 500 Group. *Id.* ¶ 12.

Plaintiff was required to withhold a portion of total amount payable under the Settlement Agreement for tax purposes, and then remit the tax to the Israeli tax authority on behalf of 500 Group. *Id.* ¶ 13. In this situation, pursuant to Israeli law, Plaintiff was required to withhold $2,500,000, or 25% of the total payment amount, unless the parties obtained prior approval from the Israeli tax authority for a different withholding arrangement. *Id.* ¶ 14. 500 Group would then be

responsible to seek a refund of any portion of the withheld amount that was not taxable directly from the Israeli tax authority. *Id.* ¶ 14.

The parties decided to delay the payment of the amount due under the Settlement Agreement so that they could obtain pre-approval from the tax authority for "structuring a reduced amount of withholding, in view of the agreed-upon structure of the Settlement Agreement." *Id.* ¶ 15. This agreement was made in mutually-signed electronic writings. *Id.* The parties believed that under Israeli law, the six million dollar patent rights payment should not be taxed, and the four million dollar royalty payment should be taxed at the prior royalty rate of 15%. *Id.* Thus, if pre-approval was obtained, 500 Group's total tax burden would be $600,000. *Id.* According to the signed electronic agreements between the parties, that amount would be withheld by Plaintiff and remitted to the Israeli tax authority. *Id.*

500 Group hired Ernst & Young to act on its behalf to assist in obtaining the aforementioned pre-approval. *Id.* ¶ 17. Defendant Tiramani and other agents of 500 Group confirmed the parties' agreement relating to the tax withholdings multiple times in writing, including in emails signed by Tiramani and other agents of 500 Group. *Id.* ¶ 18. Tiramani was personally involved in efforts to further the parties' tax withholdings agreement, and agreed that the parties should continue to seek approval for the withholdings under the current Settlement Agreement, rather than re-execute the Agreement to explicitly split the payments into two categories. *Id.* ¶ 20.

Pre-approval was ultimately obtained by Ernst & Young, acting on behalf of 500 Group for the parties' proposal. *Id.* ¶ 21. 500 Group agreed that Plaintiff was to retain $600,000 from the payment total under the Settlement Agreement. The parties' agreement to seek preapproval and proceed with withholding 15% of the royalty payment was "acted on to completion." *Id.* 500 Group's

agreements, representations and conduct regarding the tax withholding issue induced Plaintiff's reliance, in that Plaintiff aided 500 Group to obtain the preapproval, and Plaintiff performed its obligation under the agreement by remitting $600,000 to the Israeli tax authority in satisfaction of 500 Group's tax obligations. *Id.* ¶ 22.

Under the Settlement Agreement, 500 Group was to provide Plaintiff with instructions for wiring the payment from Plaintiff to 500 Group called for by the Agreement. *Id.* ¶ 23. 500 Group instructed Plaintiff to wire the payment to its account at Patriot Bank in Stamford, Connecticut. *Id.* ¶ 24. The settlement funds were wired to this bank account on June 1, 2017. *Id.* ¶ 25. However, Plaintiff mistakenly failed to deduct $600,000 from the total as the agreed-upon tax withholdings. *Id.* Thus, Plaintiff overpaid 500 Group by $600,000. *Id.*

On June 5, 2017, Plaintiff's bank requested that the funds which were erroneously transmitted be recalled; this request was denied. *Id.* ¶ 26. On or about June 7, 2017, Plaintiff explained to 500 Group that it had mistakenly overpaid, and asked 500 Group to return the $600,000 overpayment. *Id.* ¶ 27. 500 Group "failed to diligently respond" to Plaintiff's request. *Id.* ¶ 28. Plaintiff then made multiple follow-up requests to 500 Group for it to return the money. *Id.* ¶ 29. Although Tiramani initially indicated by email that he intended to return the funds and asked about the logistics of such a transfer, all of Plaintiff's follow-up communications and requests were either ignored or refused, without any legal explanation by Defendants. *Id.* ¶ 30.

Plaintiff was still liable on behalf of 500 Group to the Israeli tax authority for the full amount of the pre-approved withholdings under the Settlement Agreement. *Id.* ¶ 31. Accordingly, Plaintiff paid $600,000 to the tax authority on or about August 15, 2017. *Id.* Defendants continue to refuse to return Plaintiff's $600,000, despite continued and repeated requests and demands. *Id.* ¶ 32.

## II.    STANDARD OF REVIEW

"On a motion to dismiss, the issue is 'whether the claimant is entitled to offer evidence to support the claims.'" *Patane v. Clark*, 508 F.3d 106, 111 (2d Cir. 2007) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1984)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("*Iqbal*") (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ("*Twombly*")). This pleading standard creates a "two-pronged approach," *Iqbal*, 556 U.S. at 679, based on "[t]wo working principles." *Id*. at 678.

First, all factual allegations in the complaint must be accepted as true and all reasonable inferences must be drawn in the favor of the non-moving party. *See id.; see also Gorman v. Consolidated Edison Corp.*, 488 F.3d 586, 591-92 (2d Cir. 2007) (citation omitted). The presumption of truth does not extend, however, to "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. Second, "a complaint that states a plausible claim for relief" will survive a motion to dismiss and "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679) (quotation marks omitted). "Dismissal under Federal Rule of Civil Procedure 12(b)(6) is appropriate when 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'" *Associated Fin. Corp. v. Kleckner*, 480 F. App'x 89, 90 (2d Cir. 2012) (quoting *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000)).

## III.    DISCUSSION

Plaintiff's Amended Complaint raises counts sounding in breach of contract, unjust enrichment, unfair trade practices, conversion, and civil theft. The Court will address each of Defendants' arguments for Rule 12(b)(6) dismissal of the claims asserted by Plaintiff, based on the well-pled factual allegations of the Amended Complaint.

### A.    Choice of Law

Defendants argue that New York law should apply to all of the claims in this matter, and on this ground, move to dismiss Plaintiff's CUTPA and tort claims. The Court addresses the choice of law analysis as an initial matter.

A federal court sitting in diversity follows the choice of law principles of the forum state. *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 169 (2d Cir. 2012) (citation omitted). When evaluating choice of law questions sounding in tort, Connecticut courts apply the 'most significant relationship' test from the Restatement (Second) of Conflict of Laws, § 145. *W. Dermatology Consultants, P.C. v. VitalWorks, Inc.*, 322 Conn. 541, 558 (2016). The relevant factors that are considered are: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and business of the parties, and (4) the place where the relationship, if any, between the parties is based. *Otis Elevator Co. v. Factory Mut. Ins. Co.*, 353 F. Supp. 2d 274, 285 (D. Conn. 2005).

Here, the Settlement Agreement contains a choice of law clause, which provides that the "Agreement and Mutual Release shall, in all respects, be interpreted, enforced, and governed under the laws of the State of New York without regard to its conflicts of laws principles." Doc. 24-1 at 8. The parties are in agreement that pursuant to this provision, New York law governs Plaintiff's

breach of contract claim. The parties are also in apparent agreement that New York law should apply to the unjust enrichment and conversion claims.[1] Plaintiff cites to Connecticut law in arguing against dismissal of its CUTPA and civil theft claims.

