UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Stanley Works Israel LTD. f/k/a Zag Industries, LTD.<br><br>Plaintiff,<br><br>vs.<br><br>500 Group, Inc. and Paolo Tiramani,<br><br>Defendants. | Case No. 3:17-cv-01765-CSH |

## AFFIDAVIT OF PAOLO TIRAMANI

Paolo Tiramani, being duly sworn, hereby deposes and says as follows:

1. I am over the age of eighteen years, and believe in the obligations of an oath.

2. I make this Affidavit based on my personal knowledge of and involvement in the matters set forth herein.

3. I am the President and sole shareholder of the Defendant, 500 Group, Inc. ("500 Group"), which is an intellectual property, product development and investment company.

4. I founded and incorporated 500 Group in July 1986 as a New York Corporation, with a small office in New York City until approximately 1990. Thereafter, 500 Group operated out of temporary rented workspaces in Greenwich, Connecticut and Stamford, Connecticut until early February 2017 when 500 Group ceased any regular use of the rented workspaces in Connecticut. 500 Group also opened a small office in Nashua, New Hampshire in January 2016, which was closed in early February 2017. From early February 2017 until the present 500 Group's headquarters and sole office space has been and continues to be located in Las Vegas, Nevada. I have been a resident of Las Vegas, Nevada February 2017.

5. 500 Group registered as a foreign corporation doing business in Nevada on February 8, 2017. A copy of this registration is attached hereto as **Exhibit A**. Although 500 Group maintained the ability to use the temporary rented workspaces in Connecticut after moving the operations to Las Vegas and opening the Las Vegas office, no significant business was conducted in Connecticut after early February of 2017.

6. Among numerous other inventions and products, 500 Group developed and patented Rolling Workshop systems, which were adaptable to a number of mobile tool storage and workshop products.

7. On May 14, 1997, 500 Group entered into a license agreement (the "1997 License Agreement") with the Plaintiff, Stanley Works Israel, Ltd. ("SWI"), an Israeli company formerly known as ZAG Industries, Ltd., pursuant to which 500 Group licensed to SWI for a limited time the rights to manufacture and distribute products subject to the Rolling Workshop patents (the "Patents") in exchange for monthly royalty payments.

8. On February 27, 2004, 500 Group and SWI entered into a second license agreement (the "2004 License Agreement") providing SWI the rights to manufacture and distribute products subject to the Patents in exchange for monthly royalty payments.

9. Based on information provided to 500 Group that that Israeli law made the royalty payments taxable to 500 Group, 500 Group permitted SWI to withheld fifteen percent of each royalty payment to satisfy this tax obligation to the Israeli government.

10. Subsequent to the execution of the 2004 License Agreement a dispute arose between 500 Group and SWI due to SWI's failure to pay royalties for certain products required by the 1997 License Agreement, and SWI's failure to label licensed products that were produced under license from 500 Group as required.

11. After 500 Group threatened to initiate legal action against SWI, in January of 2007 the parties entered into a letter agreement (the "2007 Letter Agreement") to settle the dispute. A copy of the 2006 Letter Agreement is attached hereto as **Exhibit B**.

12. Pursuant to the 2007 Letter Agreement, among other things, SWI agreed to pay 500 Group a lump sum payment of $790,000 to cover prior unpaid royalties under the 1997 License Agreement through March 31, 2006. Although the lump sum payment was in the nature of a settlement payment, because that payment was for *unpaid past royalties*, **the 2007 letter Agreement expressly provided that the $790,000 payment would be "less applicable Israeli withholding tax."**

13. The 2007 Letter Agreement also reconfirmed the 1997 License Agreement and provided that SWI would pay a two percent royalty on designated products for all sales made after April 1, 2006.

14. Despite the settlement reached between the parties pursuant to the 2007 Letter Agreement, SWI continued to violate the 1997 License Agreement, the 2007 Letter Agreement and other legal rights of 500 Group by, among other things, failure to pay royalties for licensed products, failure to mark Products with the 500 Group copyright notice, failure to submit Products to 500 Group for quality control and approval, misappropriation of 500 Group's intellectual property and designs and theft of trade secrets.

15. SWI's violations caused 500 Group to demand arbitration (the "Arbitration") against SWI, which commenced in New York. SWI then filed a meritless counterclaim against 500 Group.

16. Rather than pursue the Arbitration to completion, the parties agreed to settle the dispute by way of (1) 500 Group selling and permanently assigning all rights to the Patents to SWI

3

in exchange for a lump sum payment; (2) releasing each other from all claims, rights and obligations under the 1997 License Agreement, the 2004 License Agreement, the 2007 Letter Agreement, and the claims and counterclaim asserted in the Arbitration.

17. In order to detail and memorialize such a settlement the parties began negotiating the terms of a written agreement beginning in late February 2017, after both 500 Group and I relocated to Las Vegas, Nevada.

18. 500 Group ultimately agreed to a lump sum payment of $10,000,000 from SWI for the sale and assignment of the Patents, with $9,000,000 being paid directly to 500 Group and $1,000,000 paid to 500 Group's outside attorney for legal fees incurred in connection with the Arbitration.

19. However, SWI insisted that a portion of the $10,000,000 purchase price for the Patents, ultimately agreed to be $4,000,000, be deemed a fixed-fee payment for future royalties over the next ten years. My understanding was that such a provision in the settlement agreement (the "Settlement Agreement") was merely a technicality that would provide some benefit to SWI, but would not negatively affect 500 Group, including its right to receive the full $10,000,000 in compensation for the sale of the Patents.

