# **<u>EXHIBIT 1</u>**

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

```
STANLEY WORKS ISRAEL, LTD, f/k/a  :
ZAG INDUSTRIES, LTD,              :
                                  :
          Plaintiff,              : CASE NO.:
                                  :3:17-CV-01765-CSH
   v.                             :
                                  :
500 GROUP, INC., and PAOLO        :
TIRAMANI,                         :
                                  :
          Defendants.             :
_____
```

DEPOSITION OF EFRAT FIXLER, taken in accordance with the Connecticut Practice Book at the law offices of ROBINSON & COLE, 1055 Washington Boulevard, Suite 10th Floor, Stamford, Connecticut, before Mercedes Marney-Sheldon, CT-LSR #530, a Registered Professional Reporter and Notary Public, in and, for the State of Connecticut on January 23, 2020, at 1:10 p.m.

Page 24

```
 1   right?
 2        A.   Yes.
 3        Q.   And they're describing a -- is this a
 4   wire transfer?
 5        A.   Yes.
 6        Q.   And it's being sent to 500 Group?
 7        A.   I was asking where's the beneficiary.
 8   And I saw Bank of America and then 500 Group, so
 9   yes.
10        Q.   So the beneficiary name is 500 Group?
11        A.   Yes.
12        Q.   And the beneficiary bank name is Bank of
13   America.
14        A.   Yes.
15        Q.   And that's located in New York?
16        A.   Yes.
17        Q.   This says submitted by Levishev Natali?
18        A.   Yes.
19        Q.   Do you know who that is?
20        A.   No.
21        Q.   Are these -- are you familiar with these
22   sort of payment reports?
23        A.   Yeah.  They still look the same today.
24        Q.   Okay.  So when -- for your recordkeeping
25   at Stanley Works Israel when payments are made, a
```

Page 28

1  royalty payments?

2      A.   Yes.

3      Q.   Did you have any interaction with 500

4  Group during that time period I just mentioned,

5  2012 to 2015?

6      A.   Yes.  I do remember when I just got

7  there that they wanted us to send this summary to

8  show how much payment we paid during 2011.  I think

9  that this is this number, Exhibit 12 in Exhibit 12.

10          And with the tax that we withheld.

11     Q.   So when I look at Exhibit 12, after the

12 first page, I see several documents that are in

13 Hebrew but they look like bank transfers; is that

14 right?

15     A.   Yes.  Yes.  It's a different bank.

16     Q.   And each one is -- I see there's a

17 highlighting for 15 percent.

18     A.   15 percent, yeah.

19     Q.   These are all being sent to Bank of

20 America in New York?

21     A.   Yeah.  Yes.

22     Q.   On the document 786 at the bottom.

23     A.   Yes.

24     Q.   You see there's one that indicates

25 10 percent and then there's someone wrote in 15.

1     Q.    And do you know if it was -- if the
2  highlighted portion for 15 percent if that's your
3  highlightings?
4     A.    I can't remember.
5     Q.    Okay.  But throughout this time period,
6  2011, that you provided the report for, these are
7  all transfers being made from your Israeli account
8  to the Bank of America account in New York?
9     A.    Yes.
10    Q.    Did you have any understanding as to
11 what the -- and during this time period, what the
12 royalty payments were for?
13    A.    I don't know if I knew back then, but I
14 do know now.
15    Q.    Okay.  But at the time that wasn't
16 something that you concerned yourself with, what --
17 the reason for the royalty payments; is that right?
18          MR. DALEY:  Objection to form.
19 BY MR. JENSEN:
20    Q.    In 2012, 2013, 2014?
21    A.    I do remember that I spoke with -- there
22 was a CEO in the company.
23          (Clarification requested by the Court
24      Reporter.)
25          THE WITNESS:  CEO, I spoke with her,

Page 43

1    who said he and Ted Morris were going to speak to
2    you regarding the accountant -- accounting excuse
3    me.
4              Do you recall that discussion occurring.
5         A.   No.  I really don't remember.
6         Q.   The very first e-mail on this chain or
7    the latest e-mail in the chain on the first page is
8    from you on April 2, 2017.  You state, "Worst case
9    scenario will probably be to keep in our budget
10   400,000" and you describe what the total agreement
11   is and what the break down is between patent rights
12   and royalties hence the 400K annually.
13             Can you explain what that means?
14        A.   The agreement was -- the amount of
15   10 million was split to 6 million and 4 million.
16             The 6 million -- the 6 million was
17   offset by an accrual we already had.  And the
18   4 million was my guidance was to write it as an
19   asset as a prepayment for the 10 years ahead.  So
20   4 million divided to 10 years is $400,000 annually
21   that will sit in my budget.
22        Q.   And then you would amortize that asset
23   over the course of the 10 years?
24        A.   Yeah. 400,000 a year.
25        Q.   So you would show a $4 million asset and

