**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

Stanley Works Israel LTD. f/k/a Zag Industries,
LTD.

                        Plaintiff,

            vs.                                          Case No. 3:17-cv-01765-CSH

500 Group, Inc. and Paolo Tiramani,

                        Defendants.

## LOCAL RULE 56(a)1 STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Rule 56(a)(1) of the Local Rules of Civil Procedure, the Defendants, 500

Group, Inc. and Paolo Tiramani, hereby submit the following Statement of Undisputed Facts to

accompany its Motion for Summary Judgment:

1.      The Defendant, Paolo Tiramani ("Tiramani") is President and sole shareholder of

the Defendant, 500 Group, Inc. ("500 Group"), which is an intellectual property, product

development and investment company.  Affidavit of Paolo Tiramani ("Tiramani Aff."), ¶ 3.

2.      Tiramani founded and incorporated 500 Group in July 1986 as New York

Corporation, with a small office in New York City until approximately1990.  Thereafter, 500

Group operated out of temporary rented workspaces in Greenwich, Connecticut and Stamford,

Connecticut until early February 2017 when 500 Group ceased any regular use of the rented

workspaces in Connecticut.  *Id.*, ¶ 4.

3.      500 Group also opened a small office in Nashua, New Hampshire in January

2016, which was closed in early February 2017.  From early February 2017 until the present 500

Group's headquarters and sole office space has been and continues to be located in Las Vegas,

Nevada.  *Id.*, ¶ 4.

4.       Tiramani has been a resident of Las Vegas, Nevada since February 2017.  *Id.*

5.       500 Group registered as a foreign corporation doing business in Nevada on February 8, 2017.  *Id.*, ¶ 5, and Ex. A thereto.

6.        Although 500 Group maintained the ability to use the temporary rented workspaces in Connecticut after moving the operations to Las Vegas and opening the Las Vegas office, no significant business was conducted in Connecticut after early February of 2017.  *Id.*

7.       Among numerous other inventions and products, 500 Group developed and patented Rolling Workshop systems, which were adaptable to a number of mobile tool storage and workshop products.  *Id.*, ¶ 6.

8.       The Plaintiff, Stanley Works Israel LTD. f/k/a Zag Industries, LTD ("SWI"), is an Israeli limited liability company based in Rosh Ha'Ayin, Israel.  Am. Compl., ¶ 1.  SWI is owned by a Dutch company located in the Netherlands which, in turn, is owned by a Canadian corporation with its principal place of business in Canada.  *Id.*

9.       Although SWI is somehow affiliated with Stanley Black & Decker, Inc. ("SBD"), SWI is a separate corporate entity from other Stanley Back & Decker entities, and generates its own profit and loss statements.  Efrat Fixler Deposition Transcript ("Fixler Tr.") p. 42; Dean Albanesi Deposition Transcript of ("Albanese Tr."), p. 28.[1]

10.      SWI manufactures and markets storage products, including toolboxes, which are produced at its plants in Israel.  Tali Waysbort Deposition Transcript ("Waysbort Tr.") at pp. 10-11.

---

[1] All cited excerpts of deposition transcripts and exhibits are attached to the accompanying Declaration of Robert M. Barrack.

11.     The SBD business until with which SWI is most closely affiliated is the Global Tools & Storage ("GTS") division, which is headquartered in Towson, Maryland.  Albanesi Tr., pp. 11-12, 15, 29.

12.     On May 14, 1997, 500 Group entered into a license agreement (the "1997 License Agreement") with SWI pursuant to which 500 Group licensed to SWI for a limited time the rights to manufacture and distribute products subject to the Rolling Workshop patents (the "Patents") in exchange for monthly royalty payments.  Tiramani Aff., ¶ 7.

13.     On February 27, 2004, 500 Group and SWI entered into a second license agreement (the "2004 License Agreement") providing SWI the rights to manufacture and distribute products subject to the Patents in exchange for monthly royalty payments.  *Id*., ¶ 8.

14.     Based on information provided to 500 Group that that Israeli law made the royalty payments taxable to 500 Group, 500 Group permitted SWI to withheld fifteen percent of each royalty payment to satisfy this tax obligation to the Israeli government.  *Id*., ¶ 9.

15.     The monthly royalty payments under the 1997 and 2004 License Agreements were made by SWI from its bank in Israel to 500 Group's Bank in New York.  Fixler Tr., pp. 24, 28, 30.

16.     Subsequent to the execution of the 2004 License Agreement a dispute arose between 500 Group and SWI due to SWI's failure to pay royalties for certain products required by the 1997 License Agreement, and SWI's failure to label licensed products that were produced under license from 500 Group as required.  Tiramani Aff, ¶ 10.

