## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| Stanley Works Israel LTD. f/k/a Zag Industries, LTD. <br><br><br> Plaintiff, <br><br> vs. <br><br> 500 Group, Inc. and Paolo Tiramani, <br><br> Defendants. | Case No. 3:17-cv-01765-CSH |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

**ORAL ARGUMENT REQUESTED**

## <u>TABLE OF CONTENTS</u>

**Page**

I.    STATEMENT OF FACTS ..................................................................... 1

II.   LAW AND ARGUMENT ...................................................................... 10

    A.    Legal Standard for Summary Judgment ................................................ 10

    B.    500 Group is Entitled to Summary Judgment on SWI's Breach of Contract Claim. ......................................................................................... 11

         1.    Plaintiff's Breach of Contract Claim is Contrary to the Express Terms of the Settlement Agreement. ............................................... 13

         2.    It is Undisputed that 500 Group Transferred All Rights and Title to the Patents to Plaintiff Under the Settlement Agreement, and as a Matter of Law, No Tax Was Owed ............................................ 22

         3.    The Settlement Agreement Was Not Modified or Amended ................. 26

    C.    Plaintiff's Unjust Enrichment Claim Fails as a Matter of Law. ........................ 28

    D.    The Defendants are Entitled to Summary Judgment of Plaintiff's CUTPA Claim ............................................................................................ 31

III.  CONCLUSION .................................................................................... 36

i

Pursuant to Rule 56 of the Federal rules of Civil Procedure and Rule 56 of the Local Rules of Civil Procedure, the Defendants, 500 Group, Inc. ("500 Group") and Paolo Tiramani ("Tiramani") ("collectively, Defendants"), hereby submit their Memorandum of Law in support of their Motion for Summary Judgment with respect to all claims asserted by the Plaintiff, Stanley Works Israel LTD. f/k/a Zag Industries, LTD ("SWI" or "Plaintiff").

## I.    STATEMENT OF FACTS

The Defendant, Paolo Tiramani ("Tiramani"), is President and sole shareholder of the Defendant, 500 Group, Inc. ("500 Group"), which is an intellectual property, product development and investment company.  Affidavit of Paolo Tiramani ("Tiramani Aff."), ¶ 3. Tiramani founded and incorporated 500 Group in July 1986 as New York Corporation, with a small office in New York City until approximately1990.  Thereafter, 500 Group operated out of temporary rented workspaces in Greenwich, Connecticut and Stamford, Connecticut until early February 2017 when 500 Group ceased any regular use of the rented workspaces in Connecticut. *Id.*, ¶ 4.

500 Group also opened a small office in Nashua, New Hampshire in January 2016, which was closed in early February 2017.  From early February 2017 until the present 500 Group's headquarters and sole office space has been and continues to be located in Las Vegas, Nevada. *Id.*, ¶ 4.  Tiramani has been a resident of Las Vegas, Nevada since February 2017.  *Id.*   500 Group registered as a foreign corporation doing business in Nevada on February 8, 2017.  *Id.*, ¶ 5, and Ex. A thereto.

Although 500 Group maintained the ability to use the temporary rented workspaces in Connecticut after moving the operations to Las Vegas and opening the Las Vegas office, no significant business was conducted in Connecticut after early February of 2017.  *Id.*  Among

1

numerous other inventions and products, 500 Group developed and patented Rolling Workshop systems, which were adaptable to a number of mobile tool storage and workshop products.  *Id*., ¶ 6.

The Plaintiff, Stanley Works Israel LTD. f/k/a Zag Industries, LTD ("SWI"), is an Israeli limited liability company based in Rosh Ha'Ayin, Israel.  Am. Compl., ¶ 1.  SWI is owned by a Dutch company located in the Netherlands which, in turn, is owned by a Canadian corporation with its principal place of business in Canada.  *Id.*  Although SWI is somehow affiliated with Stanley Black & Decker, Inc. ("SBD"), SWI is a separate corporate entity from other Stanley Back & Decker entities, and generates its own profit and loss statements.  Efrat Fixler Deposition Transcript ("Fixler Tr.") p. 42; Dean Albanesi Deposition Transcript of ("Albanese Tr."), p. 28.[1]

SWI manufactures and markets storage products, including toolboxes, which are produced at its plants in Israel.  Tali Waysbort Deposition Transcript ("Waysbort Tr.") at pp. 10-11.  The SBD business unit with which SWI is most closely affiliated is the Global Tools & Storage ("GTS") division, which is headquartered in Towson, Maryland.  Albanesi Tr., pp. 11-12, 15, 29.

On May 14, 1997, 500 Group entered into a license agreement (the "1997 License Agreement") with SWI pursuant to which 500 Group licensed to SWI for a limited time the rights to manufacture and distribute products subject to the Rolling Workshop patents (the "Patents") in exchange for monthly royalty payments.  Tiramani Aff., ¶ 7.  On February 27, 2004, 500 Group and SWI entered into a second license agreement (the "2004 License Agreement") providing SWI the rights to manufacture and distribute products subject to the Patents in exchange for monthly royalty payments.  *Id*., ¶ 8.

---

[1] All cited excerpts of deposition transcripts and deposition exhibits are attached to the accompanying Declaration of Robert M. Barrack.

Based on information provided to 500 Group that that Israeli law made the royalty payments taxable to 500 Group, 500 Group permitted SWI to withheld fifteen percent of each royalty payment to satisfy this tax obligation to the Israeli government. *Id.*, ¶ 9. The monthly royalty payments under the 1997 and 2004 License Agreements were made by SWI from its bank in Israel to 500 Group's Bank in New York. Fixler Tr., pp. 24, 28, 30.

Subsequent to the execution of the 2004 License Agreement a dispute arose between 500 Group and SWI due to SWI's failure to pay royalties for certain products required by the 1997 License Agreement, and SWI's failure to label licensed products that were produced under license from 500 Group as required. Tiramani Aff., ¶ 10. After 500 Group threatened to initiate legal action against SWI, in January of 2007 the parties entered into a letter agreement (the "2007 Letter Agreement") to settle the dispute. *Id.*, ¶ 11 and Ex. B.

Pursuant to the 2007 Letter Agreement, among other things, SWI agreed to pay 500 Group a lump sum payment of $790,000 to cover prior unpaid royalties under the 1997 License Agreement through March 31, 2006. *Id.*, ¶ 12 and Ex. B. Although the lump sum payment was in the nature of a settlement payment, because that payment was for *unpaid past royalties*, **the 2007 letter Agreement expressly provided that the $790,000 payment would be "less applicable Israeli withholding tax."** *Id.* and Ex. B, p.1. The 2007 Letter Agreement also reconfirmed the 1997 License Agreement and provided that SWI would pay a two percent royalty on designated products for all sales made after April 1, 2006. *Id.*, ¶ 13 and Ex. B, p. 1.

Despite the settlement reached between the parties pursuant to the 2007 Letter Agreement, SWI continued to violate the 1997 License Agreement, the 2007 Letter Agreement and other legal rights of 500 Group by, among other things, failure to pay royalties for licensed products, failure to mark Products with the 500 Group copyright notice, failure to submit

Products to 500 Group for quality control and approval, misappropriation of 500 Group's intellectual property and designs and theft of trade secrets.  *Id.*, ¶ 14.

SWI's violations caused 500 Group to demand arbitration (the "Arbitration") against SWI, which commenced in New York.  *Id.*, ¶ 15.  SWI then filed a meritless counterclaim against 500 Group in the Arbitration.  *Id.*  Rather than pursue the Arbitration to completion, the parties agreed to settle the dispute by way of (1) 500 Group selling and permanently assigning all rights to the Patents to SWI in exchange for a lump sum payment; (2) releasing each other from all claims, rights and obligations under the 1997 License Agreement, the 2004 License Agreement, the 2007 Letter Agreement, and the claims and counterclaim asserted in the Arbitration.  *Id.*, ¶ 16 and Ex. C.

In order to detail and memorialize such a settlement the parties began negotiating the terms of a written agreement beginning in late February 2017, <u>after both 500 Group and Tiramani relocated to Las Vegas, Nevada</u>.  *Id.*, ¶ 17.  Representatives of the parties met in New York at the end of February to discuss details of the settlement to be memorialized in a written agreement.  Deposition Transcript of Hamid Firooznia ("Firooznia Tr."), p. 26.

