**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| Stanley Works Israel LTD. f/k/a Zag Industries, LTD.<br><br><br>Plaintiff,<br><br>vs.<br><br>500 Group, Inc. and Paolo Tiramani,<br><br>Defendants. | Case No. 3:17-cv-01765-CSH<br><br>August 21, 2020 |

**PLAINTIFF'S LOCAL RULE 56(a)2 STATEMENT OF FACTS**
**IN OPPOSITION TO SUMMARY JUDGMENT**

Pursuant to Rule 56(a)(21) of the Local Rules of Civil Procedure, the Plaintiff hereby submits the following Statement of Facts in Opposition to Defendants' Motion for Summary Judgment:

1.      The Defendant, Paolo Tiramani ("Tiramani") is President and sole shareholder of the Defendant, 500 Group, Inc. ("500 Group"), which is an intellectual property, product development and investment company.  Affidavit of Paolo Tiramani ("Tiramani Aff."), ¶ 3.

**Admitted**

2.      Tiramani founded and incorporated 500 Group in July 1986 as New York Corporation, with a small office in New York City until approximately1990.

**Admitted**

Thereafter, 500 Group operated out of temporary rented workspaces in Greenwich, Connecticut and Stamford, Connecticut until early February 2017 when 500 Group ceased any regular use of the rented workspaces in Connecticut.  *Id.*, ¶ 4.

**DENIED:** Tiramani continued to list an address on his e-mail communication in Greenwich, Connecticut through April 2017. Natasha Streitz, the bookkeeper/project coordinator for 500 Group operated from that Greenwich address though May or early June 2017 and 500 Group had Stanley Works Israel LTD. f/k/a Zag Industries, LTD. ("SWI") make payment under the parties Settlement Agreement on June 1-2, 2017 to its account at Patriot Bank in Stamford. Morris Dec at ¶¶ 65 75; EX F, Plf. Depo Exs.18, 19, and 22; EX. G, Def. Depo. Ex. 15 at Bates p. 043.

3.     500 Group also opened a small office in Nashua, New Hampshire in January 2016, which was closed in early February 2017. **Admitted** From early February 2017 until the present 500 Group's headquarters and sole office space has been and continues to be located in Las Vegas, Nevada. *Id.*, ¶ 4.

**DENIED:** See response to ¶ 2.

4.     Tiramani has been a resident of Las Vegas, Nevada since February 2017. *Id.*

**Admitted**

5.     500 Group registered as a foreign corporation doing business in Nevada on February 8, 2017. *Id.*, ¶ 5, and Ex. A thereto.

**Admitted**

6.     Although 500 Group maintained the ability to use the temporary rented workspaces in Connecticut after moving the operations to Las Vegas and opening the Las Vegas office, no significant business was conducted in Connecticut after early February of 2017. *Id.*

**DENIED:** See response to ¶ 2

7.      Among numerous other inventions and products, 500 Group developed and patented Rolling Workshop systems, which were adaptable to a number of mobile tool storage and workshop products.  *Id.*, ¶ 6.

**Admitted**

8.      The Plaintiff, Stanley Works Israel LTD. f/k/a Zag Industries, LTD ("SWI"), is an Israeli limited liability company based in Rosh Ha'Ayin, Israel.  Am. Compl., ¶ 1.  SWI is owned by a Dutch company located in the Netherlands which, in turn, is owned by a Canadian corporation with its principal place of business in Canada.  *Id.*

**Admitted**

9.      Although SWI is somehow affiliated with Stanley Black & Decker, Inc. ("SBD"), SWI is a separate corporate entity from other Stanley Back & Decker entities, and generates its own profit and loss statements.  Efrat Fixler Deposition Transcript ("Fixler Tr.") p. 42; Dean Albanesi Deposition Transcript of ("Albanese Tr."), p. 28.[1]

**Admitted:** SWI is a downstream subsidiary of SBD and SBD's units have their own profit and loss statements.  **OBJECTION**: The issue of SWI's profit and loss statements is irrelevant to the issues in this case.

10.      SWI manufactures and markets storage products, including toolboxes, which are produced at its plants in Israel.  Tali Waysbort Deposition Transcript ("Waysbort Tr.") at pp. 10-11.

