```
 1                    UNITED STATES DISTRICT COURT

 2                      DISTRICT OF CONNECTICUT

 3   _____
     Stanley Works Israel)     NO: 3:17cv1765(CSH)
 4   Ltd.                 )     August 10, 2021
                Plaintiff )     2:00 p.m.
 5    vs.                 )
     500 Group, Inc.,     )
 6   et al               )
                Defendants. )
 7   _____)         141 Church Street
                                  New Haven, Connecticut
 8

 9                         ZOOM HEARING

10

11

12   B E F O R E:

13              THE HONORABLE CHARLES S. HAIGHT, U.S.D.J.

14

15   A P P E A R A N C E S:

16   For the Plaintiff : Peter M. Nolin
                         Timothy A. Smith
17                       Carmody Torrance Sandak & Hennessey,
                         707 Summer Street 3rd Floor
18                       Stamford, CT 06901-1026

19   For the Defendants: Robert M. Barrack
                         Peter E. Strniste, Jr.
20                       Gordon & Rees LLP
                         95 Glastonbury Boulevard
21                       Suite 206
                         Glastonbury, CT 06033
22

23

24

25
```

1          THE COURT:  This is a hearing scheduled to

2     consider a motion in the case of Stanley Works Israel

3     against 500 Group and one other defendant.  17CV1765 and

4     I will go on record or keep on record and say this on the

5     record now please.  This is a hearing for the purpose of

6     hearing oral argument on a motion made by the defendants

7     for summary judgment dismissing all claims in the

8     plaintiff's complaint.

9          There's been a considerable amount of discovery

10     in the case.  Everybody all set?  There's been a

11     considerable amount of discovery in the case.  There is

12     no cross motion for summary judgment by the plaintiffs.

13     The plaintiffs simply say the motion for discovery for

14     summary judgment by the defendants should be denied.

15          We're conducting this by Zoom conference rather

16     than being in the courtroom.  That's the way life has

17     been for the better part of two years well with the virus

18     and all of that.  I don't like that.  I enjoy my

19     courtroom.  I miss it.  I wish I was back there, but I'm

20     not and we're not.  We'll do the best we can through Zoom

21     with the help of our fine court reporter and deputy court

22     clerk.

23          What I'm going to do now is call the role.  I

24     want each of you in turn to simply state your name for

25     the record and tell us who it is that you represent and

1    let's start -- we'll start with the plaintiff.  Who

2    appears today for the plaintiff?

3              MR. NOLIN:  Good afternoon, Your  Honor.  Peter

4    Nolin of Carmody, Torrance, Sandak and Hennessey for

5    Stanley Works Israel.  With me today is Timothy Smith, my

6    colleague here in the Stamford office of Carmody and

7    Torrance.

8              THE COURT:  Who appears for the defendants?

9              MR. STRNISTA:  Good afternoon, Your Honor.  It's

10   Peter Strnista from Gordon Rees representing the

11   defendant, the 500 Group and with my colleague Robert

12   Barrack also with Gordon Rees.

13             THE COURT: Very good.  This is the defendants'

14   motion for summary judgment.  And as I said on a

15   preliminary order, I will hear first from counsel for the

16   defendants as the moving party and then I will hear from

17   plaintiffs in opposition.  I assume there will be an

18   opposition unless counsel are entirely persuaded by their

19   adversary and if that does not occur, we'll hear from the

20   defendants as moving party in reply.

21             And then as I tried to indicate in my most

22   recent text order, I do not as a matter of principal

23   rigidly adhere to that order of speaking.  So that my

24   principal concern is to get the most assistance I can

25   from able counsel in this case in dealing with this

1   interesting motion and I can achieve that purpose by

2   making sure that each of you wind up saying everything

3   you really want me to consider before the hearing is over

4   so that if during the hearing to the defendants' reply,

5   counsel for plaintiff hears something that really can't

6   stand, can't avoid not answering, would leave my

7   courtroom in the state of distress if not allowed to

8   answer it, well, he can answer it and that may inspire or

9   provoke the moving party further and he can respond to

10   that.  The last word will go to the moving party

11   defendants in this case but within reason.

12        I want each of you to tell me everything that's

13   in your mind that you think I ought to consider before

14   the case is marked fully submitted.  If you are still

15   exchanging barbs and arguments at 5:30 this afternoon, I

16   may cut it off, but I want you to understand that's the

17   way I prefer to conduct hearings and that's the way I'm

18   going to conduct these oral arguments.

19        The last thing I will say preliminarily is this

20   is an interesting, a rather complex matter.  I considered

21   it once already in the decision which the Court entered

22   denying the defendants' motion to dismiss.

23        Now the case comes before us again after a

24   considerable amount of discovery in the context of a

25   motion for summary judgment by the defendants.  I looked

1   at the underlying documents.  I have updated some of the

2   legal research.  My staff and I, for example, revisited

3   Judge Sotomayor's opinion for the Second Circuit in the

4   *White Rose* case and I'm familiar with the arguments that

5   are made in the briefs.  They are very good, very good

6   briefs, very thorough briefs.

7          So now we're at the situation where the time

8   came back in 2017 when the plaintiffs, who had a long

9   relationship with the defendants, had engaged in a

10  settlement agreement with them, these two parties, and

11  what it comes down to it seems is that the plaintiffs say

12  that they by mistake, inadvertence, mistakenly paid

13  $600,000 more than they should have to the defendants in

14  the context of a settlement agreement and they said they

15  wanted it back and the defendants say they are not going

16  to pay it back.  They don't owe the plaintiffs anything

17  and threaten a lawsuit and the plaintiffs have a number

18  of theories as to why they think they should recover that

19  amount.

20         The theories start with alleged breach of

21  contract, but there are other theories as well.  The

22  defendants ask for summary judgment dismissing each of

23  those theories and claims.

24         So I'm going to hand it over to counsel now.

25  I'm going to stop these preliminary reflections which I'm

1    sure will relieve all of you and I have some thoughts and

2    questions in my mind, but I'm trying to do what judges

3    sometimes find it difficult to do and that is just keep

4    quiet and let you develop your arguments in this rather

5    complex matter as you think best.

6          I can remember my days as an advocate when I

7    prepared an argument and instantly had difficulties with

8    the trial judge or court of appeals panel that jumped in

9    right way and couldn't keep quiet.  That does not help

10   you make your arguments.  I'm now prepared to listen to

11   your arguments with such self-restraint as I find myself

12   able to impose on myself.  So let me hear now from

13   counsel for the defendants in support of their motion for

14   summary judgment when you are ready.

15         MR. BARRACK:  Robert Barrack from Gordon Rees on

16   behalf of the defendants 500 Group and Paolo Tiramani.

17         By way of background of this lawsuit, the

18   defendant 500 Group Inc. is an intellectual property

19   project development and investment company.  And it was

20   started by its president and sole shareholder, Pablo

21   Tiramani in 1986 as a New York corporation with an office

22   in New York.  And that office remained in New York until

23   approximately 1990 and then they worked out of temporary

24   rented workspaces in Greenwich and in Stamford,

25   Connecticut, until early February 2017, when the company

1   ceased doing any material business out of these

2   Connecticut offices, relocated to Las Vegas, Nevada, and

3   also Mr. Tiramani permanently relocated to Las Vegas at

4   the same time early February 2017.

5           There was a short period of time between the

6   beginning of 2016 and February 2017 that the company also

7   had an office in Nashua, New Hampshire.  However, from

8   early 2017 on, the headquarters and permanent office

9   space for the 500 Group has been in Las Vegas as is Mr.

10  Tiramani's residence.

11          500 Group also registered to do business in Las

12  Vegas, Nevada, in February 2017.  Although the company

13  maintained a lease on its office space in Connecticut for

14  a period of time after its relocation to Las Vegas, no

15  material business was conducted out of that office space

16  after that time, after the relocation in February 2017.

17          So 500 Group developed and patented a rolling

18  workshop systems technology.  And in 1997, it entered

19  into a license agreement with the plaintiff Stanley Works

20  Israel so that they would agree to Stanley Works Israel

21  can manufacture a product of 500 Group's patents for this

22  rolling work done for various rolling toolboxes and

23  workbenches.

24          And Stanley Works Israel is really a limited

25  liability company that's headquartered in Israel and

1    manufactures its product by a Dutch company in the

2    Netherlands and which itself owned by a Canadian company

3    headquartered in Canada.

4          Although there is -- there is an affiliation

5    with Stanley Black and Decker, Stanley Works Israel is

6    considered under the law a separate legal entity and it

7    generates its own profit and loss statements and the

8    products that Stanley Works Israel manufacture are

9    marketed and sold worldwide.

10         So, as I indicated, 1997 there was the license

11   agreement between Stanley Works Israel and 500 Group

12   whereby Stanley Works Israel made royalty payments,

13   monthly royalty payments to 500 Group to allow them to

14   utilize 500 Group's intellectual property during the

15   period of the license.

16         In 2004, a new license agreement was executed

17   between the parties under similar terms.  And then based

18   upon 500 Group, Stanley Works Israel -- Stanley Works

19   Israel indicated to 500 Group that Israeli law made

20   royalty payments.  These royalty payments were taxable to

21   the 500 Group but Stanley Works Israel was required to

22   withhold the tax from the royalty payments and pay them

23   over to the parties and the withholding amount was 15

24   percent of each royalty payment.