To determine which law to apply, the Court first addresses whether the aforementioned clause in the Settlement Agreement controls the choice of law analysis for the remaining CUTPA and civil theft claims. Courts in this District have held that general choice of law provisions in contracts must be sufficiently broad to encompass tort claims. *See In re Trilegiant Corp., Inc.*, 11 F. Supp. 3d 132, 144-45 (D. Conn. 2014) (noting that in this District, courts have found that "general choice-of-law provisions in contracts must explicitly include tort claims to prevent a plaintiff from bringing a cause of action under CUTPA" and finding that the choice of law provision in certain credit card agreements was not so broad as to bar the Plaintiff's tort causes of action under CUTPA (citing *Country Club Assocs. v. Shaw's Supermarkets, Inc.*, 643 F. Supp. 2d 243, 252-55 (D. Conn. 2009))). *See also Country Club Assocs.*, 643 F. Supp. 2d at 252-55 (construing a contractual choice of law provision narrowly as to not explicitly encompass tort claims); *Aviamax Aviation Ltd. v. Bombardier Aerospace Corp.*, No. 3:08-CV-1958(CFD), 2010 WL 1882316, at *2-4 (D. Conn. May 10, 2010) (finding an analogous choice of law provision "too narrowly drawn" to encompass the

---

[1] Plaintiff does not address the choice of law issue in regards to the unjust enrichment claim, but cites New York law in arguing against dismissal. Further, while Plaintiff "believes that Connecticut law applies" to its conversion claim, it notes that there does not appear to be a conflict of laws between New York and Connecticut law on this issue, and so, "for the avoidance of further unnecessary dispute, Stanley Israel will cite to New York law." Doc. 29 at 23 n.3. This is sufficient for the Court to apply New York law in analyzing these claims. *See Prince of Peace Enterprises, Inc. v. Top Quality Food Mkt., LLC,* 760 F. Supp. 2d 384, 397 (S.D.N.Y. 2011) ("The parties have consented to application of New York law by briefing all issues under the law of New York." (citations omitted)); *see also Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 61 (2d Cir. 2004) ("Here, the parties' briefs assume that New York law controls this issue, and such implied consent is sufficient to establish choice of law." (quotation marks and citation omitted)).

"closely related" tort claims).

Here, the choice of law clause in the Settlement Agreement is similar to the provisions detailed in the cases cited above. It states that it applies to the Agreement and the mutual release; not to all claims arising thereof. The Court follows these courts in deciding that the choice of law provision here is too narrow to encompass the CUTPA or civil theft claims.

Thus, the Court turns to the 'most significant relationship' test. According to the allegations in the Amended Complaint, Plaintiff is an Israeli entity, with its principal place of business in Israel. It is owned by a Dutch company, which, in turn, is owned by a Canadian corporation. Defendant 500 Group is a New York corporation with its principal place of business in Nevada. It maintains a regular place of business in Connecticut. Defendant Tiramani is a citizen of Nevada. Tiramani previously resided in Connecticut and maintains a place of business in Connecticut. It is unclear from the record before the Court where the relationship between the parties is centered; there are no allegations as to where the contract was signed. While it appears that the injury was felt in Israel, the allegations of the Amended Complaint do not shed light on whether the injury-causing conduct occurred in Nevada, New York, or Connecticut.

It appears that it would be premature to undertake this analysis at this early stage in the litigation. The record before the Court on this motion to dismiss does not contain the necessary information to determine where the relationship between the parties was based; where the Settlement Agreement was signed; and where the injury-causing conduct took place. *See Bristol–Myers Squibb Co. v. Matrix Labs. Ltd.*, 655 F. App'x 9, 13 (2d Cir. 2016) (noting that "[n]umerous district courts in this Circuit have concluded that choice-of-law determinations are fact-intensive inquiries that would be premature to resolve at the motion-to-dismiss stage" (collecting cases)). *See also Meserole*

*v. Sony Corp. of Am.*, No. 08-CV-8987(RPP), 2009 WL 1403933, at *5 n.6 (S.D.N.Y. May 19, 2009) (noting that a detailed choice of law analysis would be premature to undertake in ruling on a motion to dismiss); *First Union Nat. Bank v. Paribas*, 135 F. Supp. 2d 443, 453 (S.D.N.Y. 2001) (declining to decide whether New York or English law applies on a motion to dismiss, because "because it is not yet clear that there is a conflict between New York and English law and because the litigation is at a preliminary stage" (footnotes omitted)), *aff'd sub nom.*, *FUNB v. Arab African Int'l Bank*, 48 F. App'x 801 (2d Cir. 2002).

Accordingly, the Court will not grant Defendants' motion to dismiss the CUTPA and civil theft claims on choice of law grounds at this time. Based on the apparent agreement of the parties, however, the Court will apply New York law to Plaintiff's claims of breach of contract, unjust enrichment, and conversion.

**B.      Breach of Contract**

Defendants move to dismiss Plaintiff's breach of contract claim on the grounds that it is contrary to the express terms of the Settlement Agreement, which "plainly establishes" that ten million dollars is the amount Plaintiff was required to pay. Defendants argue that Plaintiff failed to identify a provision of the Settlement Agreement that states that a portion of the settlement amount would be withheld for tax purposes, and the parties' prior course of dealing cannot contradict the plain language of the Settlement Agreement. Defendants claim that Plaintiff has failed to allege an enforceable agreement that would require 500 Group to refund the $600,000 payment.

For its part, Plaintiff argues that the Amended Complaint plausibly alleges that 500 Group was contractually obligated to allow for the tax withholding, because: (1) the Settlement Agreement is silent on the issue, and therefore ambiguous; (2) there exist subsequent, signed writings in which

500 Group agrees to the tax withholdings, thereby amending the operative contract; (3) the parties acted on this understanding to, at a minimum, partial completion; and (4) Plaintiff relied on the tax agreement to its detriment, thus, 500 Group is equitably estopped from evading its responsibilities.

1.    Ambiguity

"It is well established that settlement agreements are contracts and must therefore be construed according to general principles of contract law." *Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002) (quotation marks and citation omitted). In New York, a breach of contract claim requires proving four elements: "the making of an agreement, performance by the plaintiff, breach by the defendant, and damages suffered by the plaintiff." *Greenberg v. Greenberg*, 646 F. App'x 31, 32 (2d Cir. 2016) (quotation marks and citation omitted). "Under New York law the initial interpretation of a contract is a matter of law for the court to decide. Included in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, England*, 136 F.3d 82, 86 (2d Cir. 1998) (quotation marks and internal citations omitted).

A contract is unambiguous if "the contract language has a definite and precise meaning and concerning which there is no reasonable basis for a difference of opinion." *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp*., 830 F.3d 152, 157 (2d Cir. 2016) (quoting *Law Debenture Tr. Co. of New York v. Maverick Tube Corp*., 595 F.3d 458, 467 (2d Cir. 2010)). "It is axiomatic that where the language of a contract is unambiguous, the parties' intent is determined within the four corners of the contract, without reference to external evidence." *Feifer v. Prudential Ins. Co. of Am.*, 306 F.3d 1202, 1210 (2d Cir. 2002) (citation omitted). Thus, "[i]f the contract is unambiguous, that is, only susceptible to one reasonable interpretation, the court must give effect to the contract as

written." *Madeleine L.L.C. v. St.*, 757 F. Supp. 2d 403, 405 (S.D.N.Y. 2010) (quotation marks and citation omitted).

On the other hand, "[c]ontract language is ambiguous if it is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.'" *Collins*, 303 F.3d at 433 (quoting *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000)). "[T]he question of ambiguity *vel non* must be determined from the face of the agreement, without reference to extrinsic evidence." *Id.*

"At the motion to dismiss stage, a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous." *Orchard Hill Master Fund Ltd.*., 830 F.3d at156; *see also Maniolos v. United States*, 741 F. Supp. 2d 555, 567 (S.D.N.Y. 2010) ("Where a contract's language is clear and unambiguous, a court may dismiss a breach of contract claim on a Rule 12(b)(6) motion to dismiss. . . . However, when the language of a contract is ambiguous, its construction presents a question of fact, which of course precludes summary dismissal on a Rule 12(b)(6) motion." (quotation marks and citations omitted) (collecting cases)), *aff'd*, 469 F. App'x 56 (2d Cir. 2012). "[W]hile a court is not obliged to accept the allegations of the complaint as to how to construe a contract, it should resolve any contractual ambiguities in favor of the plaintiff on a motion to dismiss." *Maniolos*, 741 F. Supp. 2d at 567 (quotation marks and citation omitted).