20. During the negotiations, SWI made no mention of any tax consequences to 500 Group or that any amount would be required to be withheld as was done with respect to the periodic royalty payments under the prior agreements. The Settlement Agreement was intended to effectuate a sale of the Patents, not a license, which is a limited right. The intent of the Settlement Agreement was for 500 Group to transfer to SWI the full title to the Patents in exchange for the $10,000,000 payment. I would have never agreed to a settlement for any amount less than the full $10,000,000 that SWI agreed to pay for title to the Patents.

21. My understanding is that after the parties agreed on the essential terms of the Settlement Agreement, a copy of which is attached hereto as **Exhibit C,** the written agreement was drafted by SWI's legal counsel.

22. After the Settlement Agreement was drafted, it was signed on behalf of SWI on March 28, 2017 by Michael Bartone, a Vice President of SWI. The Settlement Agreement was then forwarded to me for execution on behalf of 500 Group.

23. However, on March 29, 2017, Hamid Firoonzia, 500 Group's outside accountant in New York, and I received an email from Ted Morris, who for the first time indicated that SWI had hit a "snag" as it was getting ready to "consummate the deal". He indicated that he only recently learned that SWI would have an obligation under Israeli law to pay withholding tax on the $4 million that was characterized in the Settlement Agreement as pre-paid royalties, and that obligation would be either fifteen or twenty-five percent, depending on the what SWI's auditors could get approved. A copy of this email is attached hereto as **Exhibit D**.

24. I did not understand why this issue was being raised at this late time, but I understood the problem to be SWI's issue, and not that of 500 Group. I understood the term "withholding" in this context to be a euphemism for SWI's purported tax obligation to the Israeli government, and not any obligation of 500 Group.

25. Nevertheless, I was alarmed that this belatedly raised tax issue would delay SWI's payment of the $10,000,000 under the Settlement Agreement, which was supposed to be paid within two weeks of its effective date. This precipitated a series of discussions between representatives of SWI and 500 Group, **for settlement purposes only**, by email and telephone, mainly between Mr. Firoonzia and Mr. Morris.

26. 500 Group's motivation for engaging in these discussion was to assist SWI in obtaining an exemption for the Israeli Tax Authority ("ITA") so as to reduce SWI's purported tax obligation from twenty-five percent to fifteen percent.

27. In the meantime, neither Mr. Bartone nor any other representative of SWI asked that I delay signing the Settlement Agreement or to agree to amend it in any way. Nor did Mr. Bartone nor any other representative of SWI attempt to withdraw or void the Settlement Agreement. Therefore, I signed it on behalf of 500 Group on March 31, 2017. I was in Las Vegas, Nevada when I signed the Settlement Agreement. At that point I was hopeful that SWI's purported tax issue could be resolved quickly and that 500 Group would timely receive the $10,000,000 to which it was entitled under the Settlement Agreement.

28. However, it ultimately became clear that the purported tax issue would take more time to resolve and 500 Group decided to forebear from declaring SWI in breach of the Settlement Agreement for failure to timely make the $10,000,000 for a period of time, as SWI indicated that its intended tax payment to the ITA would be required to be made at the time it paid 500 Group the $10,000,000.

29. In order to assist SWI, 500 Group agreed to co-retain the accounting firm Ernst & Young's Israeli affiliate, EY Israel, to obtain an exemption so that SWI's purported tax liability to the ITA would be reduced from twenty-five percent to fifteen percent. My belief was that 500 Group's assistance in this regard would help expedite SWI's payment of the $10,000,000 to 500 Group.

30. While these discussions between the parties were ongoing and we were waiting for the purported tax issue to be resolved, SWI indicated at some point that it wished to reduce the payment to 500 Group by the amount of the tax liability. However, neither I nor any other

representative of 500 Group ever agreed or acquiesced to such a reduction in payment. Such discussions were always for settlement purposes only. 500 Group always intended and expected to be paid the full $10,000,000 as clearly agreed upon under the Settlement Agreement, without any reduction for SWI's purported tax liability.

31.     Ultimately the exemption for SWI's purported tax liability was approved at fifteen percent, and on or about June 1, 2017, SWI wired the agreed payment under the Settlement Agreement to 500 Group, splitting the payment into the $1,000,000 earmarked for 500 Group's outside counsel, and the balance of $9,000,000 to 500 Group's bank account.

32.     I subsequently learned that SWI had attempted to recall all or part of its wire transfer after it was made, and that my bank refused to return the payment. However, neither I, nor any other representative of 500 Group, instructed the bank not to return the funds.

33.     Thereafter, SWI began contacting 500 Group by email claiming it had made an overpayment of $600,000, the amount of its purported tax liability to the ITA, and requested that 500 Group refund that amount to SWI.

34.     Upon receipt of these requests, I consulted with legal counsel. Consistent with my position throughout this ordeal, I had no intention of returning any portion of the money that SWI had agreed to pay for the purchase of the Patents, and felt it was extremely audacious of SWI to make such a demand.

35.     Therefore, when I did respond to SWI by email I jokingly asked if they wanted the $4,000,000 or the $600,000 back. I never intended or expected SWI to take this response seriously. Nevertheless, I made it clear that 500 Group would not be refunding any part of the $10,000,000 payment clearly agreed upon the Settlement Agreement that both parties signed.

36. I subsequently learned that SWI later paid $600,000 to the ITA for its purported tax liability. I consider that payment to have either been a voluntary act, or confirmation that this purported tax liability was the responsibility of SWI.

By: _____
Paolo Tiramani

**State of Nevada**
**County of Clark**

Subscribed and sworn to
before me this 31st day of July, 2020.

_____
Notary Public
My Commission Expires: March 28, 2024

GRACE TANG
Notary Public - State of Nevada
Appointment Recorded in Clark County
No: 20-5358-01 - Expires March 28, 2024