Page 44

1   each year an expense of $400,000.
2        A.    Yes.
3        Q.    Applied against that asset.
4        A.    Yes.
5        Q.    You then state, "However, there are
6   still open issues that Dean wants to check."
7              Do you recall what those issues were?
8        A.    No.
9        Q.    Is it fair to say that this e-mail chain
10  that we just looked at, this is all looking at,
11  from an accounting perspective, how the settlement
12  payment is going to be treated for Stanley Israel?
13             MR. DALEY:  Objection to form.
14             THE WITNESS:  This was not even my
15        concern from accounting point of view.  My
16        concern here is that I need to add to my
17        budget $400,000.
18  BY MR. JENSEN:
19       Q.    Right?
20       A.    To add it to my FCST 04 with forecast.
21  It's a forecast so I wanted to make sure that I
22  will be able to spend this $400,000 to have that in
23  my P&L and not surprise anyone.
24       Q.    Right.  And this discussion that's
25  taking place in this e-mail chain doesn't relate to

Page 50

1   BY MR. JENSEN:

2       Q.   Number 3 in her e-mail states, "We
3   suggest that 500 Group will achieve a WHT exemption
4   from the ITA with respect to the payments."
5            Do you have an understanding as to what
6   that means?
7       A.   Yes.
8       Q.   What's that understanding.
9       A.   That 500 Group will need an approval
10  from the Israeli tax authorities for, it says here
11  withholding exemptions, although I know that it's
12  not an exception -- okay, sorry.
13           Now I know that for the patent it's a
14  full exception and for the royalties it's
15  15 percent tax.
16      Q.   And I'm not asking for what you --
17      A.   I don't know why she wrote that but she
18  wrote that this is -- they'll need to achieve an
19  approval from the Israeli tax authorities for
20  withholding exemptions.
21      Q.   For an exemption.
22      A.   Yeah.
23      Q.   Right.  Okay.  And this advice from
24  Ernst & Young was received several days after the
25  agreement was signed, correct?

Page 66

1  Thursday.  We made the payment on Thursday.  And
2  I -- I don't remember how we knew that it went
3  wrong.  But on Sunday we realize that it went wrong
4  and tried to recall the payment.
5       Q.   Okay.  Who authorized Klara to seek a
6  recall of the payment?
7       A.   Probably Dalia.
8       Q.   And Stanley Works Israel tried to recall
9  the payment before reaching out to 500 Group,
10 correct?
11      A.   Yes.
12      Q.   And it was only after you were told that
13 they couldn't recall the payment that Stanley Works
14 Israel reached out to 500 Group?
15      A.   Yes.
16      Q.   Okay?
17      A.   I think in parallel they still tried to
18 do something, the bank.
19      Q.   Right?
20      A.   I think in parallel.
21      Q.   But they needed 500 Group's
22 authorization, correct?
23           MR. DALEY:  Objection to form.
24           THE WITNESS:  They told us they recalled
25      it June 5th.

1                    C E R T I F I C A T E

2

3   STATE OF CONNECTICUT )

4                        ) ss.:

5   COUNTY OF FAIRFIELD  )

6

7        I, MERCEDES MARNEY-SHELDON, Court Reporter and

8   Notary Public within and for the state of

9   Connecticut, do hereby certify:

10       That EFRAT FIXLER, the witness whose deposition

11  is hereinbefore set forth, was duly sworn by me, and

12  that such deposition is a true record of the

13  testimony given by the witness.

14       I further certify that I am not related to any

15  of the parties to this action by blood or marriage,

16  and that I am in no way interested in the outcome of

17  this matter.

18       IN WITNESS WHEREOF, I have here unto set my

19  hand this 23rd day of January, 2020.

20

21
    _____
22  Mercedes Marney-Sheldon - Shorthand Reporter
    Notary Public - State of Connecticut
23  Account Number: 167303
    Date Appointed:  08/07/2014
24  Expiration Date:  08/31/2023

25