17.     After 500 Group threatened to initiate legal action against SWI, in January of 2007 the parties entered into a letter agreement (the "2007 Letter Agreement") to settle the dispute.  *Id*., ¶ 11 and Ex. B.

18.     Pursuant to the 2007 Letter Agreement, among other things, SWI agreed to pay 500 Group a lump sum payment of $790,000 to cover prior unpaid royalties under the 1997 License Agreement through March 31, 2006.  *Id*., ¶ 12 and Ex. B.

19.     Although the lump sum payment was in the nature of a settlement payment, because that payment was for *unpaid past royalties*, **the 2007 letter Agreement expressly provided that the $790,000 payment would be "less applicable Israeli withholding tax."**  *Id*. and Ex. B, p.1.

20.     The 2007 Letter Agreement also reconfirmed the 1997 License Agreement and provided that SWI would pay a two percent royalty on designated products for all sales made after April 1, 2006.  *Id*., ¶ 13 and Ex. B thereto, p.1

21.     Despite the settlement reached between the parties pursuant to the 2007 Letter Agreement, SWI continued to violate the 1997 License Agreement, the 2007 Letter Agreement and other legal rights of 500 Group by, among other things, failure to pay royalties for licensed products, failure to mark Products with the 500 Group copyright notice, failure to submit Products to 500 Group for quality control and approval, misappropriation of 500 Group's intellectual property and designs and theft of trade secrets.  *Id*., ¶ 14.

22.     SWI's violations caused 500 Group to demand arbitration (the "Arbitration") against SWI, which commenced in New York.  *Id*., ¶ 15.

23.     SWI then filed a meritless counterclaim against 500 Group in the Arbitration.  *Id*.

24.     Rather than pursue the Arbitration to completion, the parties agreed to settle the dispute by way of (1) 500 Group selling and permanently assigning all rights to the Patents to SWI in exchange for a lump sum payment; (2) releasing each other from all claims, rights and

obligations under the 1997 License Agreement, the 2004 License Agreement, the 2007 Letter

Agreement, and the claims and counterclaim asserted in the Arbitration.  *Id*., ¶ 16 and Ex. C.

26. In order to detail and memorialize such a settlement the parties began negotiating

the terms of a written agreement beginning in late February 2017, after both 500 Group and

Tiramani relocated to Las Vegas, Nevada.  *Id*., ¶ 17.

26. Representatives of the parties met in New York at the end of February to discuss

details of the settlement to be memorialized in a written agreement.  Deposition Transcript of

Hamid Firooznia ("Firooznia Tr."), p. 26.

27. 500 Group ultimately agreed to a lump sum payment of $10,000,000 from SWI

for the sale and assignment of the Patents, with $9,000,000 being paid directly to 500 Group and

$1,000,000 paid to 500 Group's outside attorney for legal fees incurred in connection with the

Arbitration.  *Id*., ¶ 18 and Ex. C, pp. 3-4.

28. However, SWI insisted that a portion of the $10,000,000 purchase price for the

Patents, ultimately agreed to be $4,000,000, be deemed a fixed-fee payment for future royalties

over the next ten years.  *Id*., ¶ 19.

29. 500 Group wanted the entire $10,000,000 payment to be characterized as the

purchase price for the Patents, while SWI wanted to characterize as much of the payment as

possible as pre-paid future royalty payments.  Albanesi Tr., pp. 65-66.

30. The reason that SWI wanted $4,000,000 of the $10,000,000 payment

characterized in the settlement agreement as future royalties was so that SWI could amortize the

$4,000,000 over the next ten years, which would benefit SWI by (a) improving its profit and loss

'P&L") statement by not showing a large one-time expense, and showing only an annual

$400,000 expense for ten years these amounts would be offset by a $4,000,000 asset; Albanese

5

Tr., pp. 30-32, 44; Fixler Tr., pp. 43-44; and (b) for Israeli tax purposes SWI would be able to deduct what be shown as a $400,000 payment each year for the next ten years; Defendants' Deposition Exhibit (Def. Dep. Ex.") 5, p. 1, ¶ 2.

31.     SWI arrived at the $4,000,000 figure because it could offset $6,000,000 of the $10,000,000 payment amount by an accrual it already had, and wanted to write the remaining $4,000,000 as a pre-paid asset, which it could amortize over the next ten years.  Fixler Tr., pp. 43-44.

32.     Nevertheless, SWI fully intended the $10,000,000 payment as compensation for as a complete "buyout" of the Patents from 500 Group, and recognized it as such.  Def. Dep. Ex. 2, p 4 ("we're not paying more than $10MM to consummate a buyout of this contract.); Def. Dep. Ex. 4, p. 2 (I can see that we have an almost signed agreement with a $10M buyout…."; Plaintiff's Deposition Exhibit ("Plf. Dep. Ex.") 21, p. 2 ("we opted to pay a large amount of money to 'buy out' the contract and some patents with a very short life span.").