500 Group ultimately agreed to a lump sum payment of $10,000,000 from SWI for the sale and assignment of the Patents, with $9,000,000 being paid directly to 500 Group and $1,000,000 paid to 500 Group's outside attorney for legal fees incurred in connection with the Arbitration.  *Id.*, ¶ 18 and Ex. C, pp. 3-4.  However, SWI insisted that a portion of the $10,000,000 purchase price for the Patents, ultimately agreed to be $4,000,000, be deemed a fixed-fee payment for future royalties over the next ten years.  *Id.*, ¶ 19.

500 Group wanted the entire $10,000,000 payment to be characterized as the purchase price for the Patents, while SWI wanted to characterize as much of the payment as possible as

pre-paid future royalty payments.  Albanesi Tr., pp. 65-66.  The reason that SWI wanted $4,000,000 of the $10,000,000 payment characterized in the settlement agreement as future royalties was so that SWI could amortize the $4,000,000 over the next ten years, which would benefit SWI by (a) improving its profit and loss ("P&L") statement by not showing a large one-time expense, and showing only an annual $400,000 expense for ten years being offset by a $4,000,000 asset; Albanese Tr., pp. 30-32, 44; Fixler Tr., pp. 43-44; and (b) for Israeli tax purposes SWI would be able to deduct what would be shown as a $400,000 payment each year for the next ten years; Defendants' Deposition Exhibit (Def. Dep. Ex.") 5, p. 1, ¶ 2.

SWI arrived at the $4,000,000 figure because it could offset $6,000,000 of the $10,000,000 payment amount by an accrual it already had, and wanted to write the remaining $4,000,000 as a pre-paid asset, which it could amortize over the next ten years.  Fixler Tr., pp. 43-44.

Nevertheless, SWI fully intended the $10,000,000 payment as compensation for a complete "buyout" of the Patents from 500 Group, and recognized it as such.  Def. Dep. Ex. 2, p 4 ("we're not paying more than $10MM to consummate a buyout of this contract.); Def. Dep. Ex. 4, p.2 (I can see that we have an almost signed agreement with a $10M buyout…."; Plaintiff's Deposition Exhibit ("Plf. Dep. Ex.") 21, p. 2 ("we opted to pay a large amount of money to 'buy out' the contract and some patents with a very short life span.").

SWI outside accountant, EY Israel, from whom SWI sought advice regarding the tax treatment by the Israeli government of the characterization of the $10,000,000 payment under the Settlement Agreement as split between payment for the Patents and pre-paid future royalties, warned SWI on April 5, 2017, that "we think that the ITA [Israeli Tax Authority] might

challenge the fact you characterized the $4m as royalties **since you already purchased the**

**Patent**." Def. Dep. Ex. 5, p. 1, ¶ 2 (emphasis added).

A tax liability would only be incurred to the ITA for royalty payments, not for a sale of

patent rights.  Fixler Tr., p. 50 ("Now I know that for the patent it's a full exception and for the

royalties it's a 15 percent tax.").  The understanding of 500 Group was that the characterization

of the $4,000,000 payment for future royalties in the settlement agreement (the "Settlement

Agreement") was merely a technicality that would provide some benefit to SWI, but would not

negatively affect 500 Group, including its right to receive the full $10,000,000 in compensation

for the sale of the Patents.  Tiramani Aff., ¶ 19.

During the negotiations, SWI made no mention of any tax consequences to 500 Group or

that any amount would be required to be withheld as was done with respect to the periodic

royalty payments under the prior agreements.  *Id*., ¶ 20; Plf. Dep. Ex. 7, p. 2 (Morris states that "I

didn't appreciate the Israeli tax withholding issue" when the Settlement Agreement was being

drafted).

The Settlement Agreement was intended to effectuate a sale of the Patents, i.e., a

complete "buyout" of the Patents, rather than a license, which is a limited right.  Tiramani Aff., ¶

20.  The intent of the Settlement Agreement was for 500 Group to transfer to SWI the full title to

the Patents in exchange for the $10,000,000 payment.  *Id*.  500 Group would have never agreed

to a settlement for any amount less than the full $10,000,000 that SWI agreed to pay for title to

the Patents.  *Id*.

500 Group's understanding is that after the parties agreed on the essential terms of the

settlement agreement ("Settlement Agreement"), the written agreement was drafted by SWI's

legal counsel.  *Id*., ¶ 21 and Ex. C.  After the Settlement Agreement was drafted, it was signed on

behalf of SWI on March 28, 2017 by Michael Bartone, Vice President of SWI, and was then forwarded to Tiramani for execution on behalf of 500 Group.  Tiramani Aff., ¶ 22.

However, on March 29, 2017, Hamid Firooznia ("Firooznia"), 500 Group's outside accountant in New York, and Tiramani received an email from Ted Morris (the Assistant General Counsel for SBD), who for the first time indicated that SWI had hit a "snag" as it was getting ready to "consummate the deal".  Morris indicated that he only recently learned that SWI would have an obligation under Israeli law to pay withholding tax on the $4 million that was characterized in the Settlement Agreement as pre-paid royalties, and that obligation would be either fifteen or twenty-five percent, depending on what SWI's auditors could get approved.  *Id.*, ¶ 23 and Ex. D. 500 Group did not understand why this issue was being raised at this late time, but nevertheless understood the problem to be SWI's, and not that of 500 Group.  Tiramani Aff., ¶ 24.

500 Group understood the term "withholding" in this context to be a euphemism for SWI's purported tax obligation to the Israeli government, and not any obligation of 500 Group. *Id.*, and Ex. D (Morris: "Were you aware that **Stanley Israel would have this obligation** with respect to the 4MM prepaid royalties?") (Emphasis added).

Nevertheless, 500 Group was alarmed that this belatedly raised tax issue would delay SWI's payment of the $10,000,000 under the Settlement Agreement, which was supposed to be paid within two weeks of its effective date. Tiramani Aff., ¶ 25.  This precipitated a series of discussions between representatives of SWI and 500 Group, **for settlement purposes only**, by email and telephone, mainly between Firooznia and Morris.  *Id.*, ¶ 25.  500 Group's motivation for engaging in these discussions was to assist SWI in obtaining an exemption for the ITA so as

to reduce SWI's purported tax obligation from twenty-five percent to fifteen percent and to expedite the payment due under the Settlement Agreement. *Id*., ¶ 26.

In the meantime, neither Bartone nor any other representative of SWI asked that Tiramani delay signing the Settlement Agreement or to agree to amend it in any way. *Id*., ¶ 27. Nor did Bartone nor any other representative of SWI attempt to withdraw or void SWI's execution of the Settlement Agreement. *Id*. Therefore, Tiramani signed the Settlement Agreement in Las Vegas, Nevada on behalf of 500 Group on March 31, 2017. *Id*.

At that point 500 Group was hopeful that the purported tax issue could be resolved quickly and that 500 Group would timely receive the $10,000,000 to which it was entitled under the Settlement Agreement. *Id*. However, it ultimately became clear that the purported tax issue would take more time to resolve and 500 Group decided to wait to declare SWI in breach of the Settlement Agreement for failure to timely make the $10,000,000 for a period of time, as SWI indicated that its intended tax payment to the ITA would be required to be made at the time it paid 500 Group the $10,000,000. *Id*., ¶ 28.

In order to assist SWI, 500 Group agreed to co-retain EY Israel with SWI to obtain an exemption so that SWI's purported tax liability to the ITA would be reduced from twenty-five percent to fifteen percent. *Id*., ¶ 29; Albanesi Tr., p. 64; Plf. Dep. Ex. 19. Based on SWI's representations, 500 Group's belief was that 500 Group's assistance in this regard would help expedite SWI's payment of the $10,000,000 to 500 Group. Tiramani Aff., ¶ 29.

While these discussions between the parties were ongoing and 500 Group was waiting for the purported tax issue to be resolved, SWI indicated at some point that it wished to reduce the payment to 500 Group by the amount of the tax liability. *Id*., ¶ 30. However, neither Tiramani

nor any other representative of 500 Group ever agreed or acquiesced to such a reduction in payment.  *Id*.; Hamid Firooznia Deposition Transcript ("Firooznia Tr."), pp. 45, 62.

The discussions between the parties regarding the tax issue were always for settlement purposes only.  Tiramani Aff., ¶ 30.  500 Group always intended and expected to be paid the full $10,000,000 as clearly agreed upon under the Settlement Agreement, without any reduction for SWI's purported tax liability.  *Id*., Firooznia Tr., pp. 45, 62.

Ultimately the exemption for SWI's purported tax liability was approved at fifteen percent, and on or about June 1, 2017, SWI wired the agreed payment under the Settlement Agreement to 500 Group, splitting the payment into the $1,000,000 earmarked for 500 Group's outside counsel, and the balance of $9,000,000 to 500 Group's bank account.  Tiramani Aff., ¶ 31.