**Admitted**

---

[1] All cited excerpts of deposition transcripts and exhibits are attached to the accompanying Declaration of Robert M. Barrack.

11.     The SBD business until [sic]with which SWI is most closely affiliated is the Global Tools & Storage ("GTS") division, which is headquartered in Towson, Maryland. Albanesi Tr., pp. 11-12, 15, 29.

**Admitted**

12.     On May 14, 1997, 500 Group entered into a license agreement (the "1997 License Agreement") with SWI pursuant to which 500 Group licensed to SWI for a limited time the rights to manufacture and distribute products subject to the Rolling Workshop patents (the "Patents") in exchange for monthly royalty payments.  Tiramani Aff., ¶ 7.

**Admitted**

13.     On February 27, 2004, 500 Group and SWI entered into a second license agreement (the "2004 License Agreement") providing SWI the rights to manufacture and distribute products subject to the Patents in exchange for monthly royalty payments.  *Id*., ¶ 8.

**Admitted**

14.     Based on information provided to 500 Group that that Israeli law made the royalty payments taxable to 500 Group, 500 Group permitted SWI to withheld fifteen percent of each royalty payment to satisfy this tax obligation to the Israeli government.  *Id*., ¶ 9.

**Admitted**

15.     The monthly royalty payments under the 1997 and 2004 License Agreements were made by SWI from its bank in Israel to 500 Group's Bank in New York.  Fixler Tr., pp. 24, 28, 30.

**Admitted**

16.     Subsequent to the execution of the 2004 License Agreement a dispute arose between 500 Group and SWI due to SWI's failure to pay royalties for certain products required

by the 1997 License Agreement, and SWI's failure to label licensed products that were produced under license from 500 Group as required.  Tiramani Aff, ¶ 10.

**Admitted:** That a dispute arose.  **DENIED:** That the cause of the dispute was any failure by SWI.  The claims by Tiramani and the 500 Group were not adjudicated.  The Letter Agreement, Tiramani Aff, Exh. B, does not determine who was at fault. Morris Dec. at  ¶ 9.

17.     After 500 Group threatened to initiate legal action against SWI, in January of 2007 the parties entered into a letter agreement (the "2007 Letter Agreement") to settle the dispute.  *Id*., ¶ 11 and Ex. B.

**Admitted**

18.     Pursuant to the 2007 Letter Agreement, among other things, SWI agreed to pay 500 Group a lump sum payment of $790,000 to cover prior unpaid royalties under the 1997 License Agreement through March 31, 2006.  *Id*., ¶ 12 and Ex. B.

**Admitted:** that SWI agreed to pay $790,000.  **DENIED:** The Letter Agreement does not specify the payment was for "unpaid royalties".  Tiramani Aff, Exh. B

19.     Although the lump sum payment was in the nature of a settlement payment, because that payment was for *unpaid past royalties*, **the 2007 letter Agreement expressly provided that the $790,000 payment would be "less applicable Israeli withholding tax."**  *Id*. and Ex. B, p.1.

**Admitted:** to the extent the 2007 letter Agreement expressly provided that the $790,000 payment would be "less applicable Israeli withholding tax".  **DENIED:** the Letter Agreement does not specify that the withholding was "because that payment was for *unpaid past royalties.*" Tiramani Aff, Exh. B

20.     The 2007 Letter Agreement also reconfirmed the 1997 License Agreement and provided that SWI would pay a two percent royalty on designated products for all sales made after April 1, 2006.  *Id*., ¶ 13 and Ex. B thereto, p.1

**Admitted**

21.     Despite the settlement reached between the parties pursuant to the 2007 Letter Agreement, SWI continued to violate the 1997 License Agreement, the 2007 Letter Agreement and other legal rights of 500 Group by, among other things, failure to pay royalties for licensed products, failure to mark Products with the 500 Group copyright notice, failure to submit Products to 500 Group for quality control and approval, misappropriation of 500 Group's intellectual property and designs and theft of trade secrets.  *Id*., ¶ 14.

**DENIED:** The Settlement Agreement, Tiramani Aff, Exh. C, does not determine who was at fault and all claims and counterclaims were dismissed with prejudice.  Exh. C at ¶ 4.