25         Based upon this information, 500 Group allowed

1    Stanley Works Israel to withhold these amounts.  What was
2    claimed to be the taxable amounts.
3           Now, however, subsequently a dispute arose
4    between the parties under the 2004 agreement and 500
5    Group claimed that Stanley Works Israel breached the 2004
6    agreement by failing to pay royalties and failure to
7    label license products with a 500 Group's mark.  And
8    after 500 Group threatened litigation against Stanley
9    Works Israel, the parties by way of settlement entered
10   into a settlement agreement called a 2007 Letter
11   Agreement.
12          And pursuant to that agreement, Stanley Works
13   Israel agreed to pay a lump sum of $790,000 to cover
14   unpaid past royalties.  That is royalty payments that
15   should have been made and the agreement -- the settlement
16   agreement expressly stated that this $790,000 payment for
17   royalties would be less applicable to Israeli withholding
18   tax and then the letter agreement also provided that
19   Stanley Works Israel would continue to pay future
20   royalties under the 2004 agreement.
21          However, subsequently another dispute arose
22   between the parties and 500 Group accused Stanley Works
23   Israel of multiple violations of the previous agreements
24   including failure to pay royalties that were owed,
25   misappropriation of intellectual property, theft of trade

1    secrets and related violations of the agreement.

2            The parties began arbitration of this dispute in

3    New York and the parties began settlement negotiations in

4    New York and those -- the settlement negotiation began in

5    late February 2017 pursuant to meetings in New York and

6    various communications which and this occurred after 500

7    Group and Mr. Tiramani had relocated to Las Vegas,

8    Nevada.

9            At end of February 2017, the settlement

10   agreement was essentially memorialized but hadn't been

11   finalized yet.  I believe it was actually signed not

12   until March.

13           Pursuant to the settlement agreement -- we'll

14   call this agreement at issue the settlement agreement --

15   the parties agreed to essentially a sale and assignment

16   of 500 Group patent rights at issue the rolling workshop

17   technology.  There were a number of specific patents

18   related to this technology that were listed, but they

19   agreed to a sale, an assignment of these patents rights

20   to Stanley Works Israel for a lump sum payment of ten

21   million dollars.  And the lump sum payment was broken

22   into nine million dollars that would go directly to 500

23   Group and $1 million to go to 500 Group's outside counsel

24   that was representing them in the arbitration.

25           However, for its own purposes, Stanley Works

1   Israel insisted that of the $10 million payment, $4

2   million  -- $6 million be deemed, you know, being part of

3   the lump sum payment for the sale and transfer of these

4   patent rights, but $4 million should be deemed a fixed

5   fee payment for future royalties over 10 years.

6           THE COURT: Let me interrupt.  You say that

7   Stanley Works Israel insisted on that.  Is that -- you

8   mean by that I take it that was Stanley Works Israel's

9   idea that that particular allocation be made.  Is that

10  fair to say?

11          MR. BARRACK:  Yes, Your Honor.  There's evidence

12  of that in the record, Your Honor, that this was through

13  deposition testimony and so forth.  That's all cited in

14  the papers that were submitted.  This was Stanley Works

15  Israel, they insisted on including this provision in

16  there for their own purposes.  And as the evidence

17  indicates and as Stanley Works Israel own employees and

18  agents admitted in the deposition, the purpose of

19  characterizing $4 million of the lump sum payments as a

20  lump sum payment for future royalties over ten years is

21  that Stanley Works Israel wanted to amortize this $4

22  million over the ten-year period so that it would improve

23  their profit and loss statement by not showing one large

24  expense at one time.  But rather it would be showing a

25  $400,000 annual expense that was offset by four million

1  dollar asset and that this $400,000 annual expense could

2  be amortized over ten years which would presumably give

3  them a tax benefit.

4          However, regardless of how Stanley Works Israel

5  wanted to characterize the payment, it was clear that the

6  $10 million was intended to be compensation for a full

7  buyout, a purchase of 500 Group's patent rights in that

8  the 500 Group would retain no ownership interest in these

9  patent rights.  That's absolutely clear from the language

10 of the agreement and any extraneous evidence that's been

11 submitted.

12         There's certainly no indication, there's no

13 evidence at all that either party intended 500 Group to

14 retain any rights in any part of these patents after they

15 received the lump sum payment from Stanley Works Israel.

16 That was the settlement.

17         However, at the time Stanley Works Israel had an

18 outside accountant, Ernst & Young Israel, EY Israel.

19 They warned Stanley Works Israel in an email that the

20 Israeli tax authority might challenge the fact they

21 characterized $4 million to the payment as royalties

22 since you, quote, already purchased the patent, unquote.

23         Now, Stanley Works Israel has admitted and again

24 it is in the papers that a tax liability would only apply

25 to royalty payments, not to a payment to purchase patent

1    rights and in fact, if the -- if any payment to purchase

2    the patent rights was also subject to tax liability, then

3    Stanley Works Israel would be claiming more than just the

4    tax -- purported tax liability on $4 million out of the

5    $10 million payment.  They would be claiming tax

6    liability on the full $10 million.

7           Obviously they are not.  They are only claiming

8    tax liability for the royalty payments.  That's what they

9    claim they paid.  Nothing for the purchase so that

10   demonstrates and again there's admissions on record that

11   tax liability does not apply to payment for a purchase of

12   patent rights, only for royalty payments under a license.

13          Now, at the time, 500 Group understood the

14   characterization in the settlement agreement of the $4

15   million as royalty payments only to be a technicality

16   that it would provide some benefit to Stanley Works

17   Israel but not that it would reduce any payment or the

18   benefit of the bargain to 500 Group.

19          So the settlement agreement was drafted by

20   Stanley Works Israel's in-house counsel and, in fact, as

21   we submitted in the papers, that in-house counsel

22   Mr. Morris admitted that he said I did not appreciate the

23   Israeli tax withholding issue when the settlement

24   agreement was being drafted.

25          So Stanley Works Israel signed the settlement

1   agreement on March 28, 2017, then forwarded the signed

2   agreement or signed on their side to Mr. Tiramani in Las

3   Vegas.  However, the next day, March 29, 500 Group's

4   outside accountant, Mr. Firooznia in New York was

5   contacted by Ted Morris, in-house counsel and agent for

6   Stanley Works Israel, in connection with this settlement

7   agreement and indicated that Stanley Works Israel had hit

8   a snag with respect to the payment under the agreement

9   and that Stanley Works Israel had an obligation to

10  withhold -- withhold taxes on the $4 million under the

11  agreement that's characterized as royalties and this

12  would either be 15 or 25 percent depending on whether an

13  exception to reduce it from 25 percent to 15 percent

14  could be obtained from the Israeli tax authorities.

15          Now, when Mr. Morris indicated that this

16  withholding, the Stanley Works Israel was required to do

17  this withholding, 500 Group understood the term to mean

18  that this was Stanley Works Israel's obligation.  Again

19  their intent and understanding with respect to the

20  settlement agreement is they are going to get $10 million

21  total net and as indicated, even Mr. Morris indicated

22  when he drafted the agreement, he was not considering the

23  tax issue.  So if there was no intent at the time that

24  the settlement agreement was drafted, certainly it was

25  not 500 Group's intent to pay any withholding.

1          However, communications back and forth after

2     this between Stanley Works Israel's representatives and

3     500 Group's representatives were essentially that Stanley

4     Works Israel could not make the payment, could not make

5     any payment under the settlement agreement unless this

6     tax withholding was worked out.

7          And the first order of business was to try to

8     obtain an exception from the Israeli tax authority to

9     reduce the withholding amount percentage from 25 percent

10    to 15 percent.

11         And so again it was a series of discussions as

12    to how to resolve this snag and at that point, 500 Group

13    just wanted to get as much of its money as soon as it

14    could so agreed to cooperate with Stanley Works Israel in

15    order to work out this problem so they can get paid and

16    they actually co-retained Stanley Works Israel with 500

17    Group in order to try to obtain this exemption.  Again

18    all in the interest of getting this issue worked out

19    because Stanley Works Israel made it clear that no

20    payment was going to happen at all until the tax

21    withholding issue was worked out.

22         THE COURT:  Let me ask you this.  Let me ask you

23    this.  At this particular moment in time, what is your

24    understanding, if you have one, as to who the Israeli tax

25    authority regarded as the interest that would owe this

1    tax?  500 Group or Stanley Works Israel or somebody else?

2          MR. BARRACK:  Your Honor, my understanding and

3    this is all based upon statements and information

4    provided by Stanley Works Israel is that based upon what

5    they reported is that Stanley Works Israel as the Israeli

6    entity subject to the authority of the Israeli tax

7    authority was the party that was required to actually pay

8    the tax to the Israeli tax authority.  But that the tax

9    liability was of the payee of the royalties assuming

10   that, you know, payments on royalties that but so that

11   the liability was to 500 Group but Stanley Works Israel

12   is responsible for -- would be responsible for

13   withholding and paying this amount but --

14         THE COURT: That was the understanding that

15   prevailed, did it not, back in the earlier years when the

16   withholdings were made in the context of the license

17   agreements?

18         MR. BARRACK:  Correct, Your Honor.  The

19   difference being that at the time of this settlement

20   agreement, 500 Group correctly and reasonably understood

21   that the transaction between the parties was a full sale

22   and assignment of all patent rights and however Stanley

23   Group -- Stanley Works Israel wants to characterize some

24   part of the payments for their own tax purposes, was not

25   something that 500 Group was involved with or certainly

1  going to end up being damaged by.

2          So for all 500 Group understood, Stanley Works

3  Israel getting a tax benefit from this fine, you know.

4  They are not -- they are not tax lawyers, Israeli tax

5  lawyers.  All they understood and intended was they were

6  going to get the full payment and whatever Stanley Works

7  Israel wanted to do with respect to characterizing

8  certain parts of the payment and getting some tax benefit

9  of it, they could do that.  If there was a tax liability

10 involved which wasn't contemplated at the time the

11 settlement agreement was drafted and executed, that it

12 would be Stanley Works Israel that would be subject to

13 that, not the 500 Group.

14          THE COURT: Thanks. That makes my point. I will

15 now relapse into silence.

16          MR. BARRACK:  Now, at some point, Stanley Works

17 Israel did indicate that they wish to actually settle

18 this or settle this tax liability, so-called tax

19 liability issue by reducing the payment to 500 Group.