In the present case, the Settlement Agreement is attached to the Amended Complaint. The language of the contract requires Plaintiff to wire a sum of ten million dollars to Defendants; it makes no provision for any withholding from that sum for tax purposes. Plaintiff does not point to any clause that states otherwise; to the contrary, Plaintiff argues that the Settlement Agreement is

silent on the issue of tax treatment. *See, e.g.*, Doc. 29 at 9. Plaintiff contends, however, that the silence of the contract on the issue of the tax treatments renders the Agreement ambiguous, precluding dismissal of its breach of contract claim.

In support for its position, Plaintiff refers the Court to the Second Circuit's decision in *White v. White Rose Food, a Div. of DiGiorgio Corp.*, 237 F.3d 174 (2d Cir. 2001) ("*White Rose*"). This case involved, in part, a settlement agreement resolving a labor dispute between an employer and a union that represented a group of striking employees. *Id.* at 176-77. The settlement agreement provided that the employer, White Rose, would place a sum of $1.5 million into an escrow account to be distributed to the now-former employees. *Id.* at 177. The agreement was "silent on the issue whether such payroll taxes could be drawn from the Settlement Fund, and who was to pay those taxes." *Id.*[2] After White Rose deducted payroll taxes from the Settlement Fund, the employees brought the action, alleging, *inter alia,* a breach of the settlement agreement for deducting the taxes. After a bench trial, the district court granted judgment in favor of the plaintiffs. White Rose appealed.

The Second Circuit held that the district court erred in its initial conclusion "that the Settlement Agreement '[b]y its terms' provided that the $1.5 million Settlement Fund was 'net'—rather than inclusive—of the $193,000 in payroll taxes that would be owed on that amount."

---

[2] Similar to the Agreement in the present case, the Settlement Agreement in *White Rose* provided:

> Fund Amounts: Immediately at the conclusion of the one hundred twenty (120) day period set forth in Paragraph 1, [White Rose] shall deposit one million dollars ($1,000,000) in an escrow account naming Joint Council 16 [a division of Local 138's national union] as Escrow Agent. One hundred twenty days thereafter, [White Rose] shall deposit an additional five hundred thousand dollars ($500,000) in the said escrow account.

237 F.3d at177 n.1.

*Id.* at 179. The Court stated, "[t]he Agreement is silent on the 'net vs. inclusive' issue; at most, it is ambiguous on this issue. As regards the Agreement's silence on this issue, we note that it would have been futile for the district court to have implied a term or clause to the Agreement to fill this gap." *Id.* at 180. The Second Circuit held that the District Court erred in concluding that the agreement unambiguously provided that the fund was net of payroll taxes; and because the plaintiffs did not present any extrinsic evidence relevant to "resolving such ambiguity," and only "chose to argue that the Agreement unambiguously provides that the Settlement Fund is net of payroll taxes," the district court could not "be faulted for failing to resolve this ambiguity in [plaintiffs'] favor by considering extrinsic evidence." *Id.*

*White Rose* appears to speak to the issue we encounter in this case: a Settlement Agreement that says nothing at all about the tax treatment of the settlement sum. The present Settlement Agreement provides that Plaintiff "agrees to pay the sum of Ten Million U.S. Dollars . . . to 500 Group within fourteen (14) business days," six million of which constitutes payment for Plaintiff's purchase of all patents, and four million of which constitutes a fixed-fee payment for future royalties. Doc. 24-1 at 3. The Agreement further states that payment of the sum of one million dollars should be wired to one account, and payment of the sum of nine million dollars should be wired to another. There is no mention of deductions or withholdings from those amounts.

In *White Rose*, the Second Circuit found that silence on this similar issue could be characterized as an ambiguity in the contract; reading the contract to state otherwise, without more, was reversible error. To be sure, there are several differences between *White Rose* and the present case which can ultimately serve to distinguish that case from the circumstances here. Importantly, however, one must remember that the present case is in its initial stages. On a motion to dismiss, the

Court is not only required to accept Plaintiff's allegations as true, but also to draw all reasonable inferences in favor of Plaintiff. Guided by those principles, Plaintiff has sufficiently alleged that the Agreement's silence on the tax issue is an ambiguity.

The cases that Defendants cite do not lead me to a different conclusion. In support of the proposition that a court will not modify a settlement agreement to account for taxes, Defendants refer the Court to a series of cases that involve the confirmation of arbitration awards. *See* Doc. 32 at 4, 4 n.1. However, a district court's review of an arbitration award is "severely limited." *R & Q Reinsurance Co. v. Utica Mut. Ins. Co.*, 18 F. Supp. 3d 389, 392 (S.D.N.Y. 2014).

Although Defendants repeatedly contend that in such cases, the district court "refused" to modify the arbitration award, those courts in fact found that they were without power to do so under the Federal Arbitration Act. *See Pyne v. IMG Coll., LLC*, No. 8:14-CV-340-T-17(EAJ), 2014 WL 5810981, at *4 (M.D. Fla. Nov. 7, 2014) (in finding that the defendants' "actions of withholding taxes resulted in an impermissible, unilateral modification of the arbitration award," the Florida Court noted that it was "powerless to vacate, modify, or correct the original arbitration award, and must confirm it in its present form"); *Hudson v. Merrill Lynch Int'l Fin. Inc.,* No. CIV.A. 12-052, 2012 WL 5877960, at *3 (E.D. La. Nov. 20, 2012) (noting that the moving party had "not argued or established that the award is subject to modification by the Court for any of the narrow reasons set out in the Federal Arbitration Act," the court declined to address modification); *Barker v. Halliburton Co.,* No. CIVA H-07-2677, 2010 WL 1791107, at *1 (S.D. Tex. May 4, 2010) (finding that the court was without power to vacate or modify an arbitration award to account for taxes under the Federal Arbitration Act, noting that "[e]ven if the arbitrator was incorrect—and this court does not so hold—regarding the distribution of the award between the plaintiff and the federal

government, that mistake of law would be insufficient grounds to vacate or modify the award"). Here, the case arises from the implementation of a Settlement Agreement – which, as noted above, is a contract. The cases cited by Defendants are inapposite. In the case at bar, this Court is not subject to or bound by the Federal Arbitration Act; the Court is simply guided by the principles underlying the common law.

Defendants also cite to an unreported Northern District of California case as authority for the proposition that a settlement agreement that is silent on the issue of tax withholdings should be read to require the sum net of the taxes to be paid. Ruling on a motion to enforce a settlement agreement, the Magistrate Judge in *Pizza v. Fin. Indus. Regulatory Auth., Inc*., No. 13-CV-0688(MMC)(NC), 2015 WL 1383142, at *1 (N.D. Cal. Mar. 19, 2015) found that the settlement terms in that case failed to set forth the parties' tax obligations. Citing Ninth Circuit law, the Court ordered the defendant to pay the full amount provided for under the terms of the agreement. While the case appears analogous, I am bound by the law of the Second Circuit, and I find the reasoning in the *White Rose* case to be more persuasive and on point.

The Court finds that Plaintiff has sufficiently alleged that there exists ambiguity in the terms of the Settlement Agreement. Accordingly, Plaintiff's breach of contract claim is not ripe for dismissal. *See Orchard Hill Master Fund Ltd.*, 830 F.3d at 156.

2.    Modification

Plaintiff's Amended Complaint also alleges that the Settlement Agreement was modified by subsequent signed electronic writings, a point that Defendants contest.