33.     SWI outside accountant, EY Israel, from whom SWI sought advice regarding the tax treatment by the Israeli government of the characterization of the $10,000,000 payment under the Settlement Agreement as split between payment for the Patents and pre-paid future royalties, warned SWI on April 5, 2017, that "we think that the ITA [Israeli Tax Authority] might challenge the fact you characterized the $4m as royalties **since you already purchased the Patent**." Def. Dep. Ex. 5, p. 1, ¶ 2 (emphasis added).

34.     A tax liability would only be incurred to the ITA for royalty payments, not for a sale of patent rights.  Fixler Tr., p. 50 ("Now I know that for the patent it's a full exception and for the royalties it's a 15 percent tax.").

35.     The understanding of 500 Group was that the characterization of the $4,000,000

payment for future royalties in the settlement agreement (the "Settlement Agreement") was

merely a technicality that would provide some benefit to SWI, but would not negatively affect

500 Group, including its right to receive the full $10,000,000 in compensation for the sale of the

Patents.  Tiramani Aff., ¶ 19.

36.     During the negotiations, SWI made no mention of any tax consequences to 500

Group or that any amount would be required to be withheld as was done with respect to the

periodic royalty payments under the prior agreements.  *Id*., ¶ 20; Plf. Dep. Ex. 7, p. 2 (Morris

states that "I didn't appreciate the Israeli tax withholding issue" when the Settlement Agreement

was being drafted).

37.     The Settlement Agreement was intended to effectuate a sale of the Patents, i.e., a

complete "buyout" of the Patents, rather than a license, which is a limited right.  Tiramani Aff., ¶

20.

38.     The intent of the Settlement Agreement was for 500 Group to transfer to SWI the

full title to the Patents in exchange for the $10,000,000 payment.  *Id*.

39.     500 Group would have never agreed to a settlement for any amount less than the

full $10,000,000 that SWI agreed to pay for title to the Patents.  *Id*.

40.     500 Group's understanding is that after the parties agreed on the essential terms of

the settlement agreement ("Settlement Agreement"), the written agreement was drafted by SWI's

legal counsel.  *Id*., ¶ 21 and Ex. C.

41.     After the Settlement Agreement was drafted, it was signed on behalf of SWI on

March 28, 2017 by Michael Bartone, a Director of SWI, and was then forwarded to Tiramani for

execution on behalf of 500 Group.  Tiramani Aff., ¶ 22.

42.      However, on March 29, 2017, Hamid Firooznia ("Firooznia"), 500 Group's outside accountant in New York, and Tiramani received an email from Ted Morris (the Assistant General Counsel for SBD), who for the first time indicated that SWI had hit a "snag" as it was getting ready to "consummate the deal".  Morris indicated that he only recently learned that SWI would have an obligation under Israeli law to pay withholding tax on the $4 million that was characterized in the Settlement Agreement as pre-paid royalties, and that obligation would be either fifteen or twenty-five percent, depending on the what SWI's auditors could get approved. *Id*., ¶ 23 and Ex. D.

43.      500 Group did not understand why this issue was being raised at this late time, but nevertheless understood the problem to be SWI's issue, and not that of 500 Group.  Tiramani Aff., ¶ 24.

44.      500 Group understood the term "withholding" in this context to be a euphemism for SWI's purported tax obligation to the Israeli government, and not any obligation of 500 Group.  *Id.*, and Ex. D (Morris: "Were you aware that **Stanley Israel would have this obligation** with respect to the 4MM prepaid royalties?") (Emphasis added).

45.      Nevertheless, 500 Group was alarmed that this belatedly raised tax issue would delay SWI's payment of the $10,000,000 under the Settlement Agreement, which was supposed to be paid within two weeks of its effective date. Tiramani Aff., ¶ 25.

46.      This precipitated a series of discussions between representatives of SWI and 500 Group, **for settlement purposes only**, by email and telephone, mainly between Firooznia and Morris.  *Id*., ¶ 25.

47.     500 Group's motivation for engaging in these discussion was to assist SWI in obtaining an exemption for the ITA so as to reduce SWI's purported tax obligation from twenty-five percent to fifteen percent.  *Id.*, ¶ 26.

48.     In the meantime, neither Bartone nor any other representative of SWI asked that Tiramani delay signing the Settlement Agreement or to agree to amend it in any way.  *Id.*, ¶ 27.