500 Group subsequently learned that SWI had attempted to recall all or part of its wire transfer after it was made, and that 500 Group's bank refused to return the payment.  *Id*., ¶ 32; Fixler Tr., p. 66.  This request was unbeknownst to Tiramani, or any other representative of 500 Group, so neither instructed the bank not to return the funds.  Tiramani Aff., ¶ 32.

Thereafter, SWI began contacting 500 Group by email claiming it had made an overpayment of $600,000, the amount of its purported tax liability to the ITA, and requested that 500 Group refund that amount to SWI.  *Id*., ¶ 33.  Upon receipt of these requests, 500 Group consulted with legal counsel.  *Id*., ¶ 34.  Consistent with 500 Group's position throughout this ordeal, 500 Group had no intention of returning any portion of the money that SWI had agreed to pay for the purchase of the Patents, and felt it was extremely audacious of SWI to make such a demand.  *Id*.

Therefore, when Tiramani did respond to SWI by email he jokingly asked if they wanted the $4,000,000 or the $600,000 back, but he never intended or expected SWI to take this response seriously. *Id.*, ¶ 35. Nevertheless, Tiramani made it clear that 500 Group would not be refunding any part of the $10,000,000 payment clearly agreed upon the Settlement Agreement that both parties signed. *Id.*

On or about August 15, 2017, SWI paid $600,000 to the ITA for its purported tax liability. *Id.*, ¶ 36; Am. Compl., ¶ 32. SWI's payment of the $600,000 to the ITA was either a voluntary act, or confirmation that this purported tax liability was the responsibility of SWI. Tiramani Aff., ¶ 36.

## II.   LAW AND ARGUMENT

### A.  Legal Standard for Summary Judgment

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party must "demonstrate the absence of any material factual issue genuinely in dispute" to be entitled to summary judgment. *Am. Int'l Grp., Inc. v. London Am. Int'l Corp.*, 664 F.2d 348, 351 (2d Cir. 1981) (citing *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir. 1975)) (internal quotation marks omitted). All inferences and ambiguities must be viewed in the light most favorable to the nonmoving party. *Rogoz v. City of Hartford*, 796 F.3d 236, 245–46 (2d Cir. 2015).

"In order to defeat a summary judgment motion that is properly supported by affidavits, depositions, and documents as envisioned by [Rule 56], the opposing party is required to come forward with materials envisioned by the Rule, setting forth specific facts showing that there is a

genuine issue of material fact to be tried." *Gottlieb v. Cty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996). The non-moving party cannot "defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Id.* (citations omitted). In other words, "[w]hen the moving party has carried its burden under Rule 56[], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party "must present specific evidence demonstrating a genuine dispute." *Gannon v. UPS*, 529 F. App'x 102, 103 (2d Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (internal quotation marks and citation omitted); *see also Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.").

## B. 500 Group is Entitled to Summary Judgment on SWI's Breach of Contract Claim.

Under New York law[2], the elements of a breach of contract claim are: (1) the existence of a contract between the plaintiff and the defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by the defendant; and (4) damages to the plaintiff caused by the defendant's breach. *See Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011). "In pleading these elements, a plaintiff must identify what provisions

---

[2] The Court has found that New York law applies to the breach of contract and unjust enrichment claims. Ruling on Motion to Dismiss, Doc. 38 ("Ruling"), pp. 6-7.

of the contract were breached as a result of the acts at issue." *Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354, 358 (S.D.N.Y. 2001). "Under New York law the initial interpretation of a contract is a matter of law for the court to decide. Included in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous." *Maniolos v. United States,* 741 F. Supp. 2d 555, 566 (S.D.N.Y. 2010) (internal quotation marks omitted). "It is axiomatic that where the language of a contract is unambiguous, the parties' intent is determined within the four corners of the contract, without reference to external evidence." *Id.* (*quoting Feifer v. Prudential Ins. Co.*, 306 F.3d 1202, 1210 (2d Cir. 2002); *see also Rosenblatt v. Christie, Manson & Woods, Ltd.*, 195 Fed. App'x 11, 12 (2d Cir. 2006) ("Where, as here, a contract is unambiguous, it is enforced according to its terms, and the court will generally not look 'outside the four corners of the document' to add to or vary it.").

In support of its claim for breach of contract, Plaintiff alleges the existence of an agreement with 500 Group whereby Plaintiff would withhold $600,000 of the payment due to 500 Group under the Settlement Agreement for remittance to the Israeli tax authority. (Am. Compl., ¶ 34). Plaintiff further alleges that it "fully performed under the Settlement Agreement and the parties' agreements and understandings by paying $9,400,000 to 500 Group." (Am. Compl., ¶ 35). By failing to return the alleged overpayment of $600,000, Plaintiff alleges 500 Group breached the agreement and breached the implied covenant of good faith and fair dealing. (Am. Compl., ¶ 36).

As set forth below, Plaintiff's First Count fails as a matter of law, because (1) the Settlement Agreement unambiguously does not authorize Plaintiff to pay 500 Group less than $10 million, nor does it require 500 Group to refund any portion of that amount to Plaintiff for a purported tax liability to the ITA; and (2) there is no genuine dispute of material fact that under

the Settlement Agreement 500 Group permanently transferred and assigned to Plaintiff all rights to the Patents, and thus the recited $4 million for prepaid "future royalties," was in name only, and thus no tax was owed for such misnamed "royalties" to the ITA; and (3) 500 Group never agreed to modify the Settlement Agreement..

> **1.  Plaintiff's Breach of Contract Claim is Contrary to the Express Terms of the Settlement Agreement.**

Plaintiff's Amended Complaint claims breach of contract based on 500 Group's acceptance and retention of the $10 million payment made by Plaintiff pursuant to the Settlement Agreement.  The Settlement Agreement, however, plainly establishes that $10 million is the amount Plaintiff was obligated to pay and to which 500 Group was entitled. Specifically, Section 1 of the Settlement Agreement, titled "Compensation Amount," states that Plaintiff "agrees to pay the sum of Ten Million U.S. Dollars ($10,000,000)" **to *500 Group***. (Settlement Agreement, § 1, p. 3) (emphasis added). Section 1 then provides a breakdown of the $10 million payment and directs Plaintiff to make payment of $1 million to 500 Group's legal counsel and $9 million directly to 500 Group. (Settlement Agreement, § 1, pp. 4-5).

While Plaintiff pleads in the Amended Complaint that it "was required to withhold any portion of the payment amount that is taxable under Israeli law and remit the tax to the Israeli tax authority" (Am. Compl., ¶ 13), Plaintiff does not identify any contract provision setting forth an agreement by 500 Group that any portion of the Compensation Amount would be withheld to satisfy Plaintiff's so-called obligations under Israeli law. *See Wolff*, 171 F. Supp. 2d at 358-59 (dismissing breach of contract claim where plaintiff failed to provide notice of the contractual provision allegedly breached).  In fact, there is no reference in the Settlement Agreement to withholding any portion of the "Compensation Amount" by Plaintiff for payment of taxes or otherwise.

Instead, despite the merger clause and strict express amendment requirements, Plaintiff claims the tax withholding is somehow implicit in the Settlement Agreement based on the parties' prior dealings in connection with the License Agreements that pre-dated the Settlement Agreement.[3] (*See* Am. Compl., ¶¶ 7-8, 13). Specifically, Plaintiff contends that the License Agreements "did not contain provisions relating to the tax treatment of royalty payments made under their terms..." and that 500 Group "consented and agreed" to a process under the License Agreements whereby Plaintiff made withholdings from royalty payments for remittance to the Israeli tax authority. (Am. Compl., ¶ 8). Accordingly, Plaintiff contends this process under the License Agreements necessarily carried over to the payment of settlement funds under the Settlement Agreement. (*See* Am. Compl., ¶ 13).

Plaintiff's claim that the parties' course of dealing under the License Agreements could somehow contradict the plain language of the Settlement Agreement is both legally and factually incorrect. Legally, the Settlement Agreement is a fully integrated written agreement containing a merger clause. Under New York law, "[w]here the parties have reduced their agreement to an integrated writing, the parol evidence rule operates to exclude evidence of all prior or contemporaneous negotiations or agreements offered to contradict or modify the terms of their writing." *Adler & Shaykin v. Wachner*, 721 F. Supp. 472, 476 (S.D.N.Y. 1988). Further, in New York, an express merger clause in a contract is "definitive proof of integration." *Wechsler v. Hunt Health Sys. (In re Towers Fin. Corp.*, 1999 U.S. Dist. LEXIS 8944, at *20-21 (S.D.N.Y. June 16, 1999) (*citing Mfrs. Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir. 1993)). Here, the Settlement Agreement includes an express merger clause stating: **"The Parties further**

---

[3] Plaintiff's Amended Complaint defines the term "License Agreements" as including certain Product License Agreements between Plaintiff and 500 Group dated May 14, 1997 and February 27, 2004, respectively, as well as a certain Letter Agreement dated January 10, 2007. (Am. Compl., ¶ 7).