22.     SWI's violations caused 500 Group to demand arbitration (the "Arbitration") against SWI, which commenced in New York.  *Id*., ¶ 15.

**Admitted:** To the extent 500 Group demanded arbitration. **DENIED:** That SWI committed any violations and under the Settlement Agreement all claims and counterclaims were dismissed with prejudice, without any admissions in the agreement.  Tiramani Aff, Exh. C at ¶ 4.

23.     SWI then filed a meritless counterclaim against 500 Group in the Arbitration.  *Id*. **Admitted:** to the extent SWI filed counterclaims. **DENIED:** That SWI's counterclaims were meritless, under the Settlement Agreement all claims and counterclaims were dismissed with prejudice without any admissions or determination of the merits.  Tiramani Aff, Exh. C at ¶ 4.

24.     Rather than pursue the Arbitration to completion, the parties agreed to settle the dispute by way of (1) 500 Group selling and permanently assigning all rights to the Patents to

SWI in exchange for a lump sum payment; (2) releasing each other from all claims, rights and obligations under the 1997 License Agreement, the 2004 License Agreement, the 2007 Letter Agreement, and the claims and counterclaim asserted in the Arbitration.  *Id*., ¶ 16 and Ex. C.

**Admitted:** the parties agreed to settle. **DENIED:** that paragraph 24 fully states the terms of the agreed upon settlement, which is set forth in full in the Settlement Agreement. Tiramani Aff, Exh. C.

25.     In order to detail and memorialize such a settlement the parties began negotiating the terms of a written agreement beginning in late February 2017, after both 500 Group and Tiramani relocated to Las Vegas, Nevada.  *Id*., ¶ 17.

**Admitted:** That the parties negotiated a settlement in February and March 2017 and that Tiramani moved to Las Vegas and moved some operations of 500 Group to Las Vegas in February 2017.  **DENIED:** That 500 Group had fully relocated to Las Vegas.  Tiramani continued to list an address on his e-mail communication in Greenwich, Connecticut through April 2017.  Natasha Streitz, the bookkeeper/project coordinator for 500 Group operated from that Greenwich address though May/June 2017 and 500 Group had SWI make payment under the parties Settlement Agreement on June 1-2, 2017 to its account at Patriot Bank in Stamford. Morris Dec. at ¶¶ 63, 65, and 73

26.      Representatives of the parties met in New York at the end of February to discuss details of the settlement to be memorialized in a written agreement.  Deposition Transcript of Hamid Firooznia ("Firooznia Tr."), p. 26.

**Admitted**

27.     500 Group ultimately agreed to a lump sum payment of $10,000,000 from SWI for the sale and assignment of the Patents, with $9,000,000 being paid directly to 500 Group and

Case 3:17-cv-01765-CSH   Document 66   Filed 08/21/20   Page 8 of 21

$1,000,000 paid to 500 Group's outside attorney for legal fees incurred in connection with the Arbitration. *Id.*, ¶ 18 and Ex. C, pp. 3-4.

**Admitted** to the extent the Settlement Agreement provided $9 million would be payable to 500 Group and $1 million would be paid to 500 Group's attorneys. **DENIED:** as to the amount payable for the patents in that the parties expressly agreed that only $6 million would be attributable to a payment for the patents. Tiramani Aff, Exh. C at ¶ 1.

28.    However, SWI insisted that a portion of the $10,000,000 purchase price for the Patents, ultimately agreed to be $4,000,000, be deemed a fixed-fee payment for future royalties over the next ten years. *Id.*, ¶ 19.

**Admitted** to the extent the parties agreed $4 million was a payment for 10 years of future royalties. **DENIED:** that there was ever was an agreement that $10 million was attributed to the purchase of the patents. Tiramani Aff, Exh. C at ¶ 1.

29.    500 Group wanted the entire $10,000,000 payment to be characterized as the purchase price for the Patents, while SWI wanted to characterize as much of the payment as possible as pre-paid future royalty payments. Albanesi Tr., pp. 65-66.