20 And however, 500 Group never agreed or acquiesced to such

21 reduction in the payment.  There were discussions about

22 it, but as we'll discuss more later, none of the emails

23 back and forth between the parties was there ever, was

24 there ever certainly any clear indication that 500 Group

25 agreed to a reduced payment.

1          Now, finally, it was in June of 2017, Stanley

2     Works Israel made an electronic payment of ten million

3     dollars to 500 Group into 500 Group's bank account.  500

4     Group later learned that Stanley Works Israel attempted

5     to recall this payment, but I think the bank refused to

6     send the money back.  However, as we indicated and

7     there's no dispute on this, no one from 500 Group ever

8     instructed the bank not to return the funds.  This was

9     the bank saying they are not authorized under law I

10    understand to return the funds once they are made.

11         Now, and then after this attempt to get the bank

12    to send the money back failed, then Stanley Works Israel

13    demanded a refund from 500 Group of $600,000 that they

14    claim was an overpayment.  And then 500 Group's

15    representatives indicated that they are going to consult

16    with legal counsel.  There was never any statement that

17    oh well, yes, we agree that Stanley Works Israel overpaid

18    us and, you know, either -- and we acknowledge this and

19    agree to refund this money.

20         In fact, at a certain point, Mr. Tiramani

21    because he believed the request to be so absurd, asked in

22    an email to Stanley Works Israel, do you want back the

23    whole four million or 600,000.  And obviously this was

24    not, this was just an indication that Mr. Tiramani

25    believed this was a ridiculous request to refund money

1   that was agreed to and 500 Group accepted under the

2   agreement, so he said it was rather flippant but just an

3   indication of what Mr. Tiramani believed to be an absurd

4   request to return this money.

5          Now, the first cause of action asserted by

6   Stanley Works Israel is a breach of contract and their

7   initial position is that the parties actually intended

8   the $10 million payment to be -- to, you know, it

9   contemplated withholding the $600,000 so the payment

10   would be the 9,400,000 net and obviously all you have to

11   do is review the express language of the contract.

12   There's no indication of any such intent.

13          It very clearly indicates that a payment of ten

14   million dollars -- fixed fee payment of $10 million would

15   be made and broken down into $9 million to 500 Group, $1

16   million to their outside counsel.  Again characterize

17   certain payments, $4 million in payments in a certain

18   way.  No indication, no statement about withholding or

19   tax liability or anything else.  And so there's nothing

20   in the face of the agreement itself that even hints at

21   that the payment -- that the total payment to 500 Group

22   for the sale of these patent rights would be anything

23   less than the full $10 million.

24          Now, New York law is very clear that where

25   contract language is unambiguous on its face, parties'

1 intent is determined within the four corners of the

2 contract without reference to external evidence and we

3 cited numerous cases for this proposition including this

4 extensive quote from the *Chen-Oster versus Goldman Sacs*

5 matter which in turn quotes from binding Second Circuit

6 authority, such as *Chapman versus New York State Division*

7 *Of Youth* and, of course, the *Rice versus Financial*

8 *Performance Corporation* case by the New York Court of

9 Appeals in 2001 is the same year that *White Rose* decision

10 came out where the New York Court of Appeals says an

11 omission or mistake in a contract does not constitute an

12 ambiguity.

13        Second Circuit has quoted that as well in cases

14 that have come out much later than the *White Rose* case,

15 as we discussed in our papers, that case should be

16 limited to its facts.  It is a labor case decided under

17 federal labor law.

18        The Second Circuit when they indicate that they

19 think the labor agreement at issue was ambiguous because

20 it didn't discuss whether it was net or inclusive of

21 withholding tax, never cited to a single New York case.

22 The *White Rose* case or this statement by the Court has

23 never been cited in any other case with respect to

24 contract interpretation.  It's only been cited in other

25 labor law cases for other aspects of the case.

1          But this issue of an omission constituting an

2     ambiguity has never been cited in their case except for

3     Your Honor's opinion on the motion to dismiss where at

4     the urging of the plaintiff.

5          But we respectfully disagree with that

6     interpretation or that this decision is a binding or

7     persuasive.  It should be held to the fact as the labor

8     law decision and the fact that other binding Supreme

9     Court precedent that actually cites to New York law made

10    it very clear that silence with respect to a particular

11    issue does not render a contract ambiguous and again an

12    omission or mistake in a contract does not constitute an

13    ambiguity.  Those are the cases that control.  Not a

14    labor law decision in *White Rose* that cites to no

15    New York law.

16         The settlement agreement contains a merger

17    clause and expressly provides that any amendments must be

18    in writing signed by both parties.  The parol evidence

19    rule is clear that in the absence of an ambiguity,

20    extrinsic evidence can be introduced to contradict or

21    modify the express terms of the agreement.

22         Here again the express terms that a full

23    $10 million is going to be paid in exchange for the

24    patent rights to, you know, paid to 500 Group, no

25    indication of withholding or tax liabilities or anything

1   else.  It's clear and explicit on its face.  There's no

2   ambiguity regardless of what secret intention Stanley

3   Works Israel may have had.  But and again we had

4   Mr. Morris admitting when he drafted the agreement, he

5   wasn't considering the tax issue.

6        If he wasn't considering the tax issue when he

7   drafted the agreement, there was obviously there was no

8   secret intent to that point to make it less than 10

9   million.  It wasn't until later that they realized it was

10  an issue after they signed the agreement.  Mr. Morris

11  tells Mr. Firooznia there's a snag now that is going to

12  hold things up a little until we figure things out.

13  That's after the fact.  The contract itself is clear,

14  unambiguous and allows for no reasonable interpretation

15  that would provide that the total amount that would be

16  actually paid, net amount that would be paid to 500 Group

17  to sell the patent rights would be less than 10 million.

18        The plaintiff also argues the Court needs to

19  consider the parties course of dealings. First of all, in

20  order to get into the course of dealings, the Court would

21  have to find that the agreement itself was ambiguous and

22  subject to more than one interpretation but it is not.

23  Even if the Court did consider the parties course of

24  dealings, what the plaintiff argues is that well, you

25  know, when under the 1997, 2004 license agreements, those

1  agreements don't say anything about withholding.  But the

2  500 Group permitted Stanley Works Israel to withhold 15

3  percent from each royalty payment.

4         And so since they did that, you should interpret

5  that to, you know, that course of dealings, so the course

6  of dealings would apply to the settlement agreement.

7         There's a couple of fallacies to that argument,

8  Your Honor.  One is the license agreements were just

9  that, license agreements where it was 500 Group retained

10 ownership of the patents rights.  They assigned a limited

11 license to Stanley Works Israel to use the patents and

12 there were royalty payments made.  No one is disputing

13 these are royalty payments.  They were then subject to

14 then withholding for tax purposes.

15        However, under the 2007 letter agreement, which

16 was a settlement agreement from a previous dispute, there

17 was a lump sum payment of I believe it was $740,000,

18 somewhere in that range and that payment was for unpaid

19 royalties but not future royalties, to unpaid past

20 royalties.  These were royalty payments that were owed

21 but had not been paid.

22        Nevertheless, the settlement agreement

23 specifically said subject to -- that its subject to

24 withholding would be less, specifically said would be

25 less, the lump sum settlement payment would be less the

1    Israeli withholding tax.  So you are going to look at the
2    course of dealings.  When the parties had -- the only
3    other time parties had a settlement agreement to settle a
4    dispute where a lump sum payment would be made from
5    Stanley Works Israel to 500 Group this -- the agreement
6    expressly provided that it would be less Israeli
7    withholding tax even though the payment was for past
8    royalties which arguably wouldn't be subject to a tax.

9           In the present case -- and we'll get into that
10   issue a little bit.  But this was a full sale and
11   assignment of the payments of the patents rights.  Not a
12   license, not a limited right that was transferred so and
13   there was no language like in the 1997 settlement
14   agreement that expressly stated less Israeli withholding
15   tax. So in the course of dealings, the only other
16   settlement agreement they had with a lump sum payment
17   expressly provided less Israeli withholding tax, the
18   settlement agreement at issue here, no such language.

19          Even if the court is looking at the course of
20   dealings, the course of dealing supports the defendants'
21   position on this.  And we cited case law, substantial
22   case law under United States federal law and New York
23   law.

24          It is very clear that when the owner of a patent
25   sells those patent rights, when it is a full assignment

1    of those patent rights, retaining no ownership interest

2    to those patent rights to a buyer, even if the parties

3    characterize the payments as royalties in the agreement,

4    even if they characterize the agreement as a license

5    agreement rather than an assignment or sale that under

6    the law, they are not royalties.  The payments aren't

7    royalties -- they are -- the payment is a purchase price

8    for the patent rights and that law clearly applies here.

9    The settlement agreement provides that it is to be

10   construed under New York law.  New York law applies to

11   it.

12        This Court has already held that with respect to

13   the contract claim New York law applies and in the case

14   law we cite, under New York law, the transaction with

15   respect to the patent rights under the settlement

16   agreement was a sale and assignment.  No part of it was a

17   partial assignment and/or a license and the payment

18   whether they characterize as royalties or not are not

19   royalties.  They are, it is a purchase price and whatever

20   Stanley Works Israel wants to do with amortization of

21   these payments, so they can improve their balance sheet,

22   all of that is their business but, you know, 500 Group is

23   not part of the scheme and this was a sale and they

24   don't -- Stanley Works Israel doesn't even refute that

25   this was a full sale.  They made no argument or

1   introduced any facts or evidence that 500 Group retained

2   any ownership rights in these patents so, you know, this

3   is irrefuted that this was -- that this was a full sale

4   and therefore, if this was a sale and the $4 million were

5   not really royalty payments, then there would be no tax

6   liability.

7          Now, merely because Stanley Works Israel went to

8   the Israeli tax authority and said well, we have this

9   transaction and there's going to be these future

10  royalties and we want an exemption so that we can pay --

11  withhold 15 rather than 25 percent, again that's their

12  business.  They wanted to get some other tax benefit from

13  that or not just, you know, tax benefit in other

14  benefits.