"Under New York law, 'parties may modify a contract by another agreement, by course of performance, or by conduct amounting to waiver or estoppel.'" *Kaplan v. Old Mut. PLC*, 526 F.

App'x 70, 72 (2d Cir. 2013) (quoting *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 783 (2d Cir.2003)). "Contract modification requires proof of each element requisite to the formation of a contract, including a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Kaplan*, 526 F. App'x at 72 (quoting *Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*, 93 N.Y.2d 584 (1999)).

Where a contract prohibits oral modifications, any subsequent modification must not only be in writing, but also must be signed by the party against whom enforcement is sought. N.Y. Gen. Oblig. Law § 15-301 ("A written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent."). The Settlement Agreement in suit contains such a prohibition. Paragraph 6(a) mandates: "This Agreement and Mutual Release may not be modified except by a writing signed by both Parties hereto." Doc. 24-1 at 8. In New York, a contract can be modified by the exchange of emails, as emails may constitute "signed writings" within the meaning of the statute of frauds. *Stevens v. Publicis, S.A.*, 50 A.D.3d 253, 254-55 (2008). *See also Rubinstein v. Clark & Green, Inc.*, 395 F. App'x 786, 788 (2d Cir. 2010) ("While an exchange of emails may constitute a binding contract under New York law, that is not the case where the parties contemplate further negotiations and the execution of a formal instrument." (quotation marks and citations omitted)).

Here, Plaintiff plausibly alleges that through the exchange of signed electronic writings – or emails – after the execution of the Settlement Agreement, the parties modified the Agreement to account for the withholding of funds for tax purposes. Plaintiff alleges that in mutually-signed electronic writings, the parties agreed: (1) to delay payment of the amount due under the Settlement

Agreement so that the parties could obtain pre-approval from the Israeli government for structuring a reduced amount of withholding; (2) that the four million dollar payment for royalties should be taxed at a rate of 15%; (3) that the six million dollar payment for patent rights should not be taxed; (4) that if the pre-approval was obtained, the total tax burden of $600,000 would be withheld by Plaintiff and remitted to the Israeli tax authority; (5) to continue to seek preapproval for the tax withholdings under the Settlement Agreement as originally executed, rather than re-execute the Agreement to account for separate payments; and (6) that Defendant Tiramani would return the $600,000 overpayment.

Accepting the above allegations as true for the purposes of this motion, they are sufficient to assert a claim of breach of contract based on a modification of the original Settlement Agreement. Plaintiff has alleged the existence of a written agreement that the sum in question would be withheld from the amount due under the Settlement Agreement, and that the parties did not contemplate the execution of an additional formal agreement. Plaintiff has further alleged that following the mistaken overpayment, the parties agreed that Defendants would return the money. These agreements were memorialized in written form, signed by the parties. Under prevailing New York law, together with the remaining allegations concerning performance, breach, and damages, Plaintiff's allegations regarding the formation of the agreement are sufficient to support a claim for breach of contract.

Defendants' arguments on this point are unavailing. Defendants contend that the allegations in the Amended Complaint fall short of alleging a modification of the Settlement Agreement, because, *inter alia*, Plaintiff "fail[s] to identify a single mutually-signed writing containing" the terms of the modification. Doc. 32 at 5. I do not agree. The allegations in the Amended Complaint clearly state that the "parties' agreement relating to the tax withholdings" was "confirmed . . . multiple times

in writing, such as in emails signed by Tiramani and other agents of 500 Group." Doc. 24 ¶18. Further, "[i]n a signed electronic writing on behalf of 500 Group, Tiramani agreed" to not re-execute the Settlement Agreement and instead "seek preapproval for the tax withholdings under the Settlement Agreement as originally executed." *Id.* ¶ 20. "[I]f pre-approval was obtained, 500 Group's total tax burden would be $600,000, which, according to signed electronic agreements between the parties, would be withheld by Stanley Israel and remitted to the Israeli tax authority." *Id.* ¶ 15. Once pre-approval for withholding 15% of the royalty payment under the Settlement Agreement was obtained from the Israeli tax authority, "500 Group agreed that Stanley Israel was to retain $600,000 from the payment total under the Settlement Agreement to fulfill 500 Group's tax obligations and its pre-approval arrangements with the Israeli tax authority." *Id.* ¶ 21.

Plaintiff also alleges that the parties agreed for Defendants to refund the sum erroneously transferred to Defendants. The Amended Complaint states that after Plaintiff mistakenly wired the overpayment of $600,000 to 500 Group, Defendant Tiramani "indicated, in a signed electronic writing, an intention to return the $600,000 and inquired regarding the logistics of the return. . . . Stanley Works answered Tiramani's logistical inquiry *and reached agreement* on how the money should be returned. . . ." Doc. 30 ¶ 30 (emphasis added). These allegations, taken together, clearly state the existence of signed writings, and set forth the terms of the modifications. At the pleading stage, such allegations are sufficient to survive dismissal.

Defendants also argue that a valid modification would have to identify the consideration for the modification. However, "[w]hile consideration is required for a contract to be valid, modifications to a contract need not be supported by additional consideration when the modification is in writing and signed by the party against whom it is sought to be enforced." *LaRoss Partners,*

*LLC v. Contact 911 Inc.*, No. 11-CV-1980(ADS), 2015 WL 2452616, at *7 (E.D.N.Y. May 21, 2015) (quoting *Deutsche Bank Sec., Inc. v. Rhodes,* 578 F. Supp. 2d 652, 660 (S.D.N.Y. 2008) (quotation marks omitted).

Defendants also take issue with the fact that Plaintiff did not attach the alleged signed writings to the Amended Complaint, arguing that the failure to do so is "fatal to its claim that the parties entered into an enforceable agreement to modify the terms of the Settlement Agreement." Doc. 32 at 6; *see also* Doc. 27 at 11, 16. Defendants' argument on this point suggests that Plaintiff was under a heightened duty to attach said writings to the Amended Complaint, upon learning of Defendants' grounds for dismissal of the original complaint. In a clearly aggrieved tone, Defendants state that

> Notably, Plaintiff does not identify a single writing evidencing an agreement to modify the terms of the Settlement Agreement and for Plaintiff to pay 500 Group any amount less than the Compensation Amount. This omission is particularly glaring given the procedural posture of this case. . . . Plaintiff's Amended Complaint and the various allegations relating to emails . . . is a direct response to Defendants' motion to dismiss the original complaint. Plaintiff, knowing Defendants' arguments in support of dismissal, took the opportunity to amend its complaint to marshal all of its factual support for the existence of . . . an agreement to modify the plain terms of the Settlement Agreement. The paucity of specific allegations in Plaintiff's Amended Complaint demonstrates the futility of its claim.

Doc. 27 at 29.[3]

_____

[3] To the extent that Defendants are arguing that Plaintiff's inclusion of additional factual allegations in response to Defendants' original motion to dismiss was somehow improper, the Court notes that under the Federal Rules, such an amendment is not only permissible, it is encouraged. The Federal Rules of Civil Procedure provide that a party may amend its pleading once, as a matter of course, within "21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(1). This Rule "reinforces one of the basic policies of the federal rules—that pleadings are not an end in themselves but are only a means to assist in the presentation of a case to enable it to be decided on the merits." 6 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1473 (3d ed. 2018) (footnotes omitted). Indeed,

Defendants' position does not find support in the pleading standard. Under the Federal Rules of Civil Procedure, a complaint must only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). As the Second Circuit has stated, "although *Twombly* and *Iqbal* require factual amplification where needed to render a claim plausible, . . .*Twombly* and *Iqbal* [do not] require the pleading of specific evidence or extra facts beyond what is needed to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120–21 (2d Cir. 2010). Thus, in deciding a motion to dismiss, the Court's function "is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

In line with these principles, although the court may consider a document incorporated by reference to the complaint in evaluating the plausibility of the claims alleged, *Chambers v. Time Warner*, 282 F.3d 147, 153 (2d Cir. 2002), there is no general *requirement* that a plaintiff attach to the complaint the documents it relies upon in bringing suit. Thus, a plaintiff is not required to attach a copy of a contract to a complaint that alleges breach of that contract. *Stratton Grp., Ltd. v.*

---

a Rule 15(a)(1) amendment cannot prejudice an opposing party in any significant way. . . . If the amendment is made 21 days after a responsive pleading or a Rule 12 motion, the amended response may reduce the number of issues to be decided and expedite other pretrial proceedings, as well as the determination of the issues involved.