49.     Nor did Bartone or any other representative of SWI attempt to withdraw or void SWI's execution of the Settlement Agreement.  *Id.*

50.     Therefore, Tiramani signed the Settlement Agreement in Las Vegas, Nevada on behalf of 500 Group on March 31, 2017.  *Id.*

51.     At that point 500 Group was hopeful that the purported tax issue could be resolved quickly and that 500 Group would timely receive the $10,000,000 to which it was entitled under the Settlement Agreement.  *Id.*

52.     However, it ultimately became clear that the purported tax issue would take more time to resolve and 500 Group decided to forebear from declaring SWI in breach of the Settlement Agreement for failure to timely make the $10,000,000 for a period of time, as SWI indicated that its intended tax payment to the ITA would be required to be made at the time it paid 500 Group the $10,000,000.  *Id.*, ¶ 28.

53.     In order to assist SWI, 500 Group agreed to co-retain EY Israel with SWI to obtain an exemption so that SWI's purported tax liability to the ITA would be reduced from twenty-five percent to fifteen percent.  *Id.*, ¶ 29; Albanesi Tr., p. 64; Plf. Dep. Ex. 19.

54.     Based on SWI's representations, 500 Group's belief was that 500 Group's assistance in this regard would help expedite SWI's payment of the $10,000,000 to 500 Group. Tiramani Aff., ¶ 29.

9

55.     While these discussions between the parties were ongoing and 500 Group was waiting for the purported tax issue to be resolved, SWI indicated at some point that it wished to reduce the payment to 500 Group by the amount of the tax liability.  *Id*., ¶ 30.

56.     However, neither Tiramani nor any other representative of 500 Group ever agreed or acquiesced to such a reduction in payment.  *Id*.; Hamid Firooznia Deposition Transcript ("Firooznia Tr."), pp. 45, 62.

57.     The discussions between the parties regarding the tax issue were always for settlement purposes only.  Tiramani Aff., ¶ 30.

58.     500 Group always intended and expected to be paid the full $10,000,000 as clearly agreed upon under the Settlement Agreement, without any reduction for SWI's purported tax liability.  *Id*., Firooznia Tr., pp. 45, 62.

59.     Ultimately the exemption for SWI's purported tax liability was approved at fifteen percent, and on or about June 1, 2017, SWI wired the agreed payment under the Settlement Agreement to 500 Group, splitting the payment into the $1,000,000 earmarked for 500 Group's outside counsel, and the balance of $9,000,000 to 500 Group's bank account. Tiramani Aff., ¶ 31.

60.     500 Group subsequently learned that SWI had attempted to recall all or part of its wire transfer after it was made, and that 500 Group's bank refused to return the payment.  *Id*., ¶ 32; Fixler Tr., p. 66.

61.     However, neither Tiramani, nor any other representative of 500 Group, instructed the bank not to return the funds.  Tiramani Aff., ¶ 32.

10

62.     Thereafter, SWI began contacting 500 Group by email claiming it had made an overpayment of $600,000, the amount of its purported tax liability to the ITA, and requested that 500 Group refund that amount to SWI.  *Id*., ¶ 33.

63.     Upon receipt of these requests, 500 Group consulted with legal counsel.  *Id*., ¶ 34.

64.     Consistent with 500 Group's position throughout this ordeal, 500 Group had no intention of returning any portion of the money that SWI had agreed to pay for the purchase of the Patents, and felt it was extremely audacious of SWI to make such a demand.  *Id*.

65.     Therefore, when Tiramani did respond to 500 Group by email he jokingly asked if they wanted the $4,000,000 or the $600,000 back, but he never intended or expected 500 Group to take this response seriously.  *Id*., ¶ 35.

66.     Nevertheless, Tiramani made it clear that 500 Group would not be refunding any part of the $10,000,000 payment clearly agreed upon the Settlement Agreement that both parties signed.  *Id*.

67.     On or about August 15, 2017 SWI paid $600,000 to the ITA for its purported tax liability.  *Id*., ¶ 36; Am. Compl., ¶ 32.

68.     SWI's payment of the $600,000 to the ITA was either a voluntary act, or confirmation that this purported tax liability was the responsibility of SWI.  Tiramani Aff., ¶ 36.

Dated: July 31, 2020                            Respectfully submitted,

                                                DEFENDANTS
                                                500 GROUP, INC. and PAOLO TIRAMANI


                                        By:  */s/ Peter E. Strniste, Jr.*
                                                Peter E. Strniste, Jr. (ct20830)
                                                pstrniste@grsm.com
                                                Robert M. Barrack (ct08422)
                                                rbarrack@grsm.com
                                                Gordon & Rees Scully Mansukhani
                                                95 Glastonbury Boulevard, Suite 206
                                                Glastonbury, CT 06033
                                                Telephone: (860) 278-7448
                                                Facsimile: (860) 560-0185

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 31st day of July 2020, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's system.

/s/Robert M. Barrack.
Robert M. Barrack (ct08422)
rbarrack@grsm.com
Gordon & Rees Scully Mansukhani
95 Glastonbury Boulevard, Suite 206
Glastonbury, CT 06033
Telephone: (860) 278-7448
Facsimile: (860) 560-0185