14

**agree that this Agreement and Mutual Release represents the entire agreement between the**
**Parties and that there are no other agreements with regard to the settlement of the**
**disputed claims. Any and all discussions, drafts, statements, representations, or agreements**
**leading to this Agreement and Mutual Release are merged herein and superseded hereby."**
(Settlement Agreement, § 6(a), p. 7) (emphasis added).

Plaintiff's breach of contract count asks the Court to find an obligation on 500 Group's part to refund $600,000 of the $10 million paid by Plaintiff (i.e., accept a settlement payment of $9,400,000) despite the Settlement Agreement's unequivocal language entitling Plaintiff to the full $10 million.  First, both New York law and the express terms of the Settlement Agreement prevent Plaintiff from claiming any prior or contemporaneous agreement between the parties whereby Plaintiff would pay 500 Group less than $10 million, as stated in the Settlement Agreement. *See Adler & Shaykin*, 721 F. Supp. At 476 ("Where the parties have reduced their agreement to an integrated writing, the parol evidence rule operates to exclude evidence of all prior or contemporaneous negotiations or agreements offered to contradict or modify the terms of their writing."); *see also Wechsler*, 1999 U.S. Dist. LEXIS 8944, at *20-21 (an express merger clause in a contract is "definitive proof of integration").

Based on the Amended Complaint, Plaintiff claims that the alleged agreement requiring Plaintiff to withhold a portion of the settlement payment to remit to Israeli tax authorities purportedly existed at the time of the Settlement Agreement. (*See* Am. Compl., ¶ 13 ("As with the License Agreements, [Plaintiff] was required to withhold any portion of the payment amount..."). However, because evidence of an agreement whereby Plaintiff would pay 500 Group less than the full $10 million stated in the Settlement Agreement would clearly contradict, modify or expand upon the terms set forth in the Settlement Agreement, Plaintiff is barred under New York law and by the terms of the Settlement Agreement from relying on such agreements

or representations made prior to or contemporaneous with the execution of the Settlement Agreement. *See*, *e.g.*, *Intelligent Digital Sys., LLC v. Visual Mgmt. Sys.*, 736 F. Supp. 2d 596, 600-01 (E.D.N.Y. 2010) ("[C]onsideration of ... extra-contractual conditions is prohibited by the documents' merger clauses in particular, and New York law in general."). Accordingly, Plaintiff is barred under New York law from claiming the existence of a separate, contemporaneous agreement between the parties by which Plaintiff would pay 500 Group less than the Compensation Amount expressly set forth in the Settlement Agreement.

Nevertheless, in its Ruling (applying the motion to dismiss standard), this Court found that the Second Circuit's decision in *White v. White Rose Food*, 237 F.3d 174 (2d Cir. 2001), was sufficiently analogous to the circumstances in the present case, at least as alleged by Plaintiff in the Amended Complaint, to withstand dismissal under Rule 12(b)(6). Ruling, pp. 12-15. Although 500 Group respectfully disagrees, a more searching analysis on summary judgment demonstrates that *White Rose* is inapplicable to the present case. In *White Rose*, the Second Circuit held that a settlement agreement calling for an employer to place funds in escrow for payment of wage claims pending resolution of a dispute with the union was ambiguous on the issue of whether the escrow amount was inclusive or net of the employer's payroll tax obligation. *White Rose*, 237 F.3d at 180.

However, *White Rose* is distinguishable for a number of reasons, including the fact that the union and the employer had executed a written amendment to the settlement agreement that expressly provided that the employer would deduct payroll taxes from the settlement payment. *Id*. at 177. Most importantly, *White Rose* is distinguishable because the plaintiff union members brought the action against the defendant union and employer exclusively under § 301 of Labor Management Relations Act, 29 U.S.C.S. § 185 ("LMRA"), pursuant to a so-called hybrid § 301/DFR [duty of fair representation] claim. *Id*. at 176. "To establish a hybrid § 301/DFR

claim, a plaintiff must prove both (1) that the employer breached a collective bargaining agreement and (2) that the union breached its duty of fair representation vis-a-vis the union members. … The plaintiff may sue the union or the employer, or both, but must allege violations on the part of both." *Id*. at 178-79 (citation and footnote omitted).  The court ultimately found that the plaintiffs failed to prove that union violated its duty of fair representation to its members, and therefore, "their hybrid § 301/DFR claim against [the employer] necessarily fails as well." *Id*. at 183 (footnote omitted).

Notably, in determining that the settlement agreement was ambiguous because it failed to specify whether the employer's payment of the funds into escrow was net or inclusive of payroll tax, <u>the Court was applying federal labor law, and not New York contract law</u>.  The Court does not cite to any provision of New York contract law, nor has the Court's finding regarding the purported ambiguity caused by the omission in the settlement agreement regarding the tax implications been cited in any other cases outside of those brought under federal labor law.

The application of New York contract law with regard to an omitted term requires a different result. The court in *Chen-Oster v. Goldman, Sachs & Co*., 2010 U.S. Dist. LEXIS 141813 (S.D.N.Y. Mar. 1, 2010) (decided nearly a decade after *White Rose*) explained New York law on this point in detail, and the following extensive quote is instructive:

> "Under New York law, the presence or absence of ambiguity is determined by looking within the four corners of the document, without reference to extrinsic evidence." *Chapman v. New York State Division for Youth*, 546 F.3d 230, 236 (2d Cir. 2008). Accordingly, silence with respect to a particular issue does not generally render a contract ambiguous. *See Wyly v. CA, Inc*., No. 05 CV 4430, 2009 U.S. Dist. LEXIS 90037, 2009 WL 3128034, at *9 (E.D.N.Y. Sept. 29, 2009) ("'[S]ilence alone does not equate to ambiguity.'" (quoting *Henrich v. Phazar Antenna Corp*., 33 A.D.3d 864, 867, 827 N.Y.S.2d 58, 61 (2d Dep't 2006)); *Millgard Corp. v. E.E. Cruz/Nab/Fronier-Kemper,* No. 99 Civ. 2952, 2003 U.S. Dist. LEXIS 20928, 2003 WL 22741664, at *3 (S.D.N.Y. Nov. 18, 2003) (holding that "under New York law, the omission of terms in a contract does not create ambiguity"); *Kirschten v. Research Institute of America, Inc*., No. 94 Civ. 7947, 1997 U.S. Dist. LEXIS 24037, 1997 WL 739587, at *7-8 (S.D.N.Y. Sept. 24, 1997); *Reiss v. Financial Performance Corp*., 97 N.Y.2d 195, 199, 764 N.E.2d 958, 738 N.Y.S.2d 658, 661 (2001) ("'An omission or mistake in a contract does not constitute an ambiguity . . . .'" (quoting *Schmidt v. Magnetic Head Corp*., 97 A.D.2d 151, 157, 468 N.Y.S.2d 649, 654 (2d Dep't 1983))). And, in the absence of ambiguity, extrinsic evidence is inadmissible. *See Wyly*, 2009 U.S. Dist. LEXIS 90037, 2009 WL 3128034, at *9 ("Where a contract is unambiguous, extrinsic or parol evidence is inadmissible."); Millgard Corp., 2003 U.S. Dist. LEXIS 20928, 2003 WL 22741664, at *2 ("'Only when the language of the contract is ambiguous may a court turn to extrinsic evidence of the contracting parties' intent.'" (quoting *Curry Road Ltd. v. K Mart Corp*., 893 F.2d 509, 511 (2d Cir. 1990)).
>
> The cases cited by the plaintiffs for the proposition that "'silence as to [a] particular issue can, at times, create an ambiguity in a contract requiring the introduction of extrinsic evidence'" are inapposite. (Reply Memorandum of Law in Support of Plaintiffs' Motion to Compel Discovery at 3 (quoting *Wallace Industries, Inc. v. Salt City Energy Venture L.P*., 233 A.D.2d 543, 545, 649 N.Y.S.2d 531, 533 (3d Dep't 1996))). The language relied upon by the plaintiffs in the *Wallace Industries* case was dicta, since the court there found that the silence of a fully integrated contract with respect to a secondary issue created no ambiguity. *Id*. at 545, 649 N.Y.S.2d at 533. *Wallace Industries*, in turn, referred to another case cited by the plaintiffs, *Belknap v. Dean Witter & Co*., 61 N.Y.2d 802, 462 N.E.2d 125, 473 N.Y.S.2d 948 (1984). In *Belknap*, the court found that a corporate resolution had addressed, albeit incompletely, the issue of whether the defendant was obligated to continue the plaintiff's pension in the event of a

merger. *Id*. at 803-04, 473 N.Y.S.2d at 949. Thus, in stating that "[i]nsofar as that agreement was otherwise silent on the issue whether defendant had contracted to provide the pension, it was proper to admit extrinsic evidence that was probative of the parties' intent,' *id*. at 804, 473 N.Y.S.2d at 949 (emphasis supplied), the court was applying the unexceptional principle that extrinsic evidence is admissible where an agreement is ambiguous. *See Proteus Books Ltd. v. Cherry Lane Music Co*., 873 F.2d 502, 509-10 (2d Cir. 1989) (holding, under New York law, that extrinsic evidence is admissible to interpret ambiguous terms but not to alter or add terms).