**Admitted**

30.    The reason that SWI wanted $4,000,000 of the $10,000,000 payment characterized in the settlement agreement as future royalties was so that SWI could amortize the $4,000,000 over the next ten years, which would benefit SWI by (a) improving its profit and loss 'P&L") statement by not showing a large one-time expense, and showing only an annual $400,000 expense for ten years these amounts would be offset by a $4,000,000 asset; Albanese Tr., pp. 30-32, 44; Fixler Tr., pp. 43-44; and (b) for Israeli tax purposes SWI would be able to

deduct what be shown as a $400,000 payment each year for the next ten years; Defendants'

Deposition Exhibit (Def. Dep. Ex.") 5, p. 1, ¶ 2.

> **Admitted**

31.     SWI arrived at the $4,000,000 figure because it could offset $6,000,000 of the

$10,000,000 payment amount by an accrual it already had, and wanted to write the remaining

$4,000,000 as a pre-paid asset, which it could amortize over the next ten years.  Fixler Tr., pp.

43-44.

> **Admitted**

32.     Nevertheless, SWI fully intended the $10,000,000 payment as compensation for

as a complete "buyout" of the Patents from 500 Group, and recognized it as such.  Def. Dep. Ex.

2, p 4 ("we're not paying more than $10MM to consummate a buyout of this contract.); Def.

Dep. Ex. 4, p. 2 (I can see that we have an almost signed agreement with a $10M buyout…."; 

Plaintiff's Deposition Exhibit ("Plf. Dep. Ex.") 21, p. 2 ("we opted to pay a large amount of

money to 'buy out' the contract and some patents with a very short life span.").

> **DENIED:** This mischaracterize the terms of the final Settlement Agreement.  The parties
> agreed that $6 million was for the buyout of patents and $4 million was for 10 years of future
> royalty payments.  Tiramani Aff, Exh. C at ¶ 1.

33.     SWI outside accountant, EY Israel, from whom SWI sought advice regarding the

tax treatment by the Israeli government of the characterization of the $10,000,000 payment under

the Settlement Agreement as split between payment for the Patents and pre-paid future royalties,

warned SWI on April 5, 2017, that "we think that the ITA [Israeli Tax Authority] might

challenge the fact you characterized the $4m as royalties **since you already purchased the**

**Patent**." Def. Dep. Ex. 5, p. 1, ¶ 2 (emphasis added).

**Admitted.  OBJECTION:** Irrelevant and speculative. E&Y said "ITA might challenge" when in fact the ITA accepted 500 Group's application for preapproval of 15% withholding with the $4 million as future royalty payments.  Morris Dec. at ¶ 70.

34.    A tax liability would only be incurred to the ITA for royalty payments, not for a sale of patent rights.  Fixler Tr., p. 50 ("Now I know that for the patent it's a full exception and for the royalties it's a 15 percent tax.").

**Admitted.**  And the tax liability being discussed was that of 500 Group.  Morris Dec. EX. D, Fixler Depo. at p. 50.

35.    The understanding of 500 Group was that the characterization of the $4,000,000 payment for future royalties in the settlement agreement (the "Settlement Agreement") was merely a technicality that would provide some benefit to SWI, but would not negatively affect 500 Group, including its right to receive the full $10,000,000 in compensation for the sale of the Patents.  Tiramani Aff., ¶ 19.

**Admitted:** To the extent that the $4 million royalty would not negatively affect 500 Group.  **DENIED:** That $4 million royalty was a mere technicality.   This characterization contradicts the express terms of the Settlement Agreement and 500 Group's CPA Hamid Firooznia's clear understanding that the Royalty would be subject to withholding for the ITA and would not adversely affect 500 Group because the Israel tax on the royalty payment would offset 500 Group's United States' tax liability.  Tiramani Aff, Exh. C. Morris Dec. at ¶¶ 33-34.  Kovac Dec. at ¶ 6-7.

36.    During the negotiations, SWI made no mention of any tax consequences to 500 Group or that any amount would be required to be withheld as was done with respect to the periodic royalty payments under the prior agreements.  *Id*., ¶ 20; Plf. Dep. Ex. 7, p. 2 (Morris

states that "I didn't appreciate the Israeli tax withholding issue" when the Settlement Agreement was being drafted).