15         THE COURT: It seems to me as I listen to that

16  argument, that it could perhaps be said in criticism of

17  it that your client agrees on the precise wording of the

18  settlement agreement except when it doesn't by which I

19  mean there is that moment in the settlement agreement

20  when it says $10 million constitute payment for purchase

21  of the patents and $4 million constitutes payment for

22  future royalties.  Now doesn't that language to which

23  your client agreed by signing the contract, create at

24  least some tension in the context of the argument that

25  just you made.  This is all just $10 million for a

1  purchase?

2          MR. BARRACK:  Well, Your Honor, this, you know,

3  there's no evidence that 500 Group at the time that the

4  agreement was negotiated and executed, had any

5  understanding or intent that -- that withholding would be

6  paid or that withholding or that there were to be some

7  tax consequence of this at all.  Again as we indicate and

8  this is all in our papers, 500 Group's understanding was

9  that this was -- the reason why Stanley Works Israel

10  wanted this language was that they could get some kind of

11  tax benefit out of it.  Not that 500 Group would end up

12  with some tax liability.

13          THE COURT: Okay.

14          MR. BARRACK:  That's the issue.  They weren't

15  trying to -- they didn't, you know, consent to this

16  language with the understanding or intention that, you

17  know, there's going to be a negative tax consequence.

18  Their understanding was Stanley Works Israel wanted this

19  language, so they can get a positive tax consequence out

20  of it.  That's all.

21          THE COURT: I understand.  Okay.  I understand

22  the argument.  Good.

23          MR. BARRACK:  In essence, there's nothing within

24  the four corners of the settlement agreement that would

25  allow any interpretation of the terms that 500 Group

1    would accept anything less than $10 million for the sale

2    of the patent rights.

3            I also want to point out, getting back to that

4    prior point for a moment, the case law that we cite with

5    respect to a sale versus license patent rights, the case

6    law indicates it doesn't matter how the parties

7    characterize.  In some of these cases, the parties'

8    agreement.  It is called the license and characterize the

9    payment as royalties.  But the Court said, you know, you

10   can call it anything you want.  If it quacks like a duck

11   and looks like a duck, it's a duck.  It's a sale.  And,

12   you know, whatever the legal consequences that flow from

13   that that's what it is.  So that's the other point.

14           So there is nothing within the four corners of

15   the document that could open it to extrinsic evidence,

16   contradict the or allow the parol evidence rule

17   exceptions to apply because there is no ambiguity.  Under

18   clear New York state law, there's no ambiguity within the

19   four corners of the agreement with respect to how much

20   was supposed to be paid and what the -- and that the

21   intent was to sell all of the patent rights and not for

22   -- I don't think you are going to hear Stanley Works

23   Israel argue that well, actually 500 Group actually

24   owns -- still owns some of the patent rights.  I don't

25   think you will hear that argument.

1          In any event, their next argument is that,

2     although it is not expressly alleged in their amended

3     complaint, nevertheless, their position is that well,

4     there was a written amendment to the settlement agreement

5     between the parties that would allow the Court to find

6     that the parties subsequently agreed in this written

7     amendment that the payment by Stanley Works Israel could

8     be reduced to 9.4 million dollars.

9          Now, New York law is clear that an amendment to

10    a signed contract, there must be a manifestation of

11    mutual assent sufficiently definite to assure that the

12    parties are truly in agreement with respect to all

13    material terms.  Mutual assent that's sufficiently

14    definite.  Now this is where the issues or the asserted

15    facts raised by Stanley Works Israel fail to support

16    their written amendment argument.

17          There's a lot of emails between the parties --

18    representatives of the parties after that initial email

19    from Mr. Morris to Mr. Firooznia on March 28, 2017, and

20    many of those emails have been submitted to the Court.

21    There's not one of those emails is there clear

22    manifestation of the mutual assent sufficiently definite

23    to accord the Court that the parties are truly in

24    agreement with all material terms of this supposed

25    amendment.

1          There's one particular email that the -- that

2     the -- between Mr. Morris or series of emails between Mr.

3     Morris and Mr. Firooznia that they heavily rely on

4     because none of the others say anything that could be

5     even potentially interpreted to agree to amend the

6     settlement agreement to reduce the payment.

7          The email that they rely on, a series of emails,

8     some of the communication between the parties were, you

9     know, 500 Group saying we were counting on this money

10    now.  We have other obligations that we need to meet and

11    we need to get paid and, you know, when Mr. Morris made

12    it clear that, you know, this withholding issue had to be

13    worked out before any payments could be made to 500

14    Group, Mr. Firooznia said well, is there anyway that

15    another affiliate can make a partial payment now so we at

16    least could get some money and Mr. Morris responded that

17    this would be unlawful to do so and can't be an affiliate

18    and can't, you know, without this tax issue being worked

19    out, we can't make any payment and Mr. Firooznia's

20    response was, in essence, I don't want to do anything

21    unlawful.  He's not a lawyer.  He's an accountant.  I

22    don't want to do anything unlawful.  I want to figure out

23    a way to get some money now.

24          What the plaintiff's position is that, well, in

25    that series of emails that we're referencing, Mr. Morris

1    indicates that, you know, his mission was to, in essence,

2    withhold $600,000 from the $10 million payment to be made

3    to 500 Group and pay that to Israeli taxing code and so

4    the plaintiff's position is well, Mr. Firooznia in light

5    of that statement never comes back and says we disagree

6    with this mission.  You know, that -- so therefore,

7    because they didn't refute -- Mr. Firooznia didn't refute

8    Mr. Morris' expressed admission that this somehow creates

9    an acceptance and that again is contrary to New York law

10   because New York law is clear that a party does not have

11   a duty to speak unless there's a fiduciary relationship

12   between the parties.  If it is an arm's length

13   transaction between two separate entities, two

14   sophisticated commercial entities, it is not a fiduciary

15   or fiduciary-like relationship.  There's nothing to

16   indicate fiduciary duties between the parties.

17          This is a commercial transaction and in fact, it

18   is a settlement agreement of a legal dispute between the

19   two parties.  There's no way anyone can infer any kind of

20   fiduciary relationship or duty.  Therefore, 500 Group had

21   no legal duty to refute Mr. Morris's admission.

22          It's simply the law is to have a -- in order to

23   have an enforceable amendment to a written agreement, it

24   has to be -- you have to have a clear offer of acceptance

25   between the parties and a manifestation of mutual assent

1   sufficiently definite to show the parties are truly in
2   agreement.  There's nothing like that in that email or
3   any of the other emails that are introduced and in
4   addition, there's no dispute as repeatedly indicated by
5   500 Group that these discussions were just an attempt to
6   work out a problem and there's nothing in any of this
7   correspondence that could lead the Court to find a
8   manifestation of mutual assent or even -- or certainly a
9   manifestation of assent by 500 Group to amending the
10  settlement agreement so that they would accept less than
11  $10 million.  Nothing.  They have again -- 500 Group has
12  met its burden of production on these issues and the
13  plaintiff has failed to meet its burden in raising a
14  material issue of fact in dispute on this point that
15  there's some definite -- sufficiently definite assent by
16  500 Group expressed where they said we would accept less
17  than $10 million.

18          So they also argue -- the plaintiff also argues
19  well then if there wasn't a written -- a written
20  expressed amendment to the settlement agreement, then
21  there was an oral amendment to the agreement and they
22  indicate that there were telephone conversations between
23  representatives of the parties where the -- where 500
24  Group had indicated an assent to amend the settlement
25  agreement so that they would accept a 9.4 million rather

1   than $10 million.

2          Now, it's difficult to -- all you have is our

3   side where our affidavits and other evidence from our

4   side where they say we never orally agreed to accept less

5   and the other side said well, they did.  If there's not a

6   recording or something else, recording or transcript of

7   the conversation, it's difficult to prove one way or the

8   other.

9          However, under New York law, that really becomes

10  a non-issue because under New York law in order for an

11  oral amendment to a written agreement to be enforceable,

12  there has to be consideration to support -- to support

13  the agreement.  That's not true under New York law with

14  respect to a written amendment as long as there's a clear

15  agreement offer and acceptance by both parties in

16  writing.  For an oral agreement, there must be

17  consideration and there's nothing in these papers

18  submitted by the plaintiff that evidences any

19  consideration given to or being provided or offered to

20  500 Group to accept less than the full $10 million to

21  which they were entitled under the settlement agreement.

22  In the absence of such consideration, there can be as a

23  matter of law no oral amendment to this agreement.

24         The plaintiff also tries to rope in the implied

25  covenant of good faith and fair dealing in arguing

1    somehow there should be found in the course of the

2    agreement due to a breach by 500 Group of implied

3    covenant of good faith and fair dealing.

4        But under New York law, the implied covenant

5    cannot be used to create an independent obligations

6    beyond what's agreed upon and stated in the expressed

7    language of the contract and since we have already

8    established that there's no express language in the

9    contract that indicates that 500 Group would be paid any

10   less than $10 million for the sale of the patent rights,

11   there's no implied covenant of good faith and fair

12   dealing that could create some independent obligation to

13   accept less than the $10 million so therefore, that

14   argument also fails as a matter of law.

15       So then the plaintiff's next argument there's,

16   well, the plaintiff can recover under the theory of

17   unjust enrichment.  The problem with that argument, Your

18   Honor, is that we have an expressed settlement agreement

19   that covers the scope of what the transaction is and how

20   much is to be paid.

21       And an unjust enrichment claim can only proceed

22   if the parties -- if the parties -- if there is no, if

23   there is no such agreement that covers the dispute.  Here

24   it clearly does.  It says 10 million dollars -- Stanley

25   Works Israel paid $10 million to 500 Group to purchase

1    the patents rights.  It can be so -- there is no separate

2    cause of action for unjust enrichment because it's

3    nothing that goes beyond the scope of this agreement.

4    And the case in point is this, Your Honor, if the

5    plaintiff ultimately prevails on the breach of contract

6    claim, whether it is based upon extrinsic evidence.  We

7    don't believe they should for all the reasons given.