*Id.* at § 1480 (footnote omitted).

"The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Foman v. Davis*, 371 U.S. 178, 181–82 (1962) (quotation marks omitted) (quoting *Conley v. Gibson*, 335 U.S. 41, 48 (1957)). Thus, Plaintiff's decision to replead its claims in response to Defendants' motion to dismiss is not just proper, it is prescribed and promoted by the Federal Rules. Moreover, if the original complaint was subject to dismissal for reasons that could be cured, any dismissal would have been without prejudice, giving Plaintiff an opportunity to replead those claims.

*Sprayregen,* 458 F. Supp. 1216, 1218 (S.D.N.Y. 1978). *See also In re Argo Commc'ns Corp.*, 134 B.R. 776, 790 (Bankr. S.D.N.Y. 1991) ("Courts in this jurisdiction follow the general rule that in a breach of contract action, the plaintiff must plead provisions of the contract upon which the claim is based, but the plaintiff is not required to attach a copy of the contract or plead its terms verbatim." (citations omitted)). Ultimately, it may be shown that the subject "signed writings" do not evidence that which Plaintiff claims; but Plaintiff is under no obligation to offer them as evidence of its claims at the pleading stage.

3.    Oral Modification

Plaintiff also argues that the Amended Complaint alleges a valid oral modification of the Settlement Agreement, which the parties acted upon to completion, or partial completion. Relying on a New York Court of Appeals case, *Rose v. Spa Realty Associates*, 42 N.Y.2d 338, 343 (1977), Plaintiff contends that the following allegations found in the Amended Complaint evidence the parties' performance under an oral agreement: The fact that the parties worked together to achieve approval from the Israeli tax authority for the agreed-upon withholding amount; and the fact that Plaintiff remitted $600,000 to the Israeli tax authority. Plaintiff argues that Defendant 500 Group's actions in hiring a third party to assist it in obtaining preapproval for a specific withholding amount demonstrate the existence of such an agreement, and the parties' performance in seeking preapproval for 15% of the four million dollar sum is referable to the claimed modification.

Defendant contends that these allegations do not support performance of an agreement for Plaintiff to pay less than the ten million dollar sum under the Settlement Agreement. Defendant argues that Plaintiff's failure to initially withhold the money and its later claim that payment of the full amount was a mistake do not show partial performance that is unequivocally referable to the oral

modification, as *Rose* requires.

*Rose* held that "[p]artial performance of an oral agreement to modify a written contract, if unequivocally referable to the modification, avoids the statutory requirement of a writing." 42 N.Y.2d at 341. The Court in *Rose* explained:

> Parties to a written agreement who include a proscription against oral modification are protected by subdivision 1 of section 15-301 of the General Obligations Law. Any contract containing such a clause "cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement . . . is sought." Put otherwise, if the only proof of an alleged agreement to deviate from a written contract is the oral exchanges between the parties, the writing controls. Thus, the authenticity of any amendment is ensured.

> On the other hand, when the oral agreement to modify has in fact been acted upon to completion, the same need to protect the integrity of the written agreement from false claims of modification does not arise. In such case, not only may past oral discussions be relied upon to test the alleged modification, but the actions taken may demonstrate, objectively, the nature and extent of the modification. Moreover, apart from statute, a contract once made can be unmade, and a contractual prohibition against oral modification may itself be waived. Thus, section 15-301 nullifies only "executory" oral modification. Once executed, the oral modification may be proved.

> Where there is partial performance of the oral modification sought to be enforced, the likelihood that false claims would go undetected is similarly diminished. Here, too, the court may consider not only past oral exchanges, but also the conduct of the parties. But only if the partial performance be unequivocally referable to the oral modification is the requirement of a writing under section 15-301 avoided.

*Id.* at 343–44 (internal citations omitted). The "unequivocally referable" requirement has been explained as thus: "[T]he performance must be such as will admit of no other possible explanation except one pointing directly to the existence of the oral agreement claimed." *Bright Radio Labs., Inc. v. Coastal Commercial Corp.*, 4 A.D.2d 491, 494 (1957), *aff'd sub nom. Bright Radio Labs., Inc v. Costal Commercial Corp.,* 4 N.Y.2d 1021 (1958).

Here, Plaintiff sufficiently alleges the existence of an oral modification to the Settlement Agreement that was partially performed. The facts alleged in the Amended Complaint tell of an

agreement to "delay the payment of the amount due on the Settlement Agreement so that the parties could obtain pre-approval for structuring a reduced amount of withholding," and if pre-approval was obtained, $600,000 "would be withheld by Stanley Israel and remitted to the Israeli tax authority." Doc. 24 at ¶ 15. Plaintiff alleges that there was partial performance of this agreement, as the payment on the Settlement Agreement was due "within fourteen (14) business days of the Effect Date of [the] Agreement and Mutual Release," Doc. 24-1 at 4, but payment was not effectuated until June 1, 2017, Doc. 24 at ¶ 25, inconsistent with the terms of the original Settlement Agreement. Plaintiff alleges that but for Plaintiff's accidental overpayment, such payment should have been for $9,400,000, a sum less than the amount due under the plain terms of the Settlement Agreement, so that Plaintiff could effectuate the remainder of terms of the oral modification - to remit the $600,000 to the Israeli tax authority on behalf of 500 Group. Assuming the truth of these allegations, they are sufficient to establish the existence of a valid oral modification.

4.    Equitable Estoppel

Finally, Plaintiff contends that Defendant 500 Group is equitably estopped from denying the existence of an oral modification regarding the tax withholdings. In *Rose*, the Court of Appeals stated that "when a party's conduct induces another's significant and substantial reliance on the agreement to modify, albeit oral, that party may be estopped from disputing the modification notwithstanding the statute." *Rose*, 42 N.Y.2d at 341. However, "for conduct to amount to a waiver or estoppel, it must not otherwise be compatible with the agreement as written; rather, the conduct of the parties must evidence an indisputable mutual departure from the written agreement." *Dallas Aerospace, Inc.*, 352 F.3d at 783 (quotation marks and citations omitted); *see also Aircraft Servs. Resales LLC v. Oceanic Capital Co.*, 586 F. App'x 761, 763 (2d Cir. 2014) ("To invoke equitable

estoppel, the parties' conduct must not otherwise be compatible with the agreement as written." (quotation marks and citation omitted)).

Plaintiff argues that Defendant 500 Group induced Plaintiff's substantial reliance on the parties' understanding regarding the tax treatment of the royalty payment made under the Settlement Agreement. Plaintiff points to the allegations that Plaintiff assisted Defendant in obtaining preapproval for the withholding amount, and "thereby obligated itself to later remit $600,000 to the Israeli authority." Doc. 29 at 18. For its part, Defendant contends that its refusal to return a portion of the settlement payment was consistent with the four corners of the Settlement Agreement. Defendant also argues that the allegations establish that Plaintiff remitted the money to the Israeli tax authority *after* Defendant 500 Group refused Plaintiff's demand to return the alleged overpayment; thus, Plaintiff cannot allege to have relied on 500 Group's representations to its detriment.