Finally, in *Columbia Artists Management, LLC v. Swenson & Burnakus, Inc.*, No. 05 Civ. 7314, 2010 U.S. Dist. LEXIS 32879, 2010 WL 1379737 (S.D.N.Y. March 30, 2010), the court stated that "[i]ndustry custom may be used to provide a missing term when a contract is silent on an issue." 2010 U.S. Dist. LEXIS 32879, [WL] at *2. <u>However, the missing term must be one without which the contract is **inherently ambiguous** as to some issue material to defining the relationship between the parties.</u> *Cf. Kirschten*, 1997 U.S. Dist. LEXIS 24037, 1997 WL 739587, at *7 ("[W]hen a contract is silent on a point that the parties dispute, evidence outside the language of the contract itself may be considered <u>only if the point in issue is one that is 'essential' to the contract, i.e., without which a contract could not be found</u>."). In *Columbia Artists Management*, for example, the contract did not specify whether an opera singer was obligated to pay royalties to her agent for engagements booked prior to the termination of the contract but performed thereafter. 2010 U.S. Dist. LEXIS 32879, 2010 WL 1379737, at *2. Similarly, in *VistaTech Enterprises, Ltd. v. Brother International Corp.*, 677 F. Supp. 178, 180 (S.D.N.Y. 1988), the case cited by the court in *Columbia Artists*<u>, the missing term was the duration of the contract</u>; consequently, it was necessary to rely on extrinsic evidence to determine whether the agreement was at will or lasted for a particular period or, indeed, forever. 677 F. Supp. at 180. <u>In other words, the relationship between the parties to the contract was not adequately determined without supplying the missing term.</u>

*Id*. at *6-10 (emphasis added).[4]  *Accord, Spinelli v. NFL*, 96 F. Supp. 3d 81, 126-127 (S/D.N.Y 2015).

In the present case, the contract at issue is a settlement agreement intended to settle an arbitration dispute between the parties.  Settlement Agreement, p. 3.  In essence, the Settlement

---

[4] Significantly, in *Columbia Artists Management*, the agreement at issue was an <u>oral agreement</u>, 2010 U.S. Dist. LEXIS 32879 at *3, and therefore, <u>in contrast to the Settlement Agreement, obviously had no merger clause</u>.  There was also an inherent ambiguity apparent on its face, because, although the agreement provided that the defendant would pay a percentage of receipts for all events the plaintiff management agency had booked for the client, it was ambiguous as to whether such compensation was owed to the plaintiff for events booked during the term of the agreement, but occurring after its termination.  *Id*., *1-7.  Although the court found that extrinsic evidence was authorized because the agreement was silent, and therefore ambiguous, as to whether compensation for pre-booked, post-termination events was owed, *id*.,*4, in reality, this ambiguity was obvious on the face of the agreement.  In contrast, as explained above, <u>the Compensation provision of the Settlement Agreement is not facially ambiguous</u>.

Agreement provides for a payment of $10 million by SWI in exchange for a transfer of all rights to the Patents.  Although the Settlement Agreement states that the compensation will be split into two "allocation buckets," one for assignment of the rights to the Patents and the second for pre-paid future royalties, this provision is not missing an "essential term, without which a contract could not be found."  *See Chen-Oster*, 2010 U.S. Dist. LEXIS 141813 at *8 (citation omitted). There is nothing inherently or facially ambiguous regarding this allocation that require extrinsic evidence to explain their meaning.  Instead, Plaintiff here has alleged in the Amended Complaint that there is an unexpressed context and course of dealings between the parties that render the payment terms ambiguous.  However, this turns New York law on its head regarding the determination of whether a contract term is ambiguous, because extrinsic evidence cannot be considered before the contract is first found inherently ambiguous.

Nevertheless, even if the Settlement Agreement was in fact ambiguous under New York law with regard to whether tax would be owed on the so-called pre-paid future royalty payment, and which party would pay it, which it is not, the past practices or course of dealings between the parties does not support the Plaintiff's position.  As the New York Court of Appeals has explained: "Courts also may look to the past practice of the parties to give definition and meaning to language in an agreement…, which is ambiguous. …  However, past practice, like any other form of parol evidence, is merely an interpretive tool <u>and cannot be used to create a contractual right independent of some express source in the underlying agreement</u>."  *Aeneas McDonald Police Benevolent Ass'n v. City of Geneva*, 92 N.Y.2d 326, 333 (citations omitted) (emphasis added).  Even if Plaintiff could identify any relevant past practice between the parties, which it cannot, there is no "express source" in the Settlement Agreement regarding any obligation by 500 Group to pay a tax on a portion of the payment, nor for a right by Plaintiff for

reimbursement of any tax that it might pay.  In fact, Morris admits that when the Settlement

Agreement was being drafted **"I didn't appreciate the Israeli tax withholding issue."**  Plf.

Dep. Ex. 7, p. 2 (emphasis added).  Thus, given that the tax issue was apparently not even

contemplated by SWI in drafting the Settlement Agreement, there clearly could not be an

"express source" therein providing for such a payment by 500 Group.

Even if one were to examine the extrinsic evidence regarding the parties' past practice,

there is no genuine issue of material fact in dispute that the parties' **only previous settlement**

**agreement**, the 2007 Letter Agreement, expressly provided that the $790,000 compensation

payment would be "less applicable Israeli withholding tax."  Tirmani Aff., ¶ 12 and Ex. B, p. 1

thereto, p.1.  Thus, where the parties intended the payment by Plaintiff to 500 Group for past

royalties to be withheld by Plaintiff under a settlement agreement, i.e., the payment would be net

of any applicable taxes, the past practice of the parties was to expressly so provide.

Although 500 Group does not deny that it permitted Plaintiff to withhold applicable tax

from the monthly, i.e., periodic, royalty payments under the 1997 and 2004 License Agreements,

which did not expressly provide for such withholding, *id*., ¶ 9, when the parties executed a

settlement of a dispute under the 2007 Letter Agreement, which provided for a lump-sum

payment for past royalties, the parties expressly authorized Plaintiff to withhold applicable

Israeli tax in the agreement.  *Id*., ¶ 12 and Ex. B, p. 1.  Thus, the parties' past practice fully

supports 500 Group's position that no withholding by Plaintiff was contemplated or intended for

any portion of the payment under the Settlement Agreement in the absence of a specific

provision therefore.

      **2.**    **It is Undisputed that 500 Group Transferred All Rights and Title to the Patents to Plaintiff Under the Settlement Agreement, and as a Matter of Law, No Tax Was Owed.**

There is no dispute that 500 Group permanently transferred all rights to the Patents to Plaintiff under the Settlement Agreement in exchange for the recited Compensation of $10 million, despite the fact that $4 million of that amount was designated as a "fixed-fee payment for future royalties." Settlement Agreement, ¶ 1(ii). This is clear from the face of the Settlement Agreement itself. Under "Compensation Amount" $6 million "constitutes payment for SWI's purchase of all patents (listed on Schedule 1) and patents rights owned by 500 Group pertaining to the Rolling Workshop (RWS") and/or Products," and $4 million constitutes a fixed-fee payment for the future royalties (or any payments) due under the Agreements covering the next ten (10) years. SWI has no obligation for royalties or payments thereafter." Settlement Agreement, ¶ 1(i) and (ii) (emphasis added).