**Admitted:** as to negotiations before March 29, 2017.  **DENIED:** in that Morris revealed orally and in writing to 500 Group that withholding would be deducted from the $10 million before 500 Group signed the Settlement Agreement on March 31, 2017.

37.     The Settlement Agreement was intended to effectuate a sale of the Patents, i.e., a complete "buyout" of the Patents, rather than a license, which is a limited right.  Tiramani Aff., ¶ 20.

**DENIED:** This statement directly contradicts the terms of the Settlement Agreement which provides $4 million was paid for 10 years of future royalties. Tiramani Aff, Exh. C at ¶ 1.

38.     The intent of the Settlement Agreement was for 500 Group to transfer to SWI the full title to the Patents in exchange for the $10,000,000 payment.  *Id*.

**DENIED:** This statement directly contradicts the terms of the Settlement Agreement which provides $4 million was paid for 10 years of future royalties and $6 million was paid for the patent buyout. Tiramani Aff, Exh. C at ¶ 1.

39.     500 Group would have never agreed to a settlement for any amount less than the full $10,000,000 that SWI agreed to pay for title to the Patents.  *Id*.

**Admitted** 500 Group wanted $10 million on the total settlement.  **DENIED:** This statement directly contradicts the terms of the Settlement Agreement which provides $4 million was paid for 10 years of future royalties and $6 million was paid for the patent buyout. Tiramani Aff, Exh. C at ¶ 1.

40.     500 Group's understanding is that after the parties agreed on the essential terms of the settlement agreement ("Settlement Agreement"), the written agreement was drafted by SWI's legal counsel.  *Id*., ¶ 21 and Ex. C.

**DENIED:** This statement directly contradicts the terms of the Settlement Agreement which provides that 500 Group had full opportunity to consult counsel. Tiramani Aff, Exh. C at ¶ 6(c). 500 Group's counsel was involved in negotiation of the Settlement Agreement.  Morris Dec. at ¶ 11.

41.     After the Settlement Agreement was drafted, it was signed on behalf of SWI on March 28, 2017 by Michael Bartone, a Director of SWI, and was then forwarded to Tiramani for execution on behalf of 500 Group.  Tiramani Aff., ¶ 22.

**Admitted**

42.     However, on March 29, 2017, Hamid Firooznia ("Firooznia"), 500 Group's outside accountant in New York, and Tiramani received an email from Ted Morris (the Assistant General Counsel for SBD), who for the first time indicated that SWI had hit a "snag" as it was getting ready to "consummate the deal".  Morris indicated that he only recently learned that SWI would have an obligation under Israeli law to pay withholding tax on the $4 million that was characterized in the Settlement Agreement as pre-paid royalties, and that obligation would be either fifteen or twenty-five percent, depending on the what SWI's auditors could get approved. *Id*., ¶ 23 and Ex. D.

**Admitted**.

43.     500 Group did not understand why this issue was being raised at this late time, but nevertheless understood the problem to be SWI's issue, and not that of 500 Group.  Tiramani Aff., ¶ 24.

**DENIED:** Hamid Firooznia 500 Group's CPA knew that 500 Group had a duty to pay taxes on royalty payments and he hoped it would be limited to the 15% which had always been applied to royalties after 500 Group obtained pre-approval from the ITA.  Morris Dec. at ¶ 33. Kovac Dec. at ¶ 5.   Neither Tiramani nor 500 Group ever asserted it was SWI's obligation to pay withholding for taxes from SWI's own funds when in fact it was 500 Group that was legally obligated to pay the taxes.  Morris Dec. at ¶¶ 35 and 47.  Kovac Dec. at ¶ 8.

44.     500 Group understood the term "withholding" in this context to be a euphemism for SWI's purported tax obligation to the Israeli government, and not any obligation of 500 Group.  *Id.*, and Ex. D (Morris: "Were you aware that **Stanley Israel would have this obligation** with respect to the 4MM prepaid royalties?") (Emphasis added).