8    Hypothetically whether or not it is based upon extrinsic

9    evidence, an amendment, or anything of that sort, then

10   obviously there is no unjust enrichment cause of action

11   because they prevailed under the contract, amended or

12   not.

13           If the defendant prevails on the breach of

14   contract claim, the only way the defendant can prevail on

15   the breach of contract claim is if it's found that the

16   parties expressly agreed that Stanley Works Israel would

17   pay $500 -- I'm sorry.  Would pay $10 million to 500

18   Group and without any withholding.  That's how -- that's

19   who would win on that issue and there's no.  There are no

20   exceptions implied into it or anything like that.  If

21   that's the case then there can be no unjust enrichment

22   claim either.  If 500 Group was entitled to the

23   $10 million that would necessarily be the case if 500

24   Group prevailed on the breach of contract claim.  Then

25   the amount that they are paid is not unjust enrichment.

1    I don't know if it will be an enrichment because it is

2    supposedly an equal exchange.  These patent rights were

3    worth this amount and the payment for $10 million.  But

4    it is not an unjust enrichment.  That would be found

5    that's what they are entitled to under the expressed

6    contract.

7              THE COURT: That makes it you would argue just

8    enrichment.

9              MR. BARRACK:  Exactly.  Not unjust.  They would

10   necessarily be found that 500 Group was entitled to this

11   payment and they didn't breach the contract by not

12   refunding any money.  So, therefore, so under either

13   scenario, Your Honor, there would be no viable unjust

14   enrichment claim.  Therefore, that claim fails as a

15   matter of law.

16             The final claim is under Connecticut Unfair

17   Trades Practices Act, and we go into the fact that or in

18   any kind of detail, the fact that, you know, typically a

19   breach of contract claim, something of that nature, does

20   not support a CUTPA claim, but there have been

21   aggravating factors.  But what we're focused on here

22   which we think is dispositive is that in order for a

23   CUTPA claim to be viable, has to involve a form of

24   freight or commerce that's intimately associated with

25   Connecticut.

1            The plaintiff has clearly failed to meet its

2    burden of persuasion on that point.  The defendants have

3    submitted all of the undisputed facts before the Court as

4    to, you know, why or how this, you know, any relation to

5    Connecticut at all is only slight and not material

6    compared to other jurisdictions or areas outside of

7    Connecticut.

8            Beginning with the fact that the plaintiff is an

9    Israeli company and any harm that it allegedly incurred

10   was because or that problem was felt in Israel because

11   that's where they are located and, you know, although the

12   plaintiff argues, well, they are somehow an affiliate,

13   somehow an affiliate of Stanley Black & Decker that's

14   headquartered in Connecticut.  As a matter of law, they

15   are deemed separate entities, number one.  It's an issue

16   of fact -- undisputed issue of fact that Stanley Works

17   Israel is separate legal entity that's owned by a Dutch

18   company that's owned by a Canadian company.  That the

19   Stanley Black & Decker affiliate that it is most closely

20   associated with is actually its Global Tools and Storage

21   Division that's located in Towson, Maryland.  And as to

22   the 500 Group and Mr. Tiramani, when the -- first of all,

23   the settlement agreement itself is to be interpreted

24   under New York law.  500 Group is a New York corporation.

25   At all relevant times to this dispute was headquartered

1    in Las Vegas, Nevada, and as was and Mr. Tiramani's

2    permanent residence was Las Vegas, Nevada.

3        Even before the parties started, and this is

4    clear on the record, Your Honor, even before the parties

5    started negotiating the settlement agreement pursuant to

6    a series of meetings in New York which arose out of the

7    arbitration that was taking place in New York.  These

8    parties -- so they met in New York.  They started

9    negotiating.  At that point when this occurred, 500 Group

10   and Mr. Tiramani were permanently in Las Vegas, Nevada.

11       And therefore, when the actual alleged

12   wrongdoing that is alleged by the plaintiff occurred, the

13   wrongdoing they are claiming all occurred at the time,

14   essentially was the breach of their claim was failing to

15   reimburse the $600 so-called -- $600,000 so-called

16   overpayment, well, and that occurred, those decisions

17   when Mr. Tiramani and 500 Group made the determination

18   that they are going to refuse to accede to this demand by

19   Stanley Works Israel to reimburse $600,000, they were

20   located when this decision was made in Las Vegas.  That's

21   undisputed.

22       Even the negotiations or the discussions that

23   occurred between the parties after the agreement was

24   signed, that during the summer of 2017 again between

25   where the company was located and Mr. Tiramani located in

1  Las Vegas, Mr. Firooznia was always located in New York

2  who was their outside accountant for the 500 Group and no

3  harm was felt in Connecticut.

4        And we cited a couple of Connecticut District

5  Court cases *CSL Silicones* case and *Victor Reiling*

6  *Associates* case where when you look at the facts of those

7  case, the ties were even closer to Connecticut than

8  whatever ties there were here.

9        The only thing that a plaintiff can really point

10  to is to say there was a woman who was an employee of 500

11  Group who during -- at some point during the summer of a

12  -- or I think it was in April of 2019, there was an email

13  from her and that showed an address of Greenwich,

14  Connecticut.

15        But they haven't been able to refute that this

16  individual was not a high level employee or officer of

17  500 Group and that or the express testimony or in the

18  affidavit of Mr. Tiramani that that -- the Stanley

19  Group -- I'm sorry.  The 500 Group had maintained these

20  leased offices for a short period of time for a few

21  months after the relocation the beginning of September --

22  the beginning of February 2017 in Las Vegas.  They

23  maintain these offices.  No material business was

24  performed there anymore at that point.  If there's one

25  low-level employee that might have been there a short

1    period of time that doesn't turn this into an intimately

2    involved with Connecticut type of case.

3            The final argument that they make is that the

4    money that was wired by Stanley Works Israel, the payment

5    that was made in June of 2017 to 500 Group went to 500

6    Group's bank in Connecticut.

7            But the response to that, Your Honor, is the

8    fact that 500 Group maintained the relationship with its

9    bank that it had in previous years after relocated into

10   Las Vegas is not unusual or surprising and money is

11   fungible and bank accounts are fungible.

12           In fact, this bank had a brick and mortar office

13   that was also a branch located in New York.  And just

14   having the money going to a New York Bank -- to a

15   Connecticut-based bank doesn't by any means all the

16   sudden make this case intimately connected with

17   Connecticut so as to make this a viable CUTPA claim.

18           For all of those reasons, the CUTPA claim isn't

19   viable and neither are the breach of contract or unjust

20   enrichment claims and they should all be dismissed and

21   summary judgment granted in favor of the defendants.

22           THE COURT: All right, Mr. Barrack.  Thank you

23   for that argument.  Let me now hear from the other side,

24   hear from plaintiffs in opposition to the present motion

25   when you are ready.

1          MR. NOLIN:  I'm ready.  Thank you, Your Honor.

2    Good afternoon.

3          From our point of view, we see the case

4    entirely different.  You wouldn't expect

5    anything differently.  I think what is different is the

6    very detailed factual record that puts most of the claims

7    of the defendant on this motion in doubt.  Especially in

8    the form of Ted Morris's detailed affidavit and

9    supporting documents that's on the docket as Document 64

10   with attachments.

11         Almost every fact that has been claimed here

12   today has been disputed by Mr. Morris and also, of

13   course, in our response to their statement of undisputed

14   facts.

15         Let me start with the contract, Your Honor.  Our

16   position is that while it is an integrated contract, it

17   is simply silent completely.  Does not address the issue

18   of tax withhold.

19         They keep saying we promised to pay them

20   $10 million.  We did.  That doesn't change.  The tax

21   withholding comes after we pay them the $10 million.

22   They are then liable to pay some amount to the Israeli

23   Government.  In this case, it turned out that that amount

24   was $600,000.  The contract says the price for these

25   rights that you are purchasing is $10 million.  Does not

1    have anything to do with the fact they have an obligation

2    to pay the Israeli tax authority and we an obligation to

3    withhold.

4          Your Honor can see that based on the prior

5    relationship with the parties and you are entitled to

6    look at the prior relationship in determining whether the

7    contract is ambiguous.  In our view, the contract is

8    ambiguous because it doesn't address that term or it

9    simply doesn't have anything to do with withholding.

10   There's absolutely no mention of the taxes or withholding

11   in the contract.  It doesn't address that topic.  The

12   parties either modify that agreement later to address it

13   or enter into a new agreement to address it at a later

14   point in time.

15         Your Honor picked up on it and we agree with

16   you.  The fact that the defendant wants to say its

17   agreement to be paid $4 million in the royalties was not

18   a royalty payment to us seems entirely disingenuous.

19   That was a contract that resulted from a disputed

20   arbitration.  It was mutually negotiated. It specifically

21   says both sides have counsel and they agreed that $4

22   million was for royalties.  The fact they are trying to

23   say it wasn't now, to me I don't think it can be

24   countenance on the record. They are disputing the very

25   contract they say is clear and unambiguous.  If that's

1   ambiguous, there's major ambiguity in this contract.

2          Another key point, Your Honor, they claim

3   somehow that this issue was not raised in the

4   negotiations.  That's true.  But point of fact, our

5   representatives contacted 500 Group before they signed

6   the contract.  The affidavit of both Mr. Morris and then

7   document on the record 65, affidavit or declaration from

8   William Kovac, make it very clear that 500 Group was

9   contacted after we signed the agreement but before they

10  signed it, so we do not have a completely executed

11  agreement.  I think technically we could have withdrawn

12  under law any time before they executed.