Assuming the truth of the well-pleaded facts, the Court finds that Plaintiff has adequately alleged the existence of an oral modification of the Settlement Agreement, which induced Plaintiff to ultimately remit $600,000 on behalf of Defendant 500 Group to the Israeli tax authority. Drawing all inferences in Plaintiff's favor, Plaintiff has sufficiently alleged it was induced by Defendants' agreement to allocate $600,000 of the four million dollar royalty payment to the Israeli tax authority.

Accordingly, accepting Plaintiff's allegations as true and drawing all plausible inferences in Plaintiff's favor, Plaintiff has sufficiently alleged a claim of breach of contract. Defendants' motion to dismiss the breach of contract claim will be denied.

## C.    Unjust Enrichment

In the alternative, Plaintiff contends that the Amended Complaint sufficiently alleges a claim

for unjust enrichment. Defendant argues for dismissal of this claim, contending that since the claim arises under an enforceable written contract, it fails as a matter of law.

Unjust enrichment is doctrine derived from equity. "The basis of a claim for unjust enrichment is that the defendant has obtained a benefit which in equity and good conscience should be paid to the plaintiff." *Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 790 (2012). To state a claim for unjust enrichment under New York law, Plaintiff must allege that "(1) the defendant was enriched, (2) at the expense of the plaintiff, and (3) that it would be inequitable to permit the defendant to retain that which is claimed by the plaintiff." *Agerbrink v. Model Serv. LLC*, 155 F. Supp. 3d 448, 458 (S.D.N.Y. 2016) (quotation marks and citation omitted).

> [U]njust enrichment is not a catchall cause of action to be used when others fail. It is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff. Typical cases are those in which the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled. An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim.

*Corsello*, 18 N.Y.3d at 790 (quotation marks and internal citations omitted). Thus, in New York, a claim for unjust enrichment "is barred if there is a valid contract governing the subject matter of the dispute, even if one of the parties to the claim is not a party to that contract." *Mueller v. Michael Janssen Gallery Pte. Ltd.*, 225 F. Supp. 3d 201, 207 (S.D.N.Y. 2016) (quotation marks and citation omitted) (collecting cases).

Here, the parties dispute whether the Settlement Agreement covers the subject matter of the unjust enrichment claim: the $600,000 tax withholding/overpayment. While Plaintiff has alleged that Settlement Agreement – as originally executed or as modified – obligated it to withhold a certain sum for tax purposes, and it is therefore entitled to a refund of the overpayment, Defendants contend

that the Settlement Agreement contains no reference to withholding any portion of the settlement sum for the payment of taxes, and thus, there was no overpayment, and there exists no obligation under the contract for Defendant to return any funds. The parties are therefore at odds as to whether the Settlement Agreement governs the parties dispute.

In the event that the fact-finder disagrees with Plaintiff that the Settlement Agreement contemplated tax withholding, Plaintiff is entitled to pursue a claim for unjust enrichment, in the alternative. *See Singer v. Xipto Inc.*, 852 F. Supp. 2d 416, 426 (S.D.N.Y. 2012) ("While a party generally may not simultaneously recover upon a breach of contract and unjust enrichment claim arising from the same facts, it is still permissible to plead such claims as alternative theories." (citations omitted)). In situations similar to the case at hand, courts have permitted such pleading in the alternative. *See, e.g.*, *DeWitt Stern Grp., Inc. v. Eisenberg*, 14 F. Supp. 3d 480, 487 (S.D.N.Y. 2014) ("[I]f the contractual language in the [contract] is unenforceable, or if discovery yields evidence that [the alleged misconduct occurred] extraneously to and independently of the Employment Agreement, it is possible that [Defendant] benefited . . . , and that equity and good conscience might require restitution. . . . Thus, [Plaintiff's] unjust enrichment claim may stand in the alternative to its contractual claims."); *Union Bank, N.A. v. CBS Corp.*, No. 08-CV-08362(PGG), 2009 WL 1675087, at *8 (S.D.N.Y. June 10, 2009) (declining to dismiss the claim for unjust enrichment where the contracts at issue did not unambiguously address the precise issue in dispute); *Bridgeway Corp. v. Citibank, N.A.*, 132 F. Supp. 2d 297, 305 (S.D.N.Y. 2001) ("Generally, quasi-contractual relief, such as unjust enrichment, is not permitted when an express agreement exists that governs the dispute between the parties. Because there is a dispute as to defendant's obligations under the contract, however, plaintiff's unjust enrichment claim survives, although solely

as an alternative to the breach of contract claim." (internal citation omitted) (collecting authorities));

*ESI, Inc. v. Coastal Power Prod. Co.*, 995 F. Supp. 419, 436 (S.D.N.Y. 1998) ("Should a jury decide that these contracts did not grant [plaintiff] enforceable rights against the defendants, [plaintiff] could still seek recovery on the alternative, quasi-contract theory of unjust enrichment.").

Accordingly, Defendants are not entitled to dismissal on Plaintiff's claim for unjust enrichment.

### D.     Unfair Trade Practices

Plaintiff's Amended Complaint alleges that Defendants' conduct violates the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b *et seq.* Defendants argue that CUTPA does not apply to this case because the choice of law principles dictate an application of New York law, and because Plaintiff's claim does not involve trade or commerce occurring in Connecticut. Defendants also argue that the CUTPA claim fails because the Amended Complaint does not plausibly allege that violative conduct occurred in the primary trade or commerce of either party.

CUTPA prohibits any person from engaging in "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). The statute defines 'trade' and 'commerce' as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." *Id.* at § 42-110a(4). To prevail its CUTPA-based claim, Plaintiff must prove that: "(1) [Defendants] engaged in 'unfair or deceptive' acts or practices in the conduct of trade or commerce, and that (2) [Plaintiff] has suffered an 'ascertainable loss of money or property.'" *Indiaweekly.com, LLC v.*

*Nehaflix.com, Inc.*, No. 07-CV-0194 (TLM), 2011 WL 13228167, at *12 (D. Conn. Jan. 19, 2011) (citations omitted).

> It is well settled that in determining whether a practice violates CUTPA [the Supreme Court of Connecticut has] adopted the criteria set out in the cigarette rule by the Federal Trade Commission for determining when a practice is unfair: (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, competitors or other businesspersons. All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. Thus a violation of CUTPA may be established by showing either an actual deceptive practice or a practice amounting to a violation of public policy. In order to enforce this prohibition, CUTPA provides a private cause of action to any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a prohibited method, act or practice.

*Ulbrich v. Groth*, 310 Conn. 375, 409–10 (2013) (quotation marks, citation and alterations omitted).[4]

A strict reading of the statute supports the conclusion that CUTPA requires that the violative conduct complained of occur in Connecticut. Courts addressing the issue, however, have permitted an out-of-state violation to serve as the basis for a CUTPA claim where the violation itself "is tied to a form of trade or commerce intimately associated with Connecticut, or if, where Connecticut choice of law principles are applicable, those principals dictate application of Connecticut law." *Victor G. Reiling Assocs. & Design Innovation, Inc. v. Fisher-Price, Inc.*, 406 F. Supp. 2d 175, 200 (D. Conn. 2005) (quotation marks and citations omitted), *opinion adhered to as modified on reconsideration*, 409 F. Supp. 2d 112 (D. Conn. 2006). *See, e.g., Edwards v. N. Am. Power & Gas,*

---

[4] Conn. Gen. Stat. § 42-110b(b) provides in relevant part that "the commissioner and the courts of this state shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act (15 USC 45(a)(1)), as from time to time amended."