This provision further provides that:

> Upon receipt of the Compensation Amount by 500 Group, i) all business arrangements, contracts, and agreements which existed as of the Effective Date between 500 Group and/or Paolo Tiramani and SWI and any of its affiliates shall be deemed terminated and no other payments under the Agreements will be due from SWI to 500 Group whether it be for existing or future Products or otherwise, and ii) SWI shall be released from any past royalties, payments or interest due to 500 Group.

*Id.*, ¶ 1 (emphasis added).

These terms unequivocally demonstrate that no matter how the Compensation is broken down or categorized, upon payment of the $10 million by Plaintiff to 500 Group all rights and title to the Patents and products manufactured and sold subject to those Patents would permanently be owned by Plaintiff, and that 500 Group would retain no further rights under the

Patents.[5]  Although there can be no other reasonable interpretation of this provision, both 500

Group and Plaintiff agree that this was the intent of the Settlement Agreement.  *See* Trimani Aff.

¶¶ 16, 18-20, and Def. Dep. Ex. 2, p 2 (Morris: "we're not paying more than $10MM to

consummate a buyout of this contract.); Def. Dep. Ex. 4, p.2 (Fixler: "I can see that we have an

almost signed agreement with a $10M buyout…."; Plf. Dep. Ex. 21, p. 2 (Morris: "we opted to

pay a large amount of money to 'buy out' the contract and some patents with a very short life

span.").

        The law is clear that regardless whether a transfer of patent rights is called a license and

the compensation paid for the patent rights are stated as royalties, if the patent holder transfers all

rights to the patent to the transferee and does not retain title, the transaction is deemed a sale and

not a license.  As one court explained:

> "1.  The fact that the parties call an agreement a license and refer to themselves
> as licensor and licensee <u>and to the payments as royalties</u>, while a relevant
> consideration, <u>is not controlling and, as a matter of fact, appears to have been
> given very little weight by the courts.</u>  In one case the Court held that a transfer
> of patent rights was a sale despite the fact that the parties agreed in the
> instrument of transfer that the transaction not only was to be construed as a
> license but, specifically, that it was not to be construed as an assignment. *Pike v.
> United States*, D.C., 101 F.Supp. 100.
>
> 2. <u>The agreement must be construed according to what it does rather than what
> it says, and if it operates to transfer the grantor's entire title and interest in the
> patent, it will be held to be an assignment</u>.

*Merck & Co. v. Smith*, 155 F. Supp. 843, 845 (E.D. Pa. 1957) emphasis added)

---

[5] "Examples of substantial rights retained by a transferor include the right to terminate the agreement with or
without cause, *Bell Intercontinental Corporation v. United States*, 381 F. 2d 1004, 1020-1021 (Ct. Cl. 1967); rights
to grant a nonexclusive license to another firm and to compel the transferee to sublicense another, *Allied Chemical
Corporation v. United States*, 370 F. 2d 697 (C.A. 2, 1967); and the right to prohibit assignment of the agreement
without the transferor's written consent.  *Oak Manufacturing Co. v. United States*, 301 F. 2d 259, 262 (C.A. 7,
1962)." *Newton Insert Co. v. Commissioner*, 61 T.C. 570, 579 (1974).  500 Group clearly retained no such rights
under the Settlement Agreement.

"Where patent owner transfers his entire interest in patent, transaction constitutes sale as distinguished from mere license regardless of whether instrument was termed license or whether consideration was termed royalty on basis of percentage of sales over period of years." *Taylor v. Commissioner*, 16 T.C. 376 (1951).  "'Agreements transferring patent rights must be either assignments or licenses.  Whether an agreement be one or the other is governed by its substance, not its label.' *CMS Industries, Inc. v. L.P.S. International, Ltd.,* 643 F.2d 289, 294 (5th Cir. 1981) (citing *Waterman v. Mackenzie*, 138 U.S. 252, 255 (1891)). 'Where an agreement effectively transfers the entire bundle of rights residing in a patent, that agreement is an assignment.' *CMS Industries, Inc. v. L.P.S. International, Ltd*., 643 F.2d at 294 (citing *Etherington v. Hardee*, 290 F.2d 28, 29 (5th Cir. 1961))."  *Maruzen Int'l, Co. v. Bridgeport Merchandise, Inc.*, 770 F. Supp. 155, 158 (S.D.N.Y 1991).

The determination of whether an agreement to transfer patent rights is merely a license or a full assignment, i.e., sale, is determined by the contract interpretation rules of the applicable state law.  *Minco, Inc. v. Combustion Eng'g, Inc*., 95 F.3d 1109, 1117 (Fed. Cir. 1996).   Under New York state law, which controls the Settlement Agreement here, that determination is based on the language of the agreement and the surrounding circumstances.  *American Bank Note Holographics, Inc. v. Upper Deck Co*., 1997 U.S. Dist. LEXIS 661, *3-5 (S.D.N.Y., Jan. 27 1997).   Here the language of the agreement and the surrounding circumstances make clear that upon receipt of the recited consideration, 500 Group was transferring all rights to the patents at issue and no part of the transfer was merely a license.  *See , e.g., Bottlers' Seal Co. v. Rainey*, 225 N.Y. 369, 372-373 (1919) (a transfer of patent rights is a license where the transferor does not convey all of its rights in the patent to transferee).

24

Merely because $4 million of the Compensation under the Settlement Agreement was underlined characterized as pre-paid future royalties (on SWI insistence for its own purposes, Albanese Tr., pp. 30-32, 44, 65-66; Fixler Tr., pp. 43-44), does not actually transform that portion of the Compensation into royalties.   They are not.[6]  Thus, there was never any actual withholding required, as SWI admits that tax is only required to be paid for royalties, not for a sale of patent rights.   Fixler Tr., pp. 50 ("Now I know that for the patent it's a full exception and for the royalties it's a 15 percent tax.").

In fact, unbeknownst to 500 Group, as early as April 5, 2017, after the Settlement Agreement was executed, but before the payment was due, Lital Borovsky, Senior Manager for EY Israel warned SWI as follows: "However, we think the ITA [Israeli Tax Authority] might challenge the fact that you characterized the $4m as royalties **since you already purchase[d] the Patent**."  (SWI never shared this email with 500 Group, but rather, it was produced in discovery). Thus, SWI was fully aware that the $10 million compensation amount was for the purchase of 500 Group's patents, and the $4 million portion of the Compensation was not a true royalty payment.   Accordingly, when Plaintiff paid the ITA the $600,000 after 500 Group properly refused to reimburse that portion of the payment, SWI did so as a mere volunteer.  There was never any actual tax obligation to the ITA incurred, and no withholding was required.   Thus, even if there was a shred of competent evidence that 500 Group agreed to a reduction of the $10 million Compensation to account for taxes purportedly owed to the ITA, which there is not, because as a matter of law no such tax was actually owed, it follows that 500

---

[6] Nor can Plaintiff now argue that the lump sum $4 million portion of the Compensation as payment for past royalties, because the Settlement Agreement unambiguously characterizes this payment to be for underlined future royalties. Moreover, Plaintiff is actually amortizing the $4 million payment as future royalties.  Albanese Tr., pp. 31, 32, 44; Fixler Tr., pp. 43-44.

Group could not have breached the Settlement Agreement by refusing to pay or reimburse this amount.

### 3.     The Settlement Agreement Was Not Modified or Amended.

Both New York law and the express terms of the Settlement Agreement make clear that there is no genuine issue of material fact in dispute that there is no enforceable modification of the Settlement Agreement requiring 500 Group to accept less than the Compensation Amount ($10 million).  The Settlement Agreement clearly addresses the conditions necessary for modification.  Immediately following the language setting forth the merger clause, Section 6(a) states: "This Agreement and Mutual Release may not be modified except by a writing signed by both Parties hereto."  Settlement Agreement, § 6(a), p. 7.  New York law recognizes and enforces such contractual clauses.  *See John Street Leasehold LLC v. FDIC*, 196 F.3d 379, 382 (2d Cir. 1999) (New York law enforces requirements specifying conditions for modification of contracts); *Rose v. Spa Realty Assocs.*, 42 N.Y.2d 338, 343 (N.Y. 1977) ("Parties to a written agreement who include a proscription against oral modification are protected by subdivision 1 of section 15-301 of the General Obligations Law.  Any contract containing such a clause 'cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement ... is sought.'" (*quoting* N.Y. Gen. Oblig. Law § 15-301(1) (emphasis added).