**DENIED:** Tiramani, Firooznia and 500 Group all understood from long practice that "withholding" meant the amount which would be deducted from a payment SWI was making to 500 Group for the taxes owed by 500 Group on royalty payments it was receiving.  This is evidenced by the term "withholding" as used in the 2007 Letter Agreement, Tiramani Aff, Exh. B, and by the practice of withholding on monthly payments from SWI to 500 Group for years prior to the Settlement Agreement. Morris Dec. at ¶¶ 22-27, 33-35   Kovac Dec. at ¶ 5-6

45.     Nevertheless, 500 Group was alarmed that this belatedly raised tax issue would delay SWI's payment of the $10,000,000 under the Settlement Agreement, which was supposed to be paid within two weeks of its effective date. Tiramani Aff., ¶ 25.

**Admitted**

46.     This precipitated a series of discussions between representatives of SWI and 500 Group, **for settlement purposes only**, by email and telephone, mainly between Firooznia and Morris.  *Id.*, ¶ 25.

**Admitted;** there was a call and there were emails between Morris and Firooznia.

**OBJECTION:** If these communications were intended as inadmissible communications under F.R.E 408, Defendants have opened the door to the admission of these communications by offering them into evidence in support of their Motion for Summary Judgment. *See* Tiramani Aff, Exh. D;  Barrack Dec. Ex. 5 Bates pp 210-21 and Ex. 6 Bates p 241-242.

47.     500 Group's motivation for engaging in these discussion was to assist SWI in obtaining an exemption for the ITA so as to reduce SWI's purported tax obligation from twenty-five percent to fifteen percent. *Id.*, ¶ 26.

**DENIED:** At no time did 500 Group or Tiramani ever express the view that the withholding requirement was to be paid from SWI's funds as opposed to being a deduction from the payment being made to 500 Group under the Settlement Agreement.  Morris Dec. at ¶¶ 35, 47 and 61.  Firooznia confirmed his understanding the withholding would come from the payment to 500 Group in a telephone call with Morris and William Kovac on March 30, 2017 and even acknowledged that 500 Group would receive an offsetting United States foreign tax credit for the withheld Israeli tax. Morris Dec. at ¶¶ 33-35. Kovac Dec at -¶ 6.

48.     In the meantime, neither Bartone nor any other representative of SWI asked that Tiramani delay signing the Settlement Agreement or to agree to amend it in any way. *Id.*, ¶ 27.

**Admitted**

49.     Nor did Bartone or any other representative of SWI attempt to withdraw or void SWI's execution of the Settlement Agreement. *Id.*

**Admitted**

50.     Therefore, Tiramani signed the Settlement Agreement in Las Vegas, Nevada on behalf of 500 Group on March 31, 2017. *Id.*

**Admitted** Tiramani signed.  **DENIED:** that the signature was with understanding SWI would pay taxes for 500 Group.  Morris put Tiramani and 500 Group on notice that if SWI paid 500 Group, prior to obtaining pre-approval from the ITA, the payments would be subject to up to 25% withholding and Tiramani and 500 Group agreed to seek such preapproval even though they were on notice it could take at least 4 weeks. At no time did 500 Group ask that SWI proceed with the settlement payment within the two weeks of signing the Settlement Agreement. Morris Dec. at ¶¶ 27-31, 33-37, 40 and 46.

51.     At that point 500 Group was hopeful that the purported tax issue could be resolved quickly, and that 500 Group would timely receive the $10,000,000 to which it was entitled under the Settlement Agreement.  *Id*.

**DENIED:** See response to ¶ 50.

52.     However, it ultimately became clear that the purported tax issue would take more time to resolve and 500 Group decided to forebear from declaring SWI in breach of the Settlement Agreement for failure to timely make the $10,000,000 for a period of time, as SWI indicated that its intended tax payment to the ITA would be required to be made at the time it paid 500 Group the $10,000,000.  *Id*., ¶ 28.

**DENIED:** The agreed upon "mission" was to get disbursements of (i) $1MM to Eckert [500 Group's counsel on the arbitration] and (ii) $9MM minus $600k (withholding of 15% of the $4MM advance royalty payment) = $8.4MM to 500 Group.  Morris advised Tiramani and Firooznia that:

> to accomplish that, *someone* needs to get pre-approvals from Israel for the 15% reduced number for royalty payout, and 0% withholding for the other $6MM.  I'm stymied because I am told this is 500 Group's tax issue (i.e., if it wants special treatment as it has in the past), and 500 Group's routine responsibility in years past when it wanted special tax treatment for royalty payments.