13         But what happens next is telling.  They talked

14  to Mr. Firooznia.  He says oh, we didn't think to put in

15  any provision in the agreement about withholding.  We

16  always have withholding.  It is usually not at 25

17  percent.  It's usually at 15 percent.  We don't view that

18  as a problem if there's withholding because we have

19  offsets in the United States that means dollar for

20  dollar, we won't pay anything.  That's his response.  The

21  response is not what you are hearing from counsel now

22  years later.  Oh, always the tax was going to be paid by

23  Stanley Works Israel.  Their own accounting person

24  acknowledged that, in fact, it was going to be paid by

25  them that very first call before they signed.  Mr.

1    Tiramani is copied on the emails that led to that call.
2    He never disputed it so when they signed the agreement it
3    was with full knowledge that everybody assumed they were
4    going to be paying the withholding.  That's backed up,
5    Your Honor, by the subsequent events because right after
6    that, they start asking for immediate payments we say we
7    can't pay you under Israeli law without working this
8    issue out.  We can do one of two things.  We can agree to
9    let you go with your accountant that you are retaining to
10   the Israeli tax authority to negotiate that it is only 15
11   percent and only on the $4 million portion of the
12   contract or as Mr. Morris very clearly says in the
13   deposition Exhibit 12 and it's document 64-6, then it's
14   page 39.  We can pursue this mission where you will go
15   get the agreement of the tax authority at this standard
16   rate of withholding or we're going to write you a check
17   right now for the 10 million less 25 percent on the
18   entire contract and let you go fight the tax authority
19   later.
20          There's a clear indication from all the
21   subsequent emails and there's many is that they agreed to
22   talk to E&Y to follow that mission and to go get this
23   discounted rate of withholding for themselves.
24          That goes out over more than a month, and Your
25   Honor, again not once in any of these discussions will

1    you see anybody in the form of an affidavit or deposition

2    testimony or more importantly email state that oh, we

3    told Stanley Works Israel that it was their liability on

4    the taxes. It was just never said.

5         This theory they have now they weren't liable

6    for any tax, it was our responsibility.  If any of that

7    had been true at the time and not an

8    after-the-litigation-commences creation, somebody for 500

9    Group would have been saying that to us.  Would have been

10   saying wait a minute, Ted.  It is not for you to take out

11   25 percent of the whole thing.  This is your

12   responsibility.  You agreed in the contract that you were

13   going to pay the taxes.  We would have said that's silly.

14   It doesn't say that.

15        So instead what you see, Your Honor.  It can be

16   characterized as a new agreement or a written

17   modification, certainly fair game for a jury to decide

18   through this course of emails that there was either a

19   subsequent agreement or modification in writing that said

20   you 500 Group are going to go to the Israeli authorities

21   and you are going to work out with E&Y that you only have

22   15 percent withholding as Mr. Morris says is the mission

23   and we're going to then pay in accordance with the

24   contract.  We'll send you eight million four less your

25   600,000 and we're going to pay your lawyer one million

1    and everything is going to be square.  Never disputed

2    over the course of April of '17, May of '17, June of '17,

3    July of '17, into August and October.  The first time we

4    start hearing theories that they don't owe this money is

5    after the lawsuit starts. So the course of conduct of six

6    months confirms an oral agreement, a written modification

7    or a new agreement.

8         We think the facts concisely put, Your Honor,

9    establish that.  This notion somehow they did not have to

10   speak, that's an interesting concept but if you are

11   silent, you're silent.  You may not have a duty to speak.

12   They were speaking the whole time from the very first

13   conversation.  Mr. Tiramani is saying that oh, we

14   understand it is our liability.  Mr. Tiramani and

15   Firooznia are saying we're going to go to E&Y and get it

16   fixed.  They are not saying it is our responsibility.

17   They chose to speak in a way that certainly confirmed to

18   us that they were on the hook for the responsibility to

19   the tax authority.

20        The new theory that just come about in the

21   summary judgment I don't think was raised before is that

22   under New York law they are not liable for this tax at

23   all.  It is very strange.  I think you have to look at it

24   with a somewhat jaundice eye.  When somebody goes through

25   their accountant to the Israeli tax authority and

1    negotiates to pay $600,000 instead of a substantially

2    higher tax and comes four years later to this court and

3    says we don't owe the tax.  We never owed the tax.  If

4    that was your position, we would have said Mazel Tov to

5    use an appropriate phrase.  Go to the tax authority in

6    Israel and tell them that no tax is owed.  We would not

7    have cared.  Why is that argument being advanced now to

8    you instead of the Israeli tax authority who they were

9    directly negotiating with through E&Y.  The documents

10   clearly indicate they retained E&Y. We admit E&Y had done

11   audit work for us.  We admit that E&Y wanted us to sign

12   off on that retention for conflict purposes, we did.  But

13   the documents are very clear they retained E&Y to go

14   address this issue so their agent, if this argument holds

15   any water, could have raised with the tax authority to

16   agree to pay 600,000 in taxes and have us sign on to that

17   agreement and then as I say, four years later come here

18   in front of this Court and say well, the taxes were never

19   owed so it's all on Stanley Works Israel to go get the

20   money back.  We can flip it around, too.  If they think

21   no money is owed I guess they can go get a refund in

22   Israel.  But the point to have done that frankly was in

23   the spring of 2017, not now.

24           They claim there was never any intent to have

25   withholding.  Again Mr. Firooznia said it before the

1  contract was signed.  We documented it in the documents.

2  They never disputed it so if they honestly had intent to

3  have no withholding, they should have said something.

4  Instead it's not simply silence.  They are working with

5  us.  They are emailing us.  We're working on this mission

6  and plan and they never raise in any way, shape, or form

7  that they are not responsible for the taxes.

8       You heard counsel say when we first raised the

9  issue of them paying the tax, they didn't respond because

10  it was ridiculous, it was absurd as counsel just said.

11  Again that would have been a real simple email for Mr.

12  Tiramani to send, Ted, I don't know what you are talking

13  about us paying this tax or us having a potential

14  exposure for 2.5 million in withholding.  That's

15  ridiculous.  That's absurd.  It is your responsibility.

16  It was never said.  That's an after-the-fact creation.

17  If they thought it was ridiculous or absurd, why didn't

18  they say so?

19       So, you will see, Your Honor, and Mr. Morris

20  says it in these emails.  They have a plan.  When the

21  plan starts working, he says okay.  I'm instructing my

22  Israeli counterpart to hold the finger over their button

23  and when you tell us it's approved through E&Y and the

24  tax authority, she's going to hit send.  Thereafter when

25  it gets approved, Mr. Tiramani responds in another email

1  okay.  Tell her to push the button and we do and

2  unfortunately we pushed it for the wrong amount.  We made

3  a mistake and pushed 10 million instead of 960,000.

4          THE COURT: Here's a room full of lawyers.

5  That's why we're here.

6          MR. NOLIN:  Unfortunately, yes, Your Honor.

7  When we do inquire about it, again it's we overpaid you.

8  It was a mistake.  The response is not that's absurd,

9  that's ridiculous, again he chooses to speak.  He says

10  well, do you want the $600,000 back or do I have to send

11  you the full $4 million.  Now years after the fact that's

12  characterized as a joke.  There's no emojis.  There's no

13  smiley face on that.  No response just kidding.  When we

14  respond send us the 600,000, he doesn't respond.  We

15  follow-up.  We follow-up.  What we get over the next

16  three months June, July, August is not that's ridiculous,

17  that's crazy.  It is we're studying the issue or my

18  accountant is studying the issue or the accountant says

19  Mr. Tiramani is studying the issue.  Nobody is saying the

20  statement that we're going to give this money back was a

21  joke.  It just don't happen.  We get a representation

22  four hundred or six hundred.  We respond with six.  Then

23  it is met again by misleading statements, not silence,

24  misleading statements, that we're studying the issue.

25          If they are studying the issue, why didn't they

1   tell us what their study said.  They didn't say anything

2   until after the lawsuit was commenced in October.

3         Your Honor, since we're on summary judgment, if

4   there are disputes about what actually went back and

5   forth in these conversations, counsel said we haven't met

6   our burden to prove it, the conversations are an issue of

7   fact.  We think the way the evidence is overwhelming

8   there was this plan for them to pay the withholding.

9   They say there's no consideration.

10         Well, again I go back to Mr. Morris's statement,

11   guys, unless you accept this plan that you are going to

12   go get the withholding reduced to 15 percent of the $4

13   million, then I'm going to go to the tax authority and

14   dump this whole issue in their lap by withholding 2.5

15   million and sending you guys the balance.  That's the

16   consideration they got.  We didn't do that.  We worked

17   with them to solve the issue.  We delayed for three or

18   four months.  Again no suggestion we were in breach of

19   the agreement because of the delay.  No suggestion that

20   that was unreasonable.  We said two options and they

21   picked the option that was best for them, not having the

22   Israeli withholding of $2.5 million on the $10 million.

23         I will briefly -- I think our papers speak to

24   it.  I think the affidavit covers it, so I will not get

25   into more details unless Your Honor has questions.

1          THE COURT: I want to put one question.  One

2     question that occurs to me as I listen to the arguments

3     that you have just made, I gather that you are -- oh,

4     well, let me rephrase it.

5          I gather you are not so persuaded of the

6     rectitude of the factual propositions that you just

7     stated that you are cross moving for summary judgment

8     yourself, are you?  That thought crossed my mind and I

9     thought I might as well express it.

10         MR. NOLIN:  Your Honor, it crossed by mind when

11    we responded and it crossed my mind reading the briefs

12    again because we say the overwhelming way to the factual

13    evidence goes our way and we could have.  I just made a

14    call it a tactical call, legal decision that these are

15    factual issues even though I think our affidavit and the

16    paper record goes entirely our way, since they are facts,

17    I thought it was a ripe issue for a jury.  As much as I

18    perhaps should have moved that way, I did not.  I still

19    think the right way to address this case is in front of a

20    fact finder.  I think it is claimed for a jury.  We can

21    always talk about that down the road whether it be better

22    suited for the Court but as it now stands, I think it is

23    claimed for a jury.

24         THE COURT: Don't misunderstand me if anyone

25    does.  I will not presume and did not presume to suggest

1  in anyway what you should have done.  It was a passing

2  thought and I thought I would let it fly.