*LLC*, 120 F. Supp. 3d 132, 145 (D. Conn. 2015); *Bulldog New York LLC v. Pepsico, Inc.* 8 F. Supp. 3d 152, 166 (D. Conn. 2014); *PTI Assocs., LLC v. Carolina Int'l Sales Co.,* No. 3:09-CV-849(WWE), 2010 WL 363330, at *5-6 (D. Conn. Jan. 26, 2010), *order clarified on reconsideration*, No. 3:09-CV-949(WWE), 2010 WL 617374 (D. Conn. Feb. 18, 2010); *Titan Sports, Inc. v. Turner Broad. Sys., Inc.*, 981 F. Supp. 65, 71 (D. Conn. 1997); *Uniroyal Chem. Co. v. Drexel Chem. Co.*, 931 F. Supp. 132, 140 (D. Conn. 1996).

The Court has already addressed Defendants' contention regarding the choice of law, and has determined that such an inquiry is premature. Accordingly, the Court will not dismiss Plaintiff's CUTPA claim on the basis that the violation in question did not occur in Connecticut, or that Connecticut law does not apply.

The Court turns to Defendants' second argument for dismissal: That the alleged violation did not arise out of Defendants' primary trade or commerce. Defendant argues that the Amended Complaint solely alleges conduct that occurred in connection with the retention of funds arising from the settlement of an arbitration; litigation or arbitration is not Defendants' primary trade or commerce. Plaintiff responds that the "receipt of royalty payments and the monetization of intellectual property rights represent the very core of [Defendant 500 Group's] business" and thus, the transaction is within Defendants' primary trade or commerce. Doc. 29 at 22.

In connection with its claim for a violation of CUTPA, Plaintiff's Amended Complaint alleges that 500 Group's unfair retention of the $600,000 overpayment was directed by Defendant Tiramani, who "holds a malicious grudge against Stanley Israel arising out of a nearly decade-long dispute . . . evidenced in Tiramani's written communications . . . ." Doc. 24 ¶ 45, 49. Defendants knew they were not entitled to keep the overpayment, but "resolved to attempt to illegally retain" the

sum "without justification." *Id.* ¶ 50. Plaintiff concludes that the refusal to return the money was

made "out of malice and in bad faith for the sole purpose of unlawfully harming Stanley Israel." *Id.*

¶ 52.

"[A] CUTPA violation may not be alleged for activities that are incidental to an entity's

primary trade or commerce." *McCann Real Equities Series XXII, LLC v. David McDermott*

*Chevrolet, Inc.*, 93 Conn. App. 486, 523 (2006), *cert. denied*, 277 Conn. 928 (2006).

> In applying the holding of *McCann* to CUTPA claims arising out of litigation
> activity, it is . . . consistent with prior caselaw and . . . reasonable to ask whether the
> *subject matter* of the underlying litigation activity is merely incidental to the
> defendant's primary trade or whether by engaging in such litigation the defendant
> sought to obtain some benefit directly related to its primary trade. On this approach,
> litigation may be adequately related to one's primary trade to satisfy the rule in
> *McCann* even though litigation itself is not one's primary trade.

*Passaro-Henry v. Allstate Ins. Co.*, No. 3:10-CV-450(JCH), 2010 WL 5174405, at *10 (D. Conn.

Dec. 15, 2010) (emphasis supplied). *Passero-Henry* dealt primarily with a CUTPA claim based the

filing of frivolous lawsuits; it was the fact of the underlying lawsuit itself that formed the basis of

the CUTPA claim. I find the approach taken in *Passero-Henry* persuasive here.

In the present case, the Amended Complaint alleges that the subject matter of the underlying

arbitration and resultant settlement was directly related to Defendants' primary trade. The Settlement

Agreement provided for a payment of six million dollars for Defendant 500 Group's patent rights and

four million dollars as a royalty payment. The Amended Complaint likens the Settlement Agreement

to the parties' prior License Agreements. Accepting Plaintiff's allegations as true, as I am bound to

do, the conduct that forms the basis of the CUTPA claim – the wrongful retention of the money

associated with the settlement sum– is directly connected to the Defendants' primary trade of "the

receipt of royalty payments and the monetization of intellectual property rights." Doc. 24 ¶ 32.

Accordingly, the Court will not dismiss the CUTPA claim on this basis.

Finally, Defendant appears to raise the argument that Plaintiff's CUTPA claim fails because the factual allegations supporting the CUTPA claim are identical to those which form the basis for Plaintiff's breach of contract claim. A "simple contract breach is not sufficient to establish a violation of CUTPA, particularly where the count alleging CUTPA simply incorporates by reference the breach of contract claim and does not set forth how or in what respect the defendant's activities are either immoral, unethical, unscrupulous or offensive to public policy." *Boulevard Assocs. v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1039 (2d Cir. 1995) (quotation marks and citation omitted) (collecting cases). Applying that principle to the facts of the case before it, the Second Circuit continued: "Because a breach of contract standing alone does not offend public policy, to invoke CUTPA, Boulevard was required to show that the defendants engaged in some conduct that was more offensive than simply not paying the rent." *Id.* at 1039.

Thus, following *Boulevard Associates*, "Connecticut courts have permitted a CUTPA cause of action based on a breach of contract where there are aggravating circumstances attending the breach . . . ." *Caires v. JP Morgan Chase Bank, N.A.*, 880 F. Supp. 2d 288, 300 (D. Conn. 2012). "Significant aggravating circumstances can be the refusal to perform under the contract while retaining the benefits, modification under duress, misrepresentations in formation, and egregious breach." *Halo Tech. Holdings, Inc. v. Cooper,* No. 3:07-CV-489(SRU), 2010 WL 1330770, at *7 (D. Conn. Mar. 31, 2010) (internal citations omitted).

In the present case, Plaintiff's Amended Complaint plausibly alleges that Defendants' malicious and intentional retention of Plaintiff's funds is "more offensive than simply not paying" Plaintiff the money owed to it under the Settlement Agreement. *Boulevard Assocs.*, 72 F.3d at 1029.

The CUTPA claim alleges that Defendant Tiramani acted out of bad faith and malice in retaining the overpayment, due to a "malicious grudge" that Tiramani holds against Plaintiff "arising out of the nearly decade-long dispute" under the License Agreements. Doc. 24 ¶ 49, 51. Further, Defendants "knew that they were not entitled to retain the $600,000 overpayment," and Tiramani had "initially expressed an intention to return" the money in question, "before he stopped responding to Stanley Israel's requests and resolved to attempt to illegally retain the $600,000 without justification." *Id.* ¶ 50.

Such allegations are sufficient at the present stage in the litigation to state a claim under CUTPA, separate and apart from the breach of contract claim. Accordingly, Defendants' motion to dismiss the CUTPA claim will be denied.

### E.  Conversion

Defendants also move to dismiss the count alleging the tort of conversion. Conversion is the "unauthorized dominion over personal property in interference with a plaintiff's legal title or superior right of possession." *LoPresti v. Terwilliger*, 126 F.3d 34, 41 (2d Cir. 1997) (quotation marks and citation omitted). To state a claim for conversion under New York law, a plaintiff must allege that "(1) the party charged has acted without authorization, and (2) exercised dominion or a right of ownership over property belonging to another, (3) the rightful owner makes a demand for the property, and (4) the demand for the return is refused." *Pac. M. Int'l Corp. v. Raman Int'l Gems, Ltd.*, 888 F. Supp. 2d 385, 396 (S.D.N.Y. 2012) (quotation marks and citation omitted).

Defendants contend that Plaintiff's conversion claim fails because it is duplicative of the breach of contract claim, and because "Plaintiff fails to allege a specific, identifiable fund" to which it is entitled. Doc. 27 at 41. Plaintiff contends that by alleging that the retention of the money was

done in bad faith, it has sufficiently established that Defendants' actions were beyond a simple breach of contract. Plaintiff also argues that it has sufficiently alleged the existence of specifically identifiable funds that were the subject of conversion.