"Fundamental to the establishment of a contract modification is proof of each element requisite to the formulation of a contract, including mutual assent to its terms." *Beacon Terminal Corp. v. Chemprene, Inc.*, 75 A.D.2d 350, 354 (N.Y. App. Div. 2d Dep't 1980). "Email communication evidencing an agreement to modify the terms of an agreement constitutes a 'signed writing' as per the statute of frauds, where (1) the terms of the proposed modification are

set forth in the email; (2) a reply email evidences acceptance of the proposed modification; and (3) the emails include signature blocks, which signify an intent to authenticate." *TV Tokyo Corp. v. 4Kids Entm't, Inc. (In re 4Kids Entm't, Inc.)*, 463 B.R. 610, 693-94 (Bankr. S.D.N.Y. 2011). Further, New York courts recognize that "the requirements of General Obligations Law § 15-301 are more stringent than those under the statute of frauds." *Keane Telecomms. Consulting, LLC v. Manhattan Telecomms. Corp.*, 2013 NY Slip Op 32261(U), ¶¶ 14-15 (N.Y. Sup. Ct. 2013) (*citing DFI Communications v. Greenberg*, 41 N.Y.2d 602, 606 (1977)); *Merrill Lynch Interfunding v. Argenti*, 155 F.3d 113, 121 (2d Cir. 1998) ("unlike the Statute of Frauds, § 15-301 requires more than a simple note or memorandum of agreement.").

500 Group never agreed to modify any terms of the Settlement Agreement and under no circumstances did 500 Group agree to accept less than the full $10 million Compensation amount.  Tiramani Aff., ¶¶ 28, 30, 34, 35.  Plaintiff cannot meet its burden of demonstrating the existence of a genuine issue of material fact in dispute regarding this issue, **because it has no signed writings from 500 Group in which 500 Group agrees to pay any purported tax liability under the Settlement Agreement.**  There is certainly nothing on writing sufficiently definite to even infer such an agreement.  *See Kaplan v. Old Mut. PLC*, 526 F. App'x 70, 72 (2d Cir. 2013) ("'Contract modification requires proof of each element requisite to the formation of a contract, <u>including a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms.</u>'") (emphasis added) (quoting *Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*, 93 N.Y.2d 584 (1999)).

Finally, Plaintiff's allegation that 500 Group breached of the implied covenant of good faith and fair dealing is insufficient to support a claim under the Settlement Agreement fails as a matter of law.  While under New York law, courts generally assume an obligation of good faith

27

and fair dealing between parties to a contract, this obligation "cannot be used to create independent obligations beyond those agreed upon and stated in the express language of the contract." *Wolff*, 171 F. Supp. 2d at 359 (*citing Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 17 F. Supp. 2d 275, 305 (S.D.N.Y. 1998) ("Any purported duty of good faith cannot add to, detract from, or alter the terms of the contract itself."); *see also Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 304 (N.Y. 1983) ("No obligation can be implied, however, which would be inconsistent with other terms of the contractual relationship."). Here, any duty of good faith and fair dealing implied in the Settlement Agreement cannot be plausibly construed to require 500 Group to accept less money than that which the Settlement Agreement expressly states it is entitled to receive.

### C.  Plaintiff's Unjust Enrichment Claim Fails as a Matter of Law.

Under New York law, the plaintiff must establish the following elements to prevail on a claim for unjust enrichment: "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.,* 448 F.3d 573, 586 (2d Cir. 2006). "The theory of unjust enrichment lies in a quasi-contract claim. It is an obligation the law creates *in the absence of any agreement*." *Id.* at 586-87 (*quoting Goldman v. Metropolitan Life Ins. Co.*, 5 N.Y.3d 561, 572 (N.Y. 2005)).

The unjust enrichment, Plaintiff alleges, is 500 Group not repaying $600,000, which Plaintiff contends it was not entitled to under "the parties' agreements and understandings."  Am. Compl., ¶ 40). Based on these factual allegations, Plaintiff's unjust enrichment claim arises under a contract (the Settlement Agreement), the existence and enforceability of which is not disputed, and which clearly covers the subject matter of the amount 500 Group was entitled to

receive as payment from Plaintiff. Consequently, Plaintiff's claim fails as a matter of law and cannot be pleaded in the alternative to the breach of contract claim.

As the New York Court of Appeals has explained: "The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.... It is impermissible ... to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties." *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388-89 (N.Y. 1987) (internal citations omitted).

Nevertheless, in its Ruling (applying the Motion to Dismiss standard), this Court rejected 500 Group's argument that the unjust enrichment claims should be dismissed for this reason. The Court stated that, although the Plaintiff could not recover for both breach of contract and unjust enrichment, it could validly plead unjust enrichment in the alternative, because parties are at odds as to whether the Settlement Agreement covers the present dispute.   Ruling, pp. 25-26. 500 Group respectfully disagrees.  Plaintiff specifically alleges that the Settlement Agreement, or an enforceable amendment thereto, required 500 Group to reimburse Plaintiff for the $600,000 tax payment to the ITA.  Am. Compl, First Count.  500 Group's position is that the Settlement Agreement also covers the dispute, because it required payment of the $10 million Compensation without any withholding, and there is no amendment that alters this requirement.  Therefore, both parties take the position that the dispute is covered by the Settlement Agreement, whether it was amended or not.  Neither party contends that the Settlement Agreement is or was invalid or unenforceable.

Moreover, if Plaintiff does not prevail on its breach of contract claim, this would be because it is found that (1) the Settlement Agreement expressly provides that 500 Group was entitled to receive the full $10 million Compensation amount provided by the Settlement Agreement, without any withholding by Plaintiff; and (2) that 500 Group did not agree to amend to the Settlement Agreement to authorize Plaintiff to withhold any amount for tax purposes. Under such circumstances, the factfinder would necessarily have to have found that the Settlement Agreement prohibited Plaintiff from withholding any part of the $10 million for taxes and 500 Group was contractually entitled to the full amount. Consequently, the precise subject matter of Plaintiff's unjust enrichment claim would necessarily be covered by the scope of the Settlement Agreement; and there could be no finding that 500 Group was unjustly enriched because it received exactly what the Settlement Agreement required - $10 million. Recovery by Plaintiff under an alternative quasi-contractual theory would therefore be barred. *See, e.g., Mueller v. Michael Janssen Gallery Pte. Ltd*., 225 F. Supp. 3d 201, 207 (S.D.N.Y. 2016) (under New York law a claim for unjust enrichment is barred if there is a valid contract governing the subject matter of the dispute). Thus, there is no basis as a matter of law for Plaintiff to pursue an unjust enrichment claim.

Another reason the unjust enrichment claims fails as a matter of law is, as explained, *supra*, the provision that characterizes the $4 million of the Compensation as prepaid future royalty payments must be construed as part of the compensation paid to 500 Group for the sale of the Patents, because no future royalties can be owed to a patent holder after it has transferred all the its patent rights to the purchaser. *See, e.g*., *Maruzen Int'l, Co.*, 770 F. Supp. at 158; *Merck & Co.*, 155 F. Supp. at 845. Because no future royalty payments were actually made, no tax liability for such purported royalty payments should have been incurred by either party. Thus, as

a matter of law 500 Group could not have been enriched by, and there was nothing unjust about, its justified refusal to reimburse Plaintiff after it voluntarily paid the tax to the ITA in furtherance of its own scheme to amortize the $4,000,000, which provided no benefit whatsoever to 500 Group.  Accordingly, 500 Group is entitled to summary judgment on the Second Count of the Amended Complaint.

### D.  The Defendants are Entitled to Summary Judgment of Plaintiff's CUTPA Claim

Connecticut's Unfair Trade Practice Act prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce." Conn. Gen. Stat. § 42-110b(a). "'Trade' and 'commerce'" is defined as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property ... and any other article, commodity, or thing of value <u>in this state</u>." Conn. Gen. Stat. § 42-110a(4) (emphasis added). "While the plain language of CUTPA is directed at unfair competition taking place 'in this state,' ... courts have held that CUTPA does not require that a violation actually occur in Connecticut, if the violation is 'tied to a form of trade or commerce **intimately associated** with Connecticut,' or if, where Connecticut choice of law principles are applicable, those princip[les] dictate application of Connecticut law." *Victor G. Reiling Assocs. v. Fisher-Price, Inc.*, 406 F. Supp. 2d 175, 200 (D. Conn. 2005).  The undisputed facts make clear that there is no genuine dispute of material fact that neither of these tests are satisfied here, warranting the entry of summary judgment on the Third Count.

There can be no dispute that the alleged CUTPA violation cannot be deemed to be intimately associated with Connecticut.  Plaintiff is an Israeli limited liability company based in Rosh Ha'Ayin, Israel.  Am. Compl., ¶ 1.  Plaintiff is owned by a Dutch company located in the Netherlands which, in turn, is owned by a Canadian corporation with its principal place of

31

business in Canada.  *Id.*  Although SWI is somehow affiliated with Stanley Black & Decker, Inc.