> It is also my understanding that if we can't accomplish that "mission", and simply are instructed to disburse monies pursuant to the agreement, we will be forced to follow the law and disburse all $10MM minus 25% withholding – and it would be for 500 Group to chase the Israeli tax authorities for refunds of a portion of the 25%.  In other words, the burden of dealing with the tax implications/refunds/approvals that are driven by the settlement payment end up – predictably – on the party getting PAID (not the party doing the paying and withholding.)

Morris Dec. at ¶¶ 48-51

53.      In order to assist SWI, 500 Group agreed to co-retain EY Israel with SWI to obtain an exemption so that SWI's purported tax liability to the ITA would be reduced from twenty-five percent to fifteen percent.  *Id*., ¶ 29; Albanesi Tr., p. 64; Plf. Dep. Ex. 19.

**DENIED:**  Although as Albanesi testified E&Y had worked as an auditor for SWI and SBD, it was 500 Group that retained E&Y to obtain preapproval for 15% withholding from the ITA and subsequently SWI agreed to consent to that retention.  Morris Dec. at ¶¶ 49, 54, 56 and 63-64.

54.      Based on SWI's representations, 500 Group's belief was that 500 Group's assistance in this regard would help expedite SWI's payment of the $10,000,000 to 500 Group.  Tiramani Aff., ¶ 29.

**DENIED:**  500 Group was on notice it would receive the $10 million less the $600,000 withholding if E&Y was in successful in obtaining preapproval from the ITA and 500 Group accepted that situation.  Morris Dec. at ¶¶ 48-56.  Firooznia knew such withholding applied to the royalty payment under the Settlement Agreement.  Morris Dec. at ¶¶ 33-35. Kovac Dec at -¶ 6.

55.     While these discussions between the parties were ongoing and 500 Group was waiting for the purported tax issue to be resolved, SWI indicated at some point that it wished to reduce the payment to 500 Group by the amount of the tax liability. *Id*., ¶ 30.

**DENIED:** Morris and Efrat Fixler made it clear from March 29th and through repeated communication thereafter that the withholding liability was on 500 Group and Tiramani, 500 Group and Firooznia, never articulated any other position.  Morris Dec. at ¶¶ 27, 29-30, 33-35, 40, and 42-47.  Kovac Dec. at ¶ 5-6.

56.     However, neither Tiramani nor any other representative of 500 Group ever agreed or acquiesced to such a reduction in payment.  *Id*.; Hamid Firooznia Deposition Transcript ("Firooznia Tr."), pp. 45, 62.

**DENIED:** Morris Dec. at ¶¶ 48-55.  Kovac Dec. at ¶ 6

57.     The discussions between the parties regarding the tax issue were always for settlement purposes only.  Tiramani Aff., ¶ 30.

 **DENIED:** The discussions and communication were about the "mission" of getting E&Y to obtain preapproval to limit the withholding which would be deducted from the payments SWI would make to 500 Group and the subsequent discussions and communications were about the timing of when that net payment, reduced for withholding for the ITA, would be made.  Most of these communications were not labeled as for settlement purposes.  Morris Dec. at ¶¶  48-55

**OBJECTION:** If these communications were intended as in admissible communications under F.R.E 408, defendants have opened the door to the admission of these communications by offering them into evidence in support of their Motion for Summary Judgment.  .  *See* Tiramani Aff, Exh. D;  Barrack Dec. Ex. 5 Bates pp 210-21 and Ex. 6 Bates p 241-242.

58.     500 Group always intended and expected to be paid the full $10,000,000 as clearly agreed upon under the Settlement Agreement, without any reduction for SWI's purported tax liability.  *Id*., Firooznia Tr., pp. 45, 62.

**DENIED:** Morris made it clear from March 29th and through repeated communication thereafter that the withholding liability was on 500 Group and Tiramani, 500 Group and Firooznia never articulated any other position.  Morris Dec. at ¶¶ 28-31, 48-55.  Fixler also made this point.  Morris Dec. at ¶ 40.  Firooznia confirmed this understanding to Kovac and Morris. Kovac Dec. at ¶¶ 5-6.  500 Group did not even consider "withholding" when the settlement was negotiated. Morris Dec. EX. B, Firooznia Depo. at 87-88.