3         MR. NOLIN:  Thank you, Your Honor.  Let me

4  address the last two points here outside of the contract.

5  Obviously I agree with counsel.  If Your Honor decides

6  that the contract clearly and unambiguously determined

7  that Stanley was liable to pay for the tax withholding,

8  then we probably do not have an unjust enrichment claim.

9         But our view is the contract is silent on that.

10  Unless you accept our claims that it was orally modified,

11  modified in writing or new agreement entered, our view

12  would be that there is no contract.

13         At that point, as an alternative theory, Your

14  Honor, we have the claim for unjust enrichment.  We agree

15  with counsel that if you find a clear, unambiguous

16  contract exists, we're not going to have a claim for

17  unjust enrichment.

18         Let me turn to the Connecticut issue.  I think

19  counsel does summarize most of it.  If you look at the

20  correspondence right through the end of April, you see

21  that Mr. Tiramani is still listing a Connecticut address

22  on his emails.  So what we think we're dealing with is a

23  Connecticut party.  The contract is signed for Stanley

24  Works Israel by a representative in Connecticut.  Money

25  is transferred to Connecticut, Connecticut-based bank.  I

1    don't believe there's evidence in the record -- I could

2    be wrong.  Counsel can correct me -- that there was a

3    brick and mortar office open at the time for Patriot Bank

4    which was a local Connecticut -- I think still is, local

5    Connecticut bank operating out of Greenwich and I believe

6    that's where the payments went and that their bookkeeper

7    whom we were dealing with trying to recover that payment

8    was based in Connecticut.

9            We look at all of those signs including most

10   significantly that's where the money went to indicate

11   there's a sufficient nexus in Connecticut for a claim

12   under CUTPA, especially given here where the money

13   itself, the actual damage is the overpayment went into

14   Connecticut.

15           And with that, Your Honor, unless you have

16   further questions, I would stand on our paperwork in this

17   case.

18           THE COURT: No.  I have fallen silent again, Mr.

19   Nolin.  Thank you.  All right.  Mr. Barrack, do you offer

20   any comments in reply?

21           MR. BARRACK:  I was on mute.

22           THE COURT:  You had muted yourself out of

23   supreme confidence perhaps or just inadvertently, but

24   there you are and I'm ready to hear you, if you are ready

25   to speak.

1          MR. BARRACK:  Yes, Your Honor.  There's a couple

2     of points I would like to address.

3          First, it's just a basic point is that on the

4     summary judgment, once the movant, you know, demonstrates

5     or has raised to the Court issues that indicate the

6     undisputed facts will -- should -- undisputed facts

7     indicate that the plaintiff has no viable cause of

8     action, it is up to then the burden shifts to the

9     plaintiff to demonstrate that there are material issues

10    of fact in dispute and not just that but the legal

11    issues.  The law is in your favor on all of these points.

12    On both of these points, the plaintiff has failed to meet

13    their burden.

14          The only -- first, I would like to point out.

15    Again focusing on the language of the contract and they

16    admit.  You heard plaintiff counsel fully admit this is

17    an integrated contract.  It's silent on the issue of any

18    tax withholding or payments or paying less than the full

19    $10 million that's indicated and therefore, under the

20    four corners of the agreement itself, it is clear that

21    the contract provides $10 million to be paid, not less.

22    But as I indicated before and this is in the affidavit

23    and other documentation that we submitted, the 500 Group,

24    you know, never understood and there's no proof.  They

25    have not met the burden of proof to show that somehow

1    that they conveyed to 500 Group or 500 Group had any

2    basis to understand that the way that the plaintiff was

3    characterizing the $4 million portion of the $10 million

4    payment as for future royalties that somehow would invoke

5    a tax liability.  That this was, you know, they have not

6    refuted the statements in our supporting affidavits that

7    there was no, you know, that the understanding of 500

8    Group was only that Stanley Works Israel was insisting on

9    this language so they can get some kind of tax benefit.

10   Beyond that, they had no understanding or intention they

11   would receive less than $10 million.

12           On the issue of they said that -- counsel argues

13   that well, after Stanley Works Israel signed the

14   contract, settlement agreement, sent it to 500 Group, and

15   before 500 Group signed it, Mr. Morris contacted

16   Mr. Firooznia and said we have this issue, you know.  We

17   hit a snag as far as being able to pay you right away

18   because we have this tax issue and as set forth in --

19   there's no evidence that the plaintiff has submitted to

20   refute what's set forth in Mr. Tiramani's affidavit that

21   at no time in any of this communications did Stanley

22   Works Israel say we're withdrawing our execution of the

23   contract.  Do not sign this contract.  They never said

24   anything like that.  You know, without saying okay, we

25   signed it, but you didn't sign it yet, we're withdrawing

1   our execution, we're withdrawing this agreement because

2   circumstances have changed.  They never said that.  And

3   they have absolutely no evidence or no testimony

4   submitted by the plaintiff that refutes this or that that

5   even suggests that Stanley Works Israel told or

6   instructed 500 Group not to sign the contract or they had

7   withdrawn the contract.  They didn't.

8          As for their argument about well, from this

9   first phone call with -- between the parties after, you

10  know, after this issue had arisen, you know, the

11  representatives of 500 Group were saying, you know, we

12  fully understand that this is our tax liability, et

13  cetera, et cetera.  That's based on their allegation of

14  phone conversations.  Let's make that clear.  Phone

15  conversations.  Not written correspondence, signed

16  written correspondence and I ask Your Honor to review the

17  emails that the plaintiff has submitted in support of

18  their position their amendment argument.  There's nothing

19  in there.  I mean the only thing that these emails

20  indicate accords with what defendants' position is which

21  is 500 Group was over a barrel.  It's very clear from the

22  correspondence at the time that 500 Group had certain

23  financial obligations that it was counting on this money

24  being paid in order to meet these obligations.  They

25  needed this money.  They were counting on this money.

1   They were expecting this money.  Then all the sudden

2   there's this so-called snag that's going to delay payment

3   and so that email correspondence is fully in accord with

4   the defendants' position that they were doing everything

5   they could to facilitate a payment -- a payment as much

6   as money as they could get as soon as they could get it

7   and whatever the 500 Group could do to help facilitate

8   getting this issue to the point where we would get paid,

9   then that's what they were doing and there's nothing in

10  those email exchanges that where despite, you know,

11  indications of cooperation would be to get an exemption

12  and so on and so forth, there's nothing in that

13  correspondence and the plaintiff has failed to meet its

14  burden of proof on this on the point that where there

15  anything that 500 Group says in any of these email

16  correspondence is an unequivocal manifestation of 500

17  Group's assent that's sufficiently definite to assure

18  that the parties are truly in agreement that the

19  settlement agreement is being amended.

20          THE COURT: I hear what you say about at this key

21  time, the 500 Group and the individual defendant being

22  under real pressure to get this money in a hurry for

23  other obligations.  Is there anything in the record

24  before me which indicates that is so?  That's not the

25  profile I was sort of fashioned in my own mind of your

1  individual client, but is this the fact that they were

2  under this situation of a sort that would in effect color

3  the conduct they are engaged in at the time?

4      MR. BARRACK:  My understanding is that's the

5  case.  This is what they say in their correspondence.

6      THE COURT: Right.  Okay.

7      MR. BARRACK:  They say -- it's specified in some

8  of Mr. Firooznia's correspondence.  We have these

9  financial obligations.  As a matter of fact, one email

10  exchange can you pay part of the money now through an

11  affiliate so we can get some of this money that we need

12  right now to meet our final obligation.  They said no.

13  That was -- this is the clear context in which these

14  discussions occurred, but, Your Honor, the argument of

15  plaintiff's counsel what the really worked in there, what

16  is clear from when you look at the papers, what they try

17  to work in there is what they allege were oral

18  representations and phone calls.

19      Now, that's what all their so-called evidence of

20  the defendants' agreement to modify the contract.  That's

21  where it lies.

22      As we pointed out, Your Honor, we can't --

23  there's no way we can, you know, we still don't think

24  they met the burden of proof but even to the extent with

25  respect to oral conversations or oral, you know,

1  admissions that they claim were made that we refute, as a

2  matter of law, there is no -- there is no consideration.

3  That applies to any new agreement, new written agreement

4  that they are trying to say, well, that's as an

5  alternative theory there's a new agreement.  A new

6  agreement would also require consideration, Your Honor.

7         As to the plaintiff's argument that well, there

8  was consideration because, you know, we were saying well,

9  it is 25 percent, we're going to withhold 25 percent.

10 We're going to withhold 2.5 million and write you a check

11 for the balance.  But if you work with the Israeli tax

12 authority with Ernst & Young to get you your -- to get an

13 exemption and lower that liability and, you know, you

14 can -- it will be less.  Well, again they are trying to

15 get all the money they can, number one, as soon as they

16 can and not have dragged out and not get any money.

17        Number two, as far as the consideration goes,

18 consideration -- it is not consideration when it is an

19 obligation that a party already has and so to say that in

20 order for the Court to find that -- you know, so

21 basically saying we're going to pay you -- we're going to

22 even pay you less -- we're going to pay you right now.

23 Right now we're going to pay you even less, 2.5 million

24 less than we agreed, but otherwise we can drag this out

25 and work with Ernst & Young and we'll pay you an amount

1    that's less but not as small as we otherwise pay you and

2    that's consideration for an oral agreement?  That is not,

3    Your Honor.  Unless it is found that the -- that is not

4    consideration.  That is simply whatever, you know,

5    whatever the Israeli tax authorities agree to as an

6    exemption is not consideration provided by -- provided by

7    Stanley Works Israel.  You know, it is not money out of

8    their pocket.  That is simply not legal consideration.

9    The obligation was to pay -- even based upon their own --

10   their own argument that where they say, you know, well,

11   we're going to go to pay minus any withholding.  You

12   know, the fact that it was -- that they withheld 15 or

13   that they intend to withhold 15 percent rather than 25

14   percent it is not consideration out of their own pocket.