"As a general rule, a breach of contract claim is not actionable in tort in the absence of special additional allegations of wrongdoing which amount to a breach of a duty distinct from, or in addition to, the breach of contract." *Carroll v. Bayerische Landesbank*, 150 F. Supp. 2d 531, 535 (S.D.N.Y. 2001) (quotation marks and citations omitted); *see also Morrison v. Buffalo Bd. of Educ.*, No. 17-3496-CV, 2018 WL 3455910, at *3 (2d Cir. July 17, 2018) (noting that "tort liability requires a legal duty independent of the contract itself" which "must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract" (quotation marks and citations omitted)).

Thus, a "conversion action cannot be predicated on an equitable interest or a mere breach of contractual obligation." *Traffix, Inc. v. Herold*, 269 F. Supp. 2d 223, 228 (S.D.N.Y. 2003) (citations omitted); *see also Moses v. Martin*, 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004) ("[A]n action for conversion cannot be validly maintained where damages are merely being sought for breach of contract. Rather, a plaintiff must show acts that were unlawful or wrongful as opposed to mere violations of contractual rights." (quotation marks and footnotes omitted)).

Here, Plaintiff's Amended Complaint identifies no separate legal duty, sounding in tort, independent of the contractual relations that has been violated. Plaintiff's conversion claim rests on the same set of facts that underlie Plaintiff's claims for breach of contract, or, in the alternative, unjust enrichment. The money that is claimed to be wrongfully retained is the same money Plaintiff claims was due under the parties' agreement.

Moreover, if Plaintiff prevails on the breach of contract claim – or, in the alternative, its unjust enrichment claim – it will be fully compensated. Accordingly, the conversion claim is duplicative. *See Citadel Mgmt. Inc.* at 149; *AD Rendon Commc'ns, Inc. v. Lumina Americas, Inc.*, No. 04-CV-8832(KMK), 2006 WL 1593884, at *5 (S.D.N.Y. June 7, 2006) ("Where no additional damages would be awarded for prevailing on the conversion claim, it cannot be distinct from the breach of contract claim." (citations omitted)).[5]

Accordingly, the claim for conversion will be dismissed.

## F.    Civil Theft Claim

Defendants move to dismiss Plaintiff's claim for civil theft on two grounds: that Connecticut law does not apply, and for the same reasons Defendant raises in connection with Plaintiff's claim for conversion.

_____

[5] In *AR Rendon Commc'ns, Inc.*, the court notes that where a plaintiff seeks punitive damages under a conversion claim, it can qualify as a unique recovery, thereby making the claim independent of the contractual claim. In New York, a court will permit a claim for punitive damages arising from a breach of contract where: (1) the defendant's conduct is actionable as a tort independent of the contract; (2) the tortious conduct is sufficiently egregious; (3) the egregious conduct is directed at plaintiff; and (4) the conduct is part of a pattern directed at the public generally. *Id.* at *6 (citing *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 316 (1995)); *see also Icebox-Scoops, Inc. v. Finanz St. Honore, B.V.*, 715 F. App'x 54, 56 (2d Cir. 2017) (same). "In determining whether the fourth requirement is satisfied, the New York Court of Appeals has invoked a distinction between a gross and wanton fraud upon the public and an isolated transaction incident to an otherwise legitimate business, the latter of which does not constitute conduct aimed at the public generally." *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 226 (2d Cir. 2017) (quotation marks and citations omitted). Here, Plaintiff seeks punitive damages based on CUTPA and "the common law." However, there are no allegations that the conduct is part of a pattern directed at the public. As this dispute is clearly between the parties – "an isolated transaction incident to an otherwise legitimate business" – and as the alleged wrongful retainment of money was not aimed at the public generally, the request for punitive damages does not serve to make the conversion claim independent of the breach of contract claim. *See TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 93 n.10, 94–95 (2d Cir. 2005) (setting aside a jury's award of punitive damages on a breach of contract claim as the conduct was not directed at the public generally, and not actionable as an independent tort).

In Connecticut, statutory or civil theft is synonymous with larceny, and makes liable for treble damages any person who steals any property of another, or knowingly receives and conceals stolen property." *Vossbrinck v. Eckert Seamans Cherin, & Mellott, LLC*, 301 F. Supp. 3d 381, 391 (D. Conn. 2018) (quotation marks and citation omitted).[6] "The elements of civil theft are largely the same as the elements to prove the tort of conversion, but theft requires a plaintiff to prove the additional element of intent over and above what he or she must demonstrate to prove conversion." *Id.* (quotation marks omitted) (quoting *Sullivan v. Delisa*, 101 Conn. App. 605 (2007)). *See also Kopperl v. Bain*, 23 F. Supp. 3d 97, 108–09 (D. Conn. 2014) ("Conversion can be distinguished from statutory theft in two ways. . . : First, statutory theft requires an intent to deprive another of his property; second, conversion requires the owner to be harmed by a defendant's conduct. Therefore, statutory theft requires a plaintiff to prove the additional element of intent over and above what he or she must demonstrate to prove conversion." (quotation marks and citation omitted)).[7]

---

[6] Under Conn. Gen. Stat. § 53a-119, "[a] person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner."

[7] There is no appreciable difference between New York law and Connecticut law in regards to the tort of conversion. In Connecticut, "[c]onversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights." *Vossbrinck*, 301 F. Supp. 3d at 387 (quotation marks and citation omitted). To establish a claim of conversion in Connecticut, a plaintiff must allege that (1) the material at issue belonged to the plaintiff, (2) that the defendant deprived the plaintiff of that material for an indefinite period of time, (3) that the defendant's conduct was unauthorized and (4) that the defendant's conduct harmed the plaintiff. *News Am. Mktg. In-Store, Inc. v. Marquis*, 86 Conn. App. 527, 545, 862 A.2d 837, 848 (2004), *aff'd*, 276 Conn. 310, 885 A.2d 758 (2005). As with a New York claim for conversion, in Connecticut, a "mere allegation to pay money may not be enforced by a conversion action and an action in tort is inappropriate where the basis of the suit is a contract, either express or implied." *Aztec Energy Partners, Inc. v. Sensor Switch, Inc.,* 531 F. Supp. 2d 226, 230–31 (D. Conn. 2007) (quotation marks and citation omitted).

"If in order to sustain a claim for statutory theft, when coupled with a claim for conversion arising out of the same facts, a plaintiff must prove the additional element of intent over and above what he or she must demonstrate to prove conversion, it necessarily follows that a plaintiff who cannot prove conversion also cannot prove statutory theft." *Kopperl*, 23 F. Supp. 3d at 109 (quotation marks and citation omitted). Here, Plaintiff fails to sufficiently allege a claim for conversion; it follows that Plaintiff's claim for civil theft, which arises out of the same facts, cannot lie. *See id.; see also Vossbrinck*, 301 F. Supp. 3d at 391 ("For the same reasons that Plaintiff's conversion claim fails, his civil theft claim fails too.") Accordingly, the fifth count for civil theft will be dismissed.

## IV.     CONCLUSION

For the foregoing reasons, Defendants' *Motion to Dismiss* is GRANTED in part and DENIED in part. Plaintiff has adequately alleged a claim for: (1) breach of contract; (2) unjust enrichment; and (3) violations of CUTPA. Plaintiff's claims for conversion and civil theft are DISMISSED.

Defendants are directed to file their answer to the Amended Complaint on or before **August 17, 2018.**

It is SO ORDERED.

Dated: New Haven, Connecticut

August 1, 2018

 */s/ Charles S. Haight, Jr.*
CHARLES S. HAIGHT, JR.
Senior United States District Judge