("SBD"), SWI is a separate corporate entity from other SBD entities, and generates its own profit

and loss statements. Fixler Tr. p. 42; Albanese Tr., p. 28.  SWI manufactures and markets storage

products, including toolboxes, which are produced at its plants in Israel.  Waysbort Tr. at pp. 10-

11.  The SBD business unit with which SWI is most closely affiliated is the GTS division, which

is headquartered in Towson, Maryland.  Albanesi Tr., pp. 11-12, 15, 29.

500 Group is and has always been a New York corporation with its principal place of

business in Las Vegas, Nevada.  Am. Compl., ¶ 2; Tiramani Aff., ¶ 4.  Although 500 Group had

previously maintained the ability to use temporary office space (through Regis) in Connecticut, it

moved its headquarters to Nevada in early February 2017, registered to conduct business there

and ceased all material operations in Connecticut.  Tiramani Aff, ¶ 4-5.  Although Tirimani was

previously a resident of Connecticut, he has been a resident of Nevada since February 2017.  The

Arbitration between the parties, which the Settlement Agreement settled took place in New

York.  *Id*., ¶ 15.  The Settlement Agreement began to be negotiated between the parts in late

February 2017, *id*., ¶ 17, which was after both 500 Group and Tiramani permanently relocated to

Nevada.  In–person negotiations took place in New York.  Firooznia Tr., p. 26.  The Settlement

Agreement's effective date is March 31, 2017.  Settlement Agreement, p. 1.  Any alleged

wrongful conduct by the Defendants occurred after this date.  The only connection to

Connecticut alleged by Plaintiff in the Amended Complaint is that the Compensation was wired

on June 1, 2017 from Plaintiff's bank in Israel to 500 Group's bank, which Plaintiff claims was

still located at that time in Connecticut (even though this bank has at least one brick and mortar

branch in Scarsdale, New York).  Am. Compl., ¶ 25.  However, because both Defendants were

located in Nevada, their alleged unfair conduct in refusing to refund the alleged overpayment by

Plaintiff in June 2017 took place in Nevada.  Because Plaintiff is an Israeli company located

Israel, any alleged harm caused by the Defendants' denial of Plaintiff's demand to refund the

alleged overpayment was in Israel.  These facts conclusively demonstrate that the alleged unfair

conduct by Defendants is not even close to being intimately associated with Connecticut.

Where the alleged unfair conduct took place outside of Connecticut, even where the

plaintiff is a Connecticut entity and the harm was felt in Connecticut, without more, courts have

found that this is insufficient to find that the conduct was intimately associated with Connecticut.

For example, in *CSL Silicones, Inc. v. Midsun Grp. Inc.*, 301 F. Supp. 3d 328 (D. Conn. 2018),

this Court granted the defendant's motion for summary judgment on the plaintiff's CUTPA

claim in connection with an intellectual property and unfair  competition dispute, where the

plaintiff was located in Connecticut, but the alleged disparaging statements by the defendant

occurred in India.  The Court explained as follows:

> The alleged violations forming the basis of this CUTPA claim — the allegedly
> disparaging remarks — are not "tied to a form of trade or commerce intimately
> associated" with Connecticut. The fact that Midsun's principal place of business
> is located in Connecticut (and that, as a result, an economic impact may be felt
> in Connecticut) is not sufficient by itself to tie the alleged violative conduct to
> Connecticut. *See PTI Assocs., LLC,* 2010 U.S. Dist. LEXIS 5922, 2010 WL
> 36330, at *5-6 (finding that allegations of economic impact within the state
> limited to those related to plaintiff's principal place of business being in
> Connecticut are insufficient to establish a cause of action under CUTPA).

*Id.* at 374.

In *Victor G. Reiling Assocs.,* the Court also granted the defendant's motion for summary

judgment on the plaintiff's CUTPA claim, although the plaintiff was located in Connecticut, and

the harm felt in Connecticut.   The Court explained as follows:

> First, the allegedly unfair practices - in the form of misappropriation,
> blackballing, and tortious interference - are not "tied to a form of trade or
> commerce intimately associated with Connecticut," *see Uniroyal*, 931 F. Supp.
> at 140, because these all took place in or from New York, where Fisher-Price is

> located. Additionally, the action figures and other products that Fisher-Price
> sold which allegedly misappropriated plaintiffs' concepts were marketed and
> sold in stores nationwide and on the Internet, not just in Connecticut. Thus,
> plaintiffs fail to meet the first test governing the application of CUTPA to
> allegedly unfair activity occurring outside of Connecticut.

*Victor G. Reiling Assocs.,* 406 F. Supp. 2d at 200.

The alleged wrongful conduct in the present case has even less connection with Connecticut than did the conduct in *CSL Silicones, Inc.* and *Victor G. Reiling Assocs.*, because neither party is located in Connecticut and the alleged wrongful conduct took place outside of Connecticut.  *See also Bulldog New York LLC v. Pepsico, Inc.* 8 F. Supp. 3d 152, 166 (D. Conn. 2014 (CUTPA did not apply where trade and commerce was associated with New York, not Connecticut).  Thus, as a matter of law, the alleged conduct is not intimately associated with Connecticut.

In addition, the undisputed facts establish that Plaintiff cannot satisfy the choice of law test for application of Connecticut law to maintain its CUTPA claim.  For tort claims, Connecticut courts apply the "most significant relationship" test under Section 145 of the Restatement. *See O'Connor v. O'Connor*, 201 Conn. 632, 648-50 (1986). That test includes four factors: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."  *See Otis Elevator Co. v. Factory Mut. Ins. Co.*, 353 F. Supp. 2d 274, 285 (D. Conn. 2005).

The analysis by the Court in *Victor G. Reiling Assocs.* is again instructive:

> In this case, plaintiffs are Connecticut entities, whereas defendant is a Delaware
> corporation with its principal place of business in New York. The alleged
> conduct causing injury took place in New York. The relationship between the
> parties is centered in New York, given that the relevant contracts were signed

and meetings took place in New York. The only factor that weighs in favor of application of Connecticut law is that the alleged injury occurred here, because the economic impact of the allegedly unfair practices was felt by plaintiffs in Connecticut, where they are located. Thus, Connecticut choice of law principles favor application of New York law over Connecticut law, with only one factor weighing in favor of the application of Connecticut law. Plaintiffs do not meet either test for the application of CUTPA to violations occurring outside of the state and defendant's motion for summary judgment on this claim is granted.

*Victor G. Reiling Assocs*., 406 F. Supp. 2d at 200-201 (footnotes omitted).

In contrast to *Victor G. Reiling Assocs*., Plaintiff here is not even located in Connecticut. Plaintiff's alleged injury, the loss of its $600,000, obviously occurred in Israel where it is located. As explained above, the place where the alleged conduct causing the injury occurred was in Nevada, where the Defendants were located during the relevant time period. None of the parties are domiciled, have a residence, place of incorporation or place of business in Connecticut, nor did they during the time period beginning in February 2017 when the relevant conduct occurred. Based on the undisputed facts, it cannot be argued that the relationship of the parties was centered in Connecticut. Accordingly, as a matter of law, Connecticut law does not apply under the "most significant relationship" test under Section 145 of the Restatement.

Therefore, summary judgment should enter in favor of the defendants on Plaintiff's CUTPA claim.

## III.     CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their

Motion to for Summary Judgment as to Plaintiff's Amended Complaint in its entirety.


Dated: July 31, 2020                                    Respectfully submitted,

                                                        DEFENDANTS
                                                        500 GROUP, INC. and PAOLO TIRAMANI


                                                 By:  */s/ Peter E. Strniste, Jr.*
                                                        Peter E. Strniste, Jr. (ct20830)
                                                        pstrniste@grsm.com
                                                        Robert M. Barrack (ct08422)
                                                        rbarrack@grsm.com
                                                        Gordon & Rees Scully Mansukhani
                                                        95 Glastonbury Boulevard, Suite 206
                                                        Glastonbury, CT 06033
                                                        Telephone: (860) 278-7448
                                                        Facsimile: (860) 560-0185

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 31st day of July 2020, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's system.

<u>/s/Robert M. Barrack.</u>
Robert M. Barrack (ct08422)
rbarrack@grsm.com
Gordon & Rees Scully Mansukhani
95 Glastonbury Boulevard, Suite 206
Glastonbury, CT 06033
Telephone: (860) 278-7448
Facsimile: (860) 560-0185

37