59.     Ultimately the exemption for SWI's purported tax liability was approved at fifteen percent, and on or about June 1, 2017, SWI wired the agreed payment under the Settlement Agreement to 500 Group, splitting the payment into the $1,000,000 earmarked for 500 Group's outside counsel, and the balance of $9,000,000 to 500 Group's bank account. Tiramani Aff., ¶ 31.

**Admitted**

60.     500 Group subsequently learned that SWI had attempted to recall all or part of its wire transfer after it was made, and that 500 Group's bank refused to return the payment.  *Id*., ¶ 32; Fixler Tr., p. 66.

**Admitted**

61.     However, neither Tiramani, nor any other representative of 500 Group, instructed the bank not to return the funds.  Tiramani Aff., ¶ 32.

**Admitted**

62.     Thereafter, SWI began contacting 500 Group by email claiming it had made an overpayment of $600,000, the amount of its purported tax liability to the ITA, and requested that 500 Group refund that amount to SWI.  *Id.*, ¶ 33.

**Admitted**

63.     Upon receipt of these requests, 500 Group consulted with legal counsel.  *Id.*, ¶ 34.

**Admitted**

64.     Consistent with 500 Group's position throughout this ordeal, 500 Group had no intention of returning any portion of the money that SWI had agreed to pay for the purchase of the Patents, and felt it was extremely audacious of SWI to make such a demand.  *Id.*

**DENIED:** 500 Group and Tiramani never asserted this position but instead from June to October pretended to be considering how to respond to SWI. Morris Dec. at ¶¶ 98 and 71-96.

65.     Therefore, when Tiramani did respond to 500 Group by email he jokingly asked if they wanted the $4,000,000 or the $600,000 back, but he never intended or expected 500 Group to take this response seriously.  *Id.*, ¶ 35.

**DENIED:** Tiramani never intimated his response was a joke and when SWI immediately responded that he should send back $600,000 he failed to respond. SWI believed he had agreed to remit $600,000.  Morris Dec. at ¶ 82-83.

66.     Nevertheless, Tiramani made it clear that 500 Group would not be refunding any part of the $10,000,000 payment clearly agreed upon the Settlement Agreement that both parties signed.  *Id.*

**DENIED:** Tiramani never made it clear he would not return the money.  Instead he repeatedly made misleading statements that the issue was being considered by Firooznia. Morris Dec. at ¶¶ 71-96.

67.     On or about August 15, 2017 SWI paid $600,000 to the ITA for its purported tax liability. *Id.*, ¶ 36; Am. Compl., ¶ 32.

**Admitted**

68.     SWI's payment of the $600,000 to the ITA was either a voluntary act, or confirmation that this purported tax liability was the responsibility of SWI.  Tiramani Aff., ¶ 36.

**OBJECTION** This statement is made without foundation.  **DENIED** Morris Dec. at ¶ 93.

## ADDITIONAL MATERIAL FACTS

1.     Tiramani expressed considerable hostility to SWI in the negotiations for the Settlement Agreement. Morris Dec. at ¶99

2.     Tiramani has continued to express considerable hostility toward SWI since the settlement and continues to harbor hostile feelings towards SWI.  EX. F, Plf. Depo Ex. 22 at Bates p. 181; EX. D, Fixler Depo. at 72-73; EX. A, Tiramani Depo. at pp. 9-12, 80-85 (indicating his lack of response to inquiries about refunding the $600,000 is that "I have been tortured for years"). Morris Dec. at ¶ 101.

> THE PLAINTIFF,
> THE STANLEY WORKS ISRAEL LTD.,
>
> Respectfully submitted,
>
> _____/s/ Peter M. Nolin_____
> Peter M. Nolin (ct06223)
> Timothy A. Smith (ct30283)
> Carmody Torrance Sandak & Hennessey, LLP
> 707 Summer Street
> Stamford, CT 06901
> Tel:  203-425-4200
> Fax:  203-325-8608
> pnolin@carmodylaw.com
> tsmith@carmodylaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of August 2020, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's system.

        */s/Peter M Nolin*
        Peter M. Nolin (ct06223)