15   So therefore, that does not constitute legal

16   consideration to support the oral agreement.  They still,

17   as a matter of law, their allegations regarding oral

18   conversations that occur between the parties does not

19   indicate that there was any valid consideration provided

20   to support such an oral agreement to reduce the amount

21   that was agreed upon in the written settlement agreement

22   and again these emails do not indicate anywhere that that

23   the, you know, they coincide with what the defendants are

24   saying, have been saying all along which is we were

25   working with 500 Group, with Stanley Works Israel, trying

1    to work this issue out, trying to get our money as soon

2    as we can.  This is all we're doing and so to the extent,

3    we, you know, work with the Israeli tax authorities to

4    get this exemption, you know, our view is that it was

5    just hoping to get the payment expedited and, you know,

6    and get this, you know, whatever, whatever tax deal that

7    they are going to have with the Israeli government worked

8    out.

9         So there's certainly nothing in these emails

10   that again would meet the burden of showing a

11   manifestation of mutual assent sufficiently definite to

12   assure the parties are truly in agreement with respect to

13   all mutual terms.  They fail to meet that burden, Your

14   Honor.  There's no consideration or no valid

15   consideration and there's no oral agreement, no written

16   agreement that can be shown sufficiently under New York

17   law, and they talk about -- counsel talks about by

18   engaging in these discussions with the plaintiff or not

19   saying anything, you know, not saying no, we don't agree

20   that we have to owe anything, nothing that says that in

21   the written correspondence specifically that that somehow

22   misled the plaintiff.

23        The problem is they haven't indicated how they

24   were harmed by this.  They indicated -- the plaintiff

25   made it clear all along that after they discovered that

1   they, you know, failed to include the withholding in the

2   express agreement, that they, they intended -- that their

3   mission was to withhold a portion of that payment.  Well,

4   and they indicate that they intended to withhold a

5   portion of that payment right up until the time when they

6   transferred the money.  That they only transferred the

7   full amount by accident.  How does any allegedly

8   misleading conduct by silence harm them or actually --

9   how did they detrimentally rely?  There's no detriment.

10  They admit that they planned from once they discovered

11  the issue to pay less and to withhold and they intended

12  to right until the time they supposedly mistakenly paid

13  the full amount.  There's no estoppel of any kind here,

14  Your Honor, that can apply in claiming that oh, well,

15  they failed to speak.  The defendant failed to speak and

16  refute that somehow that misled them to their detriment.

17  It couldn't have by their own admission of their conduct

18  and intentions.

19          As far as we indicated -- and Your Honor, I

20  believe it is still the case, you know, if they raise the

21  issue it is really kind of outside the record.

22  Plaintiff's counsel is not aware of any brick and mortar

23  building or brick and mortar location for the 500 Group's

24  bank in New York State.  Well, there is.  And you can go

25  on Google and check that there's a branch in White

1    Plains, New York.  At least at the time we did these

2    memoranda, Your Honor.  Certainly and we believe existed

3    at the time of the transaction but really on the CUTPA

4    claim, the plaintiff has clearly failed to meet its

5    burden of proof to establish there's sufficient, you

6    know, integral involvement with Connecticut based upon

7    all of the undisputed facts to support a CUTPA claim.

8            I will point out in the *Victor G. Reiling*

9    *Associates* case that we cite, there the alleged injury

10   occurred in Connecticut because the economic impact of

11   the allegedly unfair practices was felt by plaintiffs in

12   Connecticut where they are located. That didn't occur

13   here where the plaintiff was located in Israel and I also

14   point out you say, well, the agent who signed the

15   settlement agreement on behalf of Stanley Works Israel

16   was located in Connecticut.  We point out the law in our

17   briefs, Your Honor, that under applicable law, under

18   Connecticut law, the last -- the last place -- the place

19   where the last party executed the contract is considered

20   the place of contract.  It is undisputed the last place

21   where the contract was executed or the final signature

22   was in Las Vegas, Nevada.  Therefore, Las Vegas, Nevada

23   is considered the place of execution of the contract

24   under the law.

25           So they clearly failed -- plaintiff's fairly

1    failed to meet the burden of proof on the -- that their

2    claim unfair trade practices are so intricately

3    associated with Connecticut as opposed to other locations

4    as to support a CUTPA claim.  We believe, you know, they

5    failed in that regard as well.

6            THE COURT: Okay.  All right.  Mr. Nolin, true to

7    my word, have you heard anything in this reply which you

8    can't stand and want to be heard from before we adjourn

9    this hearing?

10           MR. NOLIN:  I'm not sure it rises to that level,

11   Your Honor.  Two quick clarifications.  I'm certainly not

12   arguing that Stanley Works Israel canceled the contract.

13   The point is while we had a right to cancel the contract,

14   we contacted Mr. Firooznia.  It is documented in the

15   affidavits and he said that he understood that they were

16   liable for the 15 percent withholding so when the

17   contract proceeded and 500 Group signed a day later, we

18   had the understanding from them that, in fact, they are

19   going to be liable for the withholding.

20           The second point, Your Honor, just answering

21   your question, you were inquiring about the evidence in

22   the record of their financial distress and there was

23   some, but I'd note again if you look at Document 646 in

24   the record, at page 38, there's an email from

25   Mr. Firooznia to Mr. Morris saying that there had been a

1  problem but it was solved.  That was as of April 25 which

2  was the same day as the mission email from Mr. Morris so

3  their financial distress that may have caused them to

4  undertake certain actions was cured as of the time that

5  we believe they are entering into the new agreement that

6  expressly said there would be $600,000 withholding from

7  the $4 million portion of the contract.  With that, I

8  have nothing further, Your Honor.

9          THE COURT: All right.  Mr. Barrack, the word is

10  yours if you want to claim it.

11          MR. BARRACK:  Thanks.  I would like to briefly

12  respond to those last two points and that's it.  That is

13  there's nothing -- there's no evidence -- there's no

14  evidence that that 500 Group agreed to amend the written

15  contract before they signed it and again, plaintiff

16  doesn't refute that they never said that, you know, that

17  they were withdrawing the contract or even amending the

18  contract in that plaintiff at that time, prior to signing

19  it, they are not arguing that we agreed that there was

20  any manifestation of agreement within the written

21  contract that both parties signed.

22          So and then, you know, and again on the

23  financial issues that's only one reason.  That's only one

24  of the reasons why the plaintiff or -- I'm sorry --

25  Works, 500 Group was working with and negotiating and

1  discussing these issues with the plaintiff.  And it's in

2  our papers, in the affidavit.  Working with the plaintiff

3  because we're trying to get paid.  Whether they had

4  financial issues and needed the money right away or not.

5  Obviously it is a lot of money.  They want to get paid.

6  This was a long, involved dispute that the parties had

7  and they thought it was settled and all of the sudden at

8  the last second there's a snag.  We can't pay you right

9  away.  As it turns out, the payment was delayed for

10  months.

11           Any party that signed a settlement agreement

12  expects to get paid right away and then finds out are

13  told there's a problem.  We can't pay you right away

14  until these issues get worked out.  They will help with

15  working out the issues, but there's nothing of record

16  that indicates some unequivocal acceptance of a

17  modification of the agreement or ultimately that, you

18  know, and again to the extent they argue there's some

19  oral, oral conversations to that effect, there's no

20  consideration to support it.  The writings don't support

21  it.  They haven't met their burden on that.  With that,

22  Your Honor, we just conclude that summary judgment should

23  be granted in full to the defendants.

24           THE COURT: Well, the snag that that witness

25  referred to in the email in the discussion, led to some

1    accumulation of legal fees which must have reached a few

2    bucks by now I imagine and added to somewhat during this

3    really good hearing.  I think that I extracted from

4    counsel for both sides all of the assistance you can give

5    to the Court in deciding this interesting matter and that

6    is considerable assistance.  I anticipated from the

7    quality of the briefs that the oral arguments would be

8    good and effective and they have been and in order that

9    they be preserved for my continued benefit, I make this

10   direction to the counsel.  Get in touch with our good

11   reporter.  Order transcripts.  I don't require daily copy

12   or anything dramatic like that but there is such a thing

13   as expedited copy I believe.  Our good reporter will

14   discuss that with you, but I would like it ordered on an

15   expedited basis because otherwise I will go off and do a

16   number of other things.  I do have two or three other

17   cases and the sooner, I get to this, the better off I

18   will be.  So order an expedited indicted basis transcript

19   and the cost of that transcript should be in the first

20   instance divided equally between the parties because it

21   is requested by the court for the assistance of the

22   court.  The transcript will be a comfortable cost in the

23   litigation to abide the event when if an orders for costs

24   is made but in the first instance divide that cost among

25   yourselves equally and having made that direction, I

1    think that it's appropriate to continue the case now.   My

2    compliments to counsel for good arguments on all issues

3    raised by the parties on this motion.   The Court reserves

4    judgment pending decision and after I get the transcript

5    and I think you will have an opportunity counsel will to

6    make any corrections to the transcript once you get it.

7    But once I have the final transcript at hand, then I will

8    regard the case as fully submitted and you will hear from

9    me in due course to use an overworked legal phrase so

10   with that, I compliment counsel, express my appreciation

11   on this Zoom panel.

12          There's a little red line that says leave.   I'm

13   clicking on that.   Now it is says leave meeting which

14   means I'm about to disappear so with this farewell wave.

15   I'm now --

16          MR. NOLIN:   He's gone.

17          (Whereupon, the above hearing concluded at 4:53

18   p.m.)

19

20

21

22

23

24

25

1

2

3    COURT REPORTER'S TRANSCRIPT CERTIFICATE

4    I hereby certify that the within and foregoing is a true

5    and correct transcript taken from the proceedings in the

6    above-entitled matter.

7

8    /s/   Terri Fidanza

9    Terri Fidanza, RPR

10   Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25