## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| THE STANLEY WORKS ISRAEL LTD., f/k/a ZAG INDUSTRIES, LTD.<br><br>              Plaintiff,<br><br>v.<br><br>500 GROUP, INC. and PAOLO TIRAMANI,<br><br>              Defendants. | Civil Action No.<br>3:17 - CV - 01765 (CSH)<br><br><br><br><br>**AUGUST 1, 2024** |

### RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [Doc. 61]

**HAIGHT, Senior District Judge:**

The Plaintiff in this diversity action is Stanley Works Israel, Ltd. ("SWI"), an Israeli limited liability company, formerly known as ZAG Industries, Ltd. SWI sues the Defendants, 500 Group, Inc., a New York corporation, and Paolo Tiramani, a citizen of Nevada and the president and sole shareholder of 500 Group. Disputes have arisen with respect to patent rights owned by 500 Group and settlement agreements between the parties.

Following discovery, Defendants now move for summary judgment [Doc. 61]. Plaintiff opposes Defendants' motion. Counsel for the parties filed extensive briefs and exhibits, and presented oral arguments. This Ruling resolves the motion.

### I. BACKGROUND

The Court has previously granted in part and denied in part a motion by Defendants under Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiff's Amended Complaint [Doc. 24]. The

opinion, familiarity with which is assumed, is reported at 332 F. Supp.3d 488 (D. Conn. 2018).[1]  The background and procedural history of the case are not restated herein in full.  For present purposes, it is sufficient to say that at the pertinent times, Plaintiff  SWI manufactured commercial tools and storage equipment in Israel,  which it thereafter distributed into markets internationally.

Defendant 500 Group is an intellectual property, product development, and investment company which developed and patented "Rolling Workshop" systems, adaptable to mobile tool storage and workshop products.  "Rolling workshop" would appear to be a rather elaborate way of saying "tool box."   In any event, a time came when 500 Group and SWI entered into licensing agreements,  pursuant to which 500 Group licensed to SWI for a limited time the rights to manufacture in Israel and distribute products subject to 500 Group's patents, in exchange for monthly royalty payments by SWI to 500 Group.

The first license agreement between SWI and 500 Group was entered into on May 14, 1997.  Doc. 61-1 ("Affidavit of Paolo Tiramani"),  at ¶ 7.[2]  On February 27, 2004, the parties entered into a second license agreement.  *Id*. ¶ 8.  As far as appears, the parties dwelt together in commercial harmony until some time after execution of the 2004 license agreement.  500 Group then began to complain of SWI's failures to pay royalties required by the 1997 license agreement and label licensed products appropriately.  *Id.* ¶ 10.

---

[1]  In that Ruling, the Court granted Defendants' Motion to Dismiss in part and denied it in part.  332 F. Supp. 3d at 515–16.  Specifically, the Court found that SWI had "adequately alleged a claim for: (1) breach of contract; (2) unjust enrichment; and (3) violations of CUTPA." *Id*. at 516. However, the Court dismissed Plaintiff's conversion and civil theft claims, the Fourth and Fifth Counts in the Amended Complaint. *Id.*

[2]  Tiramani, according to his Affidavit, is the president and sole stockholder of 500 Group. Doc. 61-1, ¶ 3.

SWI denied wrongdoing at this time.  Negotiations ensued between SWI and 500 Group.  In January of 2007 these parties entered into a letter agreement [Doc. 61-3], which called for a payment by SWI to 500 Group in respect of prior unpaid royalties under the 1997 license agreement through March 31, 2006, and further provided for future royalties on designated products for all sales after April 1, 2006.  Doc. 61-1, ¶¶ 12-13.

This document appears as Exhibit B to the Tiramani affidavit.  *See* Doc. 61-3.   The signature page recites that Tiramani signed the agreement on behalf of 500 Group on January 10, **2007**.   *Id.* at 3.  That page also recites that Michael Bartone, a director of SWI's corporate predecessor, ZAG Industries, Inc., signed the agreement on January 4, **2006.**  *Id.*  The text of the agreement shows that it was signed by the parties in January 2007, not in 2006.  New Year's Day appears to have escaped Mr. Bartone's attention.  I will refer to this document throughout as the "2007 Letter Agreement."

One would have thought at this time that peace had broken out; but 500 Group has taken the position that even after execution of the 2007 Letter Agreement, SWI persevered in wrongful conduct "by, among other things, failure to pay royalties for licensed [P]roducts, failure to mark Products with the 500 Group copyright notice, failure to submit Products to 500 Group for quality control and approval, misappropriation of 500 Group's intellectual property and design and theft of trade secrets."  Doc. 61-1, ¶ 14.

That rather dramatic worsening in the parties' relationship brought them, in 2016, to the brink of arbitration in New York. The arbitration had actually commenced, with the parties asserting claims and counterclaims, when the parties decided to attempt once again to reach a settlement.  That effort succeeded, in the manner described by the affidavit of Theodore C. Morris, the assistant

general counsel and assistant secretary of SWI's parent company in Connecticut:

> The settlement was negotiated for 500 Group by Paolo Tiramani ("Tiramani"), his counsel and his CPA Hamid Firooznia ("Firooznia"), and for SWI by representatives of SBD/SWI, including me, John Michael Adinolfi, Myriam Waller and SWI's outside attorneys.
> . . .
>
> The negotiation culminated in a settlement agreement and mutual release executed by the parties in the last few days of March 2017 (the "Settlement Agreement").

Doc. 64, ¶¶ 11, 13 (citing Doc. 61-1 (Tiramani Affidavit)).

In this Ruling, I will refer to this document as the "2017 Settlement Agreement," in order to distinguish it from the earlier 2007 Letter Agreement, described *supra*. The 2017 Settlement Agreement is in the record as Exhibit C to the Tiramani Affidavit. *See* Doc. 61-4. This document must be considered carefully, because the Defendants' core contention is that the terms and conditions of the 2017 Settlement Agreement entitle them to summary judgment dismissing Plaintiff's claims against them.

## II.  THE 2017 SETTLEMENT AGREEMENT

The salient feature of the 2017 Settlement Agreement between SWI and 500 Group is that after prolonged tension, these two corporations stopped trying to do business with each other. One thinks inevitably of a couple, exhausted by domestic strife, finally getting a divorce.

The accuracy of this homespun analogy is demonstrated by comparing the parties' 2007 Letter Agreement with their 2017 Settlement Agreement.

Each agreement was negotiated by individual officers and drafted by attorneys. Both were preceded by 500 Group's disputed claims that SWI acted improperly as licensees of 500 Group's

patents.  The difference between the agreements reflects the change in the manner the parties had come to regard each other.

The 2007 Letter Agreement was informed by the parties' intention—one might plausibly infer their fervent if unexpressed hope— that they would go on doing business with each other:  500 Group as a commercial patent owner and licensor, SWI as a royalty-paying licensee of those patents.  Thus, the 2007 Letter Agreement began  with the identification of 500 Group as the "Licensor" and ZAG Industries ( SWI's former name) as the "Licensee" of patents on products covered by the earlier 1997 Product License Agreement between the parties.  The 2007 Letter Agreement obligated ZAG to pay 500 Group the sum of U.S. $790,000, "less applicable Israeli withholding tax," on the effective date of the Agreement (January 10, 2007, the last date of the parties' execution).  Doc. 61-3, ¶ 1.  That payment satisfied, *inter alia*, 500 Group's claims for royalties due through March 31, 2006.  *Id.* ¶ 2.  The Letter Agreement further provided that "the Product License Agreement shall remain in full force and effect, and royalties for sales of licensed products made following April 1, 2006 should be paid in accordance with its terms." *Id.* ¶ 6.

The 2007 Letter Agreement's genial contemplation of future amicable relationships stands in stark contrast to the 2017 Settlement Agreement [Doc. 61-4], whose core purpose was to allow the parties to quit each other's company.  Thus, the Settlement Agreement is captioned "Agreement and Mutual Release," a concept captured by the second full paragraph on page 4:

> WHEREAS, the Parties wish to settle and forever resolve all disputes and controversies which have previously arisen out of all the Agreements and all disputes asserted in the Arbitration whether or not asserted by them as of the date of this Agreement and Mutual Release.

Doc. 61-4, at 4.[3]

The Settlement Agreement provides in paragraph one, captioned "Compensation Amount," that "SWI agrees to pay the sum of Ten Million U.S. Dollars ($10,000,000) (the 'Compensation Amount') to 500 Group within fourteen (14) business days of the Effective Date of this Agreement and Mutual Release." *Id.* at 4 (¶ 1).

That paragraph of the Agreement continues with the phrase "[w]ith regard to the Compensation Amount," and then sets forth additional provisions which purport to characterize components of the $ 10,000,000 amount which the Settlement Agreement obligated SWI to pay to the 500 Group within fourteen (14) days of the effective date of the Agreement and Release. *Id.* at 4 (¶¶ 1 (i)-(ii)).

Paragraph 1(i) provides:

> Six Million U.S. Dollars ($6,000,000) constitutes payment for SWI's purchase of all patents (listed on Schedule 1) and patents rights owned by 500 Group pertaining to the Rolling Workshop ("RWS") and/or Products.

Paragraph 1(ii) provides:

> Four Million U.S. Dollars ($4,000,000) constitutes a fixed-fee payment for the future royalties (or any payments) due under the Agreements covering the next ten (10) years. SWI has no obligation for royalties or payments thereafter.

The Settlement Agreement further provides:

> Upon receipt of the Compensation Amount by the 500 Group, i) all business arrangements, contracts, and agreements which existed as of the Effective Date between 500 Group and/or Paolo Tiramani and

---

[3] The Court cites to the page numbers designated by the CM/ECF filing system (on the case docket), rather than the original page numbers appearing on the Settlement Agreement.

> SWI and any of its affiliates shall be deemed terminated and no other payments under the Agreements will be due from SWI to 500 Group whether it be for existing or future Products or otherwise, and   ii) SWI shall be released from any past royalties, payments or interest due to 500 Group.

*Id.* at 4-5.

The Settlement Agreement concludes with instructions for payment by SWI of the ten million dollar Compensation Amount.  One million of that amount was to be paid to attorneys who represented  500 Group during the earlier arbitration proceedings in the case. *Id.* at 5.  The remaining nine million dollars were to be paid into 500 Group's bank account. *Id.* at 6.

### III.   EVOLUTION OF THE PRESENT DISPUTE

The Settlement Agreement contains at its outset the disarmingly simple recitation that "SWI agrees to pay the sum of Ten Million U.S.  Dollars ($10,000,000) (the 'Compensation Amount') to 500 Group within fourteen (14) business days of the Effective Date of this Agreement and Mutual Release." Doc. 61-4, at 4 (¶ 1).

It would be an easier and less litigious world if that event had simply come to pass: that is to say, SWI made  a timely payment of $10,000,000 of "compensation" to 500 Group, the recipient 500 Group replied  "thank you," and the parties thereupon parted company completely, to pursue their fortunes elsewhere.

But life is not that simple.  This ease is complicated by the inclusion in the Settlement Agreement of subparagraphs (i) and (ii) of paragraph 1, which purport to characterize two components of the $10,000,000 sum as $6,000,000 in "payment for SWI's purchase of all patents" listed, *id.* ¶ 1 (i),  and $4,000,000, as "a fixed-fee payment for future royalties . . .  covering the next ten years," *id.* ¶ 1 (ii).

It is undisputed that these particular provisions were inserted into the Settlement Agreement at SWI's insistence and to further its interests.  The affidavit of Tiramani, 500 Group's president, states without contradiction:

> 500 Group ultimately agreed to a lump sum payment of $10,000,000 from SWI for the sale and assignment of the Patents, with $9,000,000 being paid directly to 500 Group and $1,000,000 paid to 500 Group's outside attorney for legal fees incurred in connection with the Arbitration.
>
> However, SWI insisted that a portion of the $10,000,000 purchase price for the Patents, ultimately agreed to be $4,000,000, be deemed a fixed-fee payment for future royalties over the next ten years.  My understanding was that such a provision in the settlement agreement (the "Settlement Agreement") was merely a technicality that would provide some benefit to SWI, but would not negatively affect 500 Group, including its right to receive the full $10,000,000 in compensation for the sale of the Patents.

Doc. 61-1, ¶¶ 18-19.

Tiramani expands on that theme in the following paragraph of his affidavit:

> The Settlement Agreement was intended to effectuate a sale of the Patents, not a license, which is a limited right.  The intent of the Settlement Agreement was for 500 Group to transfer to SWI the full title to the Patents in exchange for the $10,000,000 payment.  I would never have agreed to a settlement for any amount less than the full $10,000,000 that SWI agreed to pay for title to the Patents.

*Id.* ¶ 20.

The main brief for Defendants on this motion [Doc. 61-14] states without contradiction: "500 Group wanted the entire $10,000,000 payment to be characterized as the purchase price for the Patents, while SWI wanted to characterize as much of the payment as possible as pre-paid royalty payments," for internal accounting reasons peculiar to SWI, which did not affect 500 Group in any

way.  Doc. 61-14, at 6-7.[4]  500 Group agreed to that provision, though it profited nothing by it.

Complications arose when counsel for SWI advised 500 Group's officers that "SWI would have an obligation under Israeli law to pay withholding tax on the $4 million that was characterized in the Settlement Agreement as pre-paid royalties."  Doc. 61-1,¶ 23.

Eventually, SWI paid the Israeli government $600,000 in taxes on account of the transaction, and sues 500 Group to recover that amount.  That is the justiciable claim that emerges in the case at the end of the day.  Defendants deny any liability, and move for summary judgment dismissing the complaint.

## IV.   DISCUSSION

### A.  Standard of Law - Summary Judgment under Fed. R. Civ. P. 56

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Second Circuit has repeatedly declared that, pursuant to Rule 56(a), "[s]ummary judgment is appropriate only if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 533 (2d Cir. 2016) (citation omitted). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

In deciding whether to award summary judgment, the court "constru[es] the evidence in the

---

[4]  *See* n. 3, *supra*, regarding citation to document page numbers.

light most favorable to the [nonmoving party]' and 'draw[s] all reasonable inferences and resolv[es] all ambiguities in [its] favor.' " *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018) (quoting *Darnell v. Pineiro*, 849 F.3d 17, 22 (2d Cir. 2017)). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 25 (2d Cir. 2015) (quoting *Liberty Lobby, Inc.*, 477 U.S. at 248). "The summary judgment standard requires a court to 'consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits.'" *Nicosia v. Amazon.com, Inc.,* 834 F.3d 220, 229 (2d Cir. 2016) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir. 2002)).

Under Rule 56(a), the moving party bears the initial burden of demonstrating that no genuine issue exists as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013). Thereafter, if the movant successfully carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citing *Liberty Lobby, Inc.*, 477 U.S. at 249).

Ultimately, the test "is whether the evidence can reasonably support a verdict in plaintiff's favor." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Baez v. JetBlue Airways Corp.*, 793 F.3d 269, 274 (2d Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). *See also Dighello v. Thurston Foods, Inc.*, No. 3:16-CV-1340 (CSH), 2018 WL 6313187, at *2 (D. Conn. Dec. 3, 2018).

**B. Defendants' Summary Judgment Motion**

In the case at bar, Defendants move for summary judgement with respect to all claims asserted by Plaintiff SWI.  Doc. 61, at 1.  In particular, Defendants assert that "there is no genuine dispute of material fact that Plaintiff cannot prevail as a matter of law on its claims for breach of contract, unjust enrichment or violation of the Connecticut Unfair Trade Practices Act ('CUTPA')." *Id.*

With respect to Plaintiff's breach of contract claim, Defendants state that they are entitled to summary judgment because "(1) the Settlement Agreement at issue unambiguously does not authorize Plaintiff to pay 500 Group less than $10 million, nor does it require 500 Group to refund any portion of that amount to Plaintiff for a purported tax liability; (2) there is no genuine dispute of material fact that under the Settlement Agreement 500 Group permanently transferred and assigned to Plaintiff all rights to certain patents, and thus the recited $4 million for prepaid 'future royalties,' was in name only, and thus no tax was owed for such misnamed 'royalties;' and (3) 500 Group never agreed to modify the Settlement Agreement." *Id.* at 1-2.

Furthermore, Defendant "500 Group is entitled to summary judgment o[n] the unjust enrichment claim, because there is no dispute that the subject matter of this claim is covered by the scope of the Settlement Agreement, which both parties agree is valid and enforceable." *Id.* at 2.

Finally, both Defendants are entitled to summary judgment on the CUTPA claim "because there is no genuine dispute of material fact that the alleged wrongful conduct is not intimately associated with Connecticut, and Connecticut law does not apply to the dispute." *Id.*

Plaintiff SWI opposes summary judgment.  First, regarding its breach of contract claim, SWI asserts that "[t]he documents and evidentiary record support a contractual agreement for 500 Group

to allow 15% withholding on the $4 million of the Settlement Agreement which was paid as a royalty" so that "500 Group's retention of the incorrect full payment was a clear breach of that agreement." Doc. 63, at 19-20.

Second, and alternatively, SWI argues that "[i]f he Court finds no such contract exists, the facts serve to grant judgment as a matter of law on SWI's alternative unjust enrichment claim." *Id.* at 20.

Lastly, as to SWI's CUTPA claim, "the evidence establishes the application of Connecticut's unfair trade practice law to the Defendants' bad faith and deceptive conduct given the many connections with Connecticut;" and "[a]lternatively, the Court can find there are genuine issues of material fact still existing on the CUTPA claim." *Id.*

Considering the parties' arguments and all relevant pleadings and evidence presented, the Court will examine the parties' contentions in detail, focusing on the crux of this case, the contract executed between them.

### 1. Breach of Contract

#### a. *Parties' Contentions*

The Settlement Agreement, comprising the contract at issue in this case, expressly states that it "shall, in all respects, be interpreted, enforced, and governed under the laws of the State of New York without regard to its conflicts of laws principles." Doc. 61-4, at 8 (¶ 6 (b)).  Under New York law, the elements of a breach of contract claim are: (1) the existence of a contract between the plaintiff and the defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by the defendant; and (4) damages to the plaintiff caused by the defendant's breach. *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011). "In

pleading these elements, a plaintiff must identify what provisions of the contract were breached as a result of the acts at issue." *Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354, 358 (S.D.N.Y. 2001).

"Under New York law the initial interpretation of a contract is a matter of law for the court to decide. Included in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous." *Maniolos v. United States*, 741 F. Supp. 2d 555, 566 (S.D.N.Y. 2010) (internal quotation marks omitted) (collecting cases). "It is axiomatic that where the language of a contract is unambiguous, the parties' intent is determined within the four corners of the contract, without reference to external evidence." *Id.* (quoting *Feifer v. Prudential Ins. Co.*, 306 F.3d 1202, 1210 (2d Cir. 2002); *see also Rosenblatt v. Christie, Manson & Woods, Ltd.*, 195 F. App'x 11, 12 (2d Cir. 2006) ("Where, as here, a contract is unambiguous, it is enforced according to its terms, and the court will generally not look 'outside the four corners of the document' to add to or vary it."); *Am. Home Prods. Corp. v. Liberty Mut. Ins. Co.*, 748 F.2d 760, 765 (2d Cir.1984) ("Where . . . the contract's language admits of only one reasonable interpretation, the court need not look to extrinsic evidence of the parties' intent or to rules of construction to ascertain the contract's meaning.").

In support of its claim for breach of contract, Plaintiff SWI alleges the existence of an agreement with 500 Group whereby Plaintiff would withhold $600,000 of the payment due to 500 Group under the Settlement Agreement for remittance to the Israeli tax authority. Doc. 24 (Amended Complaint), ¶ 34. Plaintiff further alleges that it "fully performed under the Settlement Agreement and the parties' agreements and understandings by paying $9,400,000 to 500 Group." *Id.* ¶ 35. By failing to return the alleged overpayment of $600,000, Plaintiff alleges 500 Group breached the agreement and breached the implied covenant of good faith and fair dealing. *Id.* ¶ 36.

For the reasons described below, the Court finds that the terms of the contract, governed by

13

New York law, are unambiguous, such that the parties' intent is contained within the four corners of the contract.

The Settlement Agreement suggests the existence of a current and probative claim for future unpaid royalties, payable by SWI to 500 Group.  Doc. 61-4, at 4 (¶ 1(ii)).   In fact, however, that concept is contrary to the settlement actually reached by the parties, and their conduct relevant to it.

The record on this motion clearly shows that 500 Group was tired of fighting  with SWI about SWI's performance as licensee of patents owned by 500 Group, under previously existing Licensing Agreements.  The Settlement Agreement recites that the parties' wish "to settle and forever resolve all disputes and controversies" arising out of the Licensing Agreements.  *Id.* at 4. They accomplished that purpose by negotiating a lump-sum payment of $10,000,000 by SWI to 500 Group.  *Id.*

Defendants state without contradiction in their reply brief that in exchange for that payment, "500 Group permanently assigned [SWI] all rights and title to the Patents under the Settlement Agreement." Doc. 69, at 16.  The Settlement Agreement did not provide that "500 Group was intended to retain any rights to any of the Patents following the transfer," and in fact SWI does not "even attempt to argue that 500 Group retained any such rights whatsoever." *Id*.

In these circumstances, which are undisputed, Defendant 500 Group correctly argues in its reply brief—

> the $4 Million portion of the Compensation under the Settlement Agreement was not actually for royalty payments no matter what label was attached to them.  It follows that since the $4 Million portion of the payment was actually part of the compensation for the assignment of the Patents to Plaintiff, and were not royalties, based on Plaintiff's own admissions no taxes were owed [by 500 Group] to the ITA ["Israeli Tax Authority"] for any portion of the $10 Million.

*Id.* at 17.  That conclusion necessarily follows from the parties' conduct which resulted in this action.

In 500 Group's view, the case is a simple one (albeit elaborately briefed and argued by counsel).  500 Group contrasts the Settlement Agreement, which is in suit, with earlier Licensing Agreements between SWI and 500 Group.  During the time of those earlier agreements, SWI and 500 Group were doing business with each other. SWI licensed patents owned by 500 Group to third parties, and paid royalties to 500 Group.  SWI was an Israeli company, the Israeli Tax Authority levied taxes on those royalties, SWI paid the taxes to Israel but they were ultimately for 500 Group's account, and SWI recouped them by withholding the amounts of paid taxes from royalties otherwise owing from SWI to 500 Group.

That commercial world changed when 500 Group, irritated beyond endurance by continuing accounting disputes with SWI, put an end to its business relationship with SWI.[5]  500 Group accomplished that cessation by selling and assigning the patents in question to SWI for a negotiated payment of $10,000,000.  That is the purpose and effect of the Settlement Agreement.

Upon completion of that transaction, 500 Group had no further interest in the patents, and would receive no royalties for their use.  These facts are undisputed.  Accordingly, in Defendant's view of the case, the reference in the Settlement Agreement to $ 4 Million for "future royalties" has nothing to do with 500 Group. Doc. 61-4, at 4 (¶ 1(ii)).

500 Group's litigation position is that SWI inserted those particular references in the Settlement Agreement for its own purposes and perceived benefit.  Mr. Barrack, counsel for 500 Group, expanded on that perception in his argument at the hearing.  He stated that "at the end of

---

[5] This recitation in text is solely for the purpose of stating the relevant factual background. I neither have nor express a view as to the merits of the prior business disputes between the parties to the action.

February 2017," the parties had—

> agreed to a sale, an assignment of these patent rights to Stanley Works Israel to a lump sum of ten million dollars. . . . .
>
> [R]egardless of how Stanley Works Israel wanted to characterize the payment, it was clear that the $10 million was intended to be compensation for a full buyout, a purchase of the 500 Group's patent rights in that the 500 Group would retain no ownership interest in these patent rights.
>
> . . .
>
> [A]t the time of this settlement agreement, 500 Group correctly and reasonably understood that the transaction between the parties was a full sale and assignment of all patent rights and however . . . Stanley Works Israel wants to characterize part of the payments for their own tax purposes, was not something that 500 Group was involved with or certainly going to end up being damaged by.
>
> . . .
>
> All they understood and intended was they were going to get the full payment and whatever Stanley Works Israel wanted to do with respect to characterizing certain parts of the payment and getting some tax benefit of it, they could do that.  If there was a tax liability involved which wasn't contemplated at the time the settlement agreement was drafted and executed, that it would be Stanley Works Israel that would be subject to that, not the 500 Group.
>
> . . .
>
>  Now, at some point, Stanley Works Israel did indicate that they wish to actually settle this or settle this tax liability, so-called tax liability issue by reducing the payment to 500 Group. [H]owever, 500  Group never agreed or acquiesced to such reduction in the payment. There were discussions about it, but . . . [in] none of the emails back and forth between the parties was there ever, was there ever certainly any clear indication that 500 Group agreed to a reduced payment.
>
> . . .
>
>  . . . [T]here's nothing in the face of the agreement itself that even hints at that the payment—that the total payment to 500 Group for the sale of these patent rights would be anything less than the full $10 million.
>
> . . .
>
> Their understanding was [that] Stanley Works Israel wanted this language, so they can get a positive tax consequence out of it.
>
> . . .
>
> In essence, there's nothing within the four corners of the settlement

> agreement that would allow any interpretation of the terms that 500
> Group would accept anything less than the $10 million for the sale of
> the patent rights.

Doc. 79 (Hearing Transcript ("Tr.")) at 10: 19-21; 12:4-9; 16: 19 to 17:1; 17: 5-13; 17: 16-25; 19:

19-23; 27: 18-20; 27: 23 to 28:2.

These oral submissions of counsel echo the previously quoted affidavit of his client,

Tiramani: "I would never have agreed to a settlement for any amount less than the full $10,000,000

that SWI agreed to pay for title to the Patents." Doc. 61-1, ¶ 20.

Not surprisingly, at the hearing counsel for SWI, Mr. Nolin, took an entirely different view

of the case. In this action, SWI seeks to recover $600,000 from 500 Group. SWI paid that amount

to the Israeli Tax Authority, in connection with the transactions between SWI and 500 Group. SWI

contends that while it paid the $600,000 to Israel in the first instance, the payment is ultimately for

500 Group's account. Mr. Nolin said about the contract in suit between SWI and 500 Group:

> Our position is that while it is an integrated contract, it is simply
> silent completely. Does not address the issue of tax withheld.
>
> They [Defendants] keep saying we promised to pay them $10 million.
> We did. That doesn't change. The tax withholding comes after we
> pay them the $10 million. They are then liable to pay some amount
> to the Israeli Government. In this case, it turned out that that amount
> was $600,000. The contract says the price for these rights that you
> are purchasing is $10 million. Does not have anything to do with the
> fact they have an obligation to pay the Israeli tax authority and we
> have an obligation to withhold.

Tr. 41: 15 to 42: 3.

Counsel for SWI  also dealt specifically with the characterization in the Settlement

Agreement of $4,000,000 as "a fixed-fee payment for the future royalties . . . due under the

Agreements covering the next ten (10)years."  Doc. 61-4, at 4 (¶ 1(ii)).  As to that provision, Mr.

Nolin said:

> The fact that the defendant wants to say its agreement to be paid $4
> million in the royalties was not a royalty payment to us seems entirely
> disingenuous. That was a contract that resulted from a disputed
> arbitration. It was mutually negotiated. It specifically says both sides
> have counsel and they agreed that $4 million was for royalties. The
> fact they are trying to say it wasn't now, to me I don't think it can be
> countenance[d] on the record. They are disputing the very contract
> they say is clear and unambiguous. If that's ambiguous, there's major
> ambiguity in this contract.

*Id.* 42: 16 to 42:3.

Mr. Barrack's reply argument reiterated the 500 Group's differing concept of the contract

between SWI and the 500 Group created by the Settlement Agreement:

> . . . You heard plaintiff['s] counsel fully admit this is an integrated
> contract. It's silent on the issue of any tax withholding or payments
> or paying less than the full $10 million that's indicated and therefore,
> under the four corners of the agreement itself, it is clear that the
> contract provides $10 million to be paid, not less. . . . . [T]he 500
> Group, you know, never understood and there's no proof. They have
> not met the burden of proof to show that somehow that they conveyed
> to 500 Group or [that] 500 Group had any basis to understand that the
> way that the plaintiff was characterizing the $4 million portion of the
> $10 million payment as for future royalties that somehow would
> invoke a tax liability. . . . . [T]he understanding of 500 Group was
> only that Stanley Works Israel was insisting on this language so they
> can get some kind of tax benefit. Beyond that, they had no
> understanding or intention they would receive less than $10 million.

*Id.* 54: 16 to 55: 11.

The Settlement Agreement and Mutual Release  was signed on behalf of "Stanley Works

Israel Ltd." on March 28, 2017. Doc. 61-4, at 9. The document was signed by Tiramani on behalf

of "500 Group, Inc."  on March 31, 2017. *Id.* The Settlement Agreement and Mutual Release

provides in its first paragraph that the document "is entered into effective [sic] as of the date it has

been fully executed by both parties." *Id.* at 2.   The Agreement concludes with the recitation that "the undersigned have executed this Agreement and Mutual Release as of the last date indicated below." *Id.* at 9.   That "last date" is that of Tiramani's signature on March 31, 2017.  *Id.* The effective date of the document was thus March 31, 2017.  SWI was obligated to pay 500 Group the "Compensation Amount" of $10,000,000 "within fourteen (14) business days" of that "Effective Date":  a time in mid-April, 2017.  *Id.* at 4.

In point of fact, it was not until "on or about June 1, 2017" that "SWI wired the agreed payment under the Settlement Agreement to 500 Group, splitting the amount into the $1,000,000 earmarked for 500 Group's outside counsel, and the balance of $9,000,000 to 500 Group's bank account."  Doc. 61-1 (Tiramani Affidavit), ¶ 31.

The delay in payment resulted from an exchange of communications between representatives of SWI and 500 Group which began on March 29, 2017, when Theodore Morris, house counsel for SWI, told Tiramani by email that Morris had "only recently learned that SWI would have an obligation under Israeli law to pay withholding tax on the $4 million that was characterized in the Settlement Agreement as pre-paid royalties, and that obligation would be either fifteen or twenty-five percent, depending on what SWI's auditors could get approved."  *Id.* ¶ 23.

Tiramani states bluntly in his Affidavit that when he received that email from Morris, "I understood the problem to be SWI's issue, and not that of 500 Group.  I understood the term 'withholding' in this context to be a euphemism of SWI's purported tax obligation to the Israeli government, and not an obligation of 500 Group." *Id.* ¶ 24.  However, Tiramani was concerned that "this belatedly raised tax issue would delay SWI's payment of the $10,000,000 under the Settlement Agreement, which was supposed to be paid within two weeks of its effective date."  *Id.* ¶ 25.

An email and telephone dialogue ensued.  According to Tiramani, "500 Group's motivation for engaging in these discussions was to assist SWI in obtaining an exemption for the Israeli Tax Authority ('ITA') so as to reduce SWI's purported tax obligation from twenty-five percent to fifteen percent." *Id.* ¶ 26.  "SWI indicated that its intended tax payment to the ITA would be required to be paid at the time it paid 500 Group the $10,000,000." *Id.* ¶ 28.  500 Group retained an accounting firm to assist in obtaining an exemption "so that SWI's purported tax liability to the ITA would be reduced from twenty-five percent to fifteen percent." *Id.* ¶ 29.  Tiramani believed and hoped that "500 Group's assistance in that regard would help expedite SWI's payment of the $10,000,000 to 500 Group." *Id.* The matter continued to drag on.

SWI complicated the case in a manner  Tiramani describes in his Affidavit: "While these discussions between the parties were ongoing and we were waiting for the purported tax issue to be resolved, SWI indicated at some point that it wished to reduce the payment to 500 Group by the amount of the tax liability." *Id.* ¶ 30.

500 Group's response to that suggestion, to state Tiramani's Affidavit in the vernacular,  is: "No way."  He says:

> [N]either I nor any other representative of 500 Group ever agreed or acquiesced to such a reduction in payment.  Such discussions were always for settlement purposes only.  500 Group always intended and expected to be paid the full $10,000,000 as clearly agreed upon under the Settlement Agreement, without any reduction for SWI's purported tax liability.
>  . . .
>  . . . I made it clear that 500 Group would not be refunding any part of the $10,000,000 payment clearly agreed upon [in] the Settlement Agreement that both parties signed.
>
> I subsequently learned that SWI later paid $600,000 to the ITA for its purported tax liability.  I consider that payment to have either been

> a voluntary act, or confirmation that this purported tax liability was
> the responsibility of SWI.

*Id.* ¶¶ 30, 35, 36.

To revert to the parties' conduct, as previously stated: SWI, having paid the Compensation Amount of $10,000,000 to 500 Group and its attorneys on June 1, 2017, Doc. 61-1, ¶ 31, thereafter tried unsuccessfully to recall all or part of that payment, and then claimed in an email to 500 Group that SWI "had made an overpayment of $600,000, the amount of its purported tax liability to the ITA, and requested that 500 Group refund that amount to SWI," *id.* ¶ 33.  500 Group refused that request; Tiramani says "I made it clear that 500 Group would not be refunding any part of the $10,000,000 payment clearly agreed upon [in] the Settlement Agreement that both parties signed."

*Id.* ¶ 35.  Tiramani concludes:

> I subsequently learned that SWI later paid $600,000 to the ITA for its
> purported tax liability.  I consider that payment to have either been a
> voluntary act, or confirmation that the purported tax liability was the
> responsibility of SWI.

*Id.* ¶ 36.

As noted *supra*, Plaintiff SWI brought this action against Defendant 500 Group to recover the sum of $600,000 that SWI had paid to the Israeli Tax Authority.  500 Group denies liability, and moves for summary judgment dismissing SWI's complaint.

### b. Further Analysis

I conclude that Defendant's motion for summary judgment should be granted with respect to the breach of contract claim.

In the Settlement Agreement and Mutual Release between SWI and 500 Group, SWI agreed in plain language to pay $10,000,000 to 500 Group within two weeks' time.  Tiramani states

accurately in his Affidavit that "500 Group ultimately agreed to a lump sum payment of $10,000,000 from SWI for the sale and assignment of the Patents" in question. Doc. 61-1, ¶ 18.

As Tiramani's Affidavit makes clear, the Settlement Agreement conferred upon the 500 Group the "right to receive the full $10,000,000 in compensation for the sale of the Patents," the intent of the Agreement being "to effectuate a sale of the Patents" and "to transfer to SWI the full title to the Patents in exchange for the $10,000,000 payment." *Id.* ¶¶ 19-20.

The Settlement Agreement further provided that "[u]pon receipt of the Compensation Amount by 500 Group, i)  all business arrangements, contracts, and agreements which existed as of the Effective Date between 500 Group and/or Paolo Tiramani and SWI and any of its affiliates shall be deemed terminated and no other payments under the [License or Letter] Agreements will be due from SWI to 500 Group whether it be for existing or future products or otherwise." Doc. 61-4, at 5.

In consequence, 500 Group had no interest in, and received no royalties generated by, these Patents after it received the Compensation Amount from SWI on June 1, 2017.

It necessarily follows that the provision in the Settlement Agreement, which purports to characterize $4,000,000 of the $10,000,000 payment  by SWI to 500 Group as "a fixed-fee payment for the future royalties (or any payments) due under the Agreements covering the next ten (10) years," *id.* at 4 (¶ 1(ii)), can have no reference to 500 Group, an entity which at the pertinent times played no part in this drama, and plays none today.

 By the same token, SWI cannot rely on this language as a basis for deducting $600,000 (or any other amount) from the $10,000,000 it agreed to pay to 500 Group in the Settlement Agreement.

If SWI found it crucial to have its tax liability deducted from its $10,000,000 payment, it was necessary to include that term within the Settlement Agreement.  That contract was plain in its

language and included no such term.  Under New York law, "silence with respect to a particular issue does not generally render a contract ambiguous." *Chen-Oster v. Goldman, Sachs & Co.*, No. 10 CIV. 6950 (LBS)(JCF), 2011 WL 803101, at *2 (S.D.N.Y. Mar. 1, 2011) (collecting cases). *See also Wyly v. CA Inc.,* No. 05 CV 4430, 2009 WL 3128034, at *9 (E .D.N.Y. Sept. 29, 2009) ("'[S]ilence alone does not equate to ambiguity.'") (quoting *Henrich v. Phazar Antenna Corp.*, 33 A.D .3d 864, 867, 827 N.Y.S.2d 58, 61 (2d Dep't 2006)); *Millgard Corp. v. E.E. Cruz/Nab/Fronier–Kemper*, No. 99 Civ. 2952, 2003 WL 22741664, at *3 (S.D.N.Y. Nov. 18, 2003) ( "[U]nder New York law, the omission of terms in a contract does not create ambiguity.").

Furthermore, in the absence of ambiguity, extrinsic evidence is inadmissible. *See, e.g., Wyly*, 2009 WL 3128034, at *9 ("Where a contract is unambiguous, extrinsic or parol evidence is inadmissible."); *Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195, 199, 764 N.E.2d 958, 738 N.Y.S.2d 658, 661 (2001) ("'An omission or mistake in a contract does not constitute an ambiguity [and] . . . the question of whether an ambiguity exists must be ascertained from the face of an agreement without regard to extrinsic evidence.'") (quoting *Schmidt v. Magnetic Head Corp.*, 97 A.D.2d 151, 157, 468 N.Y.S.2d 649, 654 (2d Dep't 1983)).

It follows that SWI has no basis in fact or in law for its assertion that it overpaid any amount to 500 Group in connection with the transactions forming the subject matter of this action.

### 2. Unjust Enrichment

Under New York law, the plaintiff must establish the following elements to prevail on a claim for unjust enrichment: "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006). "The theory of unjust enrichment lies in

a quasi-contract claim. It is an obligation the law creates *in the absence of any agreement*." *Id.* at 586-87 (emphasis in original) (quoting *Goldman v. Metro. Life Ins. Co.*, 5 N.Y.3d 561, 572, 841 N.E.2d 742 (2005)).

In the case at bar, Plaintiff alleges that 500 Group was unjustly enriched by not repaying $600,000, to which it "was not entitled" under the "parties' agreements and understandings." Doc. 24 (Amended Complaint), ¶ 40.  Based on these factual allegations, Plaintiff's unjust enrichment claim arises under a contract (the Settlement Agreement), the existence and enforceability of which is not disputed, and which clearly covers the subject matter of the amount 500 Group was entitled to receive as payment from Plaintiff. Therefore, Plaintiff's claim fails as a matter of law; it  cannot be pleaded in the alternative to the breach of contract claim.

"The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter. . . . It is impermissible . . . to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties." *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388-89, 516 N.E.2d 190  (1987) (internal citations omitted).

Here, the parties concur that the dispute is covered by the Settlement Agreement.  Moreover, neither party contends that the Settlement Agreement is or was invalid or unenforceable. Where the precise subject matter of Plaintiff's unjust enrichment claim is necessarily encompassed by the Settlement Agreement, 500 Group was not unjustly enriched.  It received from SWI only what the Settlement Agreement provided SWI should pay to 500 Group:  $10 million, nothing more, nothing less.  That is the only payment contemplated by the plain language of the contract between the

parties.   Recovery by SWI of a different amount, under an alternative quasi-contractual theory, is

accordingly barred. *See, e.g., Mueller v. Michael Janssen Gallery Pte. Ltd.*, 225 F. Supp. 3d 201, 207

(S.D.N.Y. 2016) (under New York law a claim for unjust enrichment is barred if there is a valid

contract governing the subject matter of the dispute). Plaintiff's unjust enrichment claim fails as a

matter of law.

### 3. CUTPA Claim

Connecticut's Unfair Trade Practice Act ("CUTPA") prohibits "unfair methods of

competition and unfair or deceptive acts or practices in the conduct of trade or commerce." Conn.

Gen. Stat. § 42-110b(a). "'Trade' and 'commerce'" is defined as "the advertising, the sale or rent or

lease, the offering for sale or rent or lease, or the distribution of any services and any property . . .

and any other article, commodity, or thing of value *in this state*." Conn. Gen. Stat. § 42-110a(4)

(emphasis added). "While the plain language of CUTPA is directed at unfair competition taking

place 'in this state,' . . . courts have held that CUTPA does not require that a violation actually occur

in Connecticut, if the violation 'is tied to a form of trade or commerce intimately associated with

Connecticut,' or if, where Connecticut choice of law principles are applicable, those princip[les]

dictate application of Connecticut law." *Victor G. Reiling Assocs. & Design Innovation, Inc. v.

Fisher-Price, Inc.,* 406 F. Supp. 2d 175, 200 (D. Conn. 2005)[6] (citation omitted).

In the instant case, the undisputed facts reveal that there is no genuine dispute of material fact

that neither of these tests are satisfied.  Summary judgment is thus warranted on the CUTPA claim.

The facts on the record indicate that Defendants have conducted no trade or commerce

intimately associated with Connecticut.  Plaintiff is an Israeli limited liability company based in Rosh

---

[6] *Opinion adhered to as modified on reconsideration*, 409 F. Supp. 2d 112 (D. Conn. 2006).

Ha'Ayin, Israel. Doc. 24 (Amended Complaint), ¶ 1. Plaintiff is owned by a Dutch company located in the Netherlands which, in turn, is owned by a Canadian corporation with its principal place of business in Canada.[7] *Id.*   500 Group is, and has always been, a New York corporation with its principal place of business in Las Vegas, Nevada. *Id.*  ¶ 2; Doc. 61-1 (Tiramani Affidavit), ¶ 4. Although 500 Group previously maintained temporary office space (through Regis) in Connecticut, it moved its headquarters to Nevada in early February 2017, registered to conduct business there and ceased all material operations in Connecticut. Doc. 61-1, ¶ 4-5. Although Tiramani was previously a resident of Connecticut, he has been a resident of Nevada since February 2017. *Id.* ¶ 4.

Furthermore, the Arbitration between the parties, which the Settlement Agreement settled, took place in New York. *Id.* ¶ 15. The parties began negotiating the Settlement Agreement in late February 2017— after both 500 Group and Tiramani permanently relocated to Nevada.  *Id.* ¶ 17. All in–person negotiations took place in New York.  Doc. 61- 10 (Firooznia Depo. Tr.),  at 26: 17-25.[8] The Settlement Agreement's effective date is March 31, 2017, so that any alleged wrongful conduct by the Defendants occurred after this date. Doc. 61-4, at 9. The only connection to Connecticut that Plaintiff alleges in the Amended Complaint is that the Compensation was wired on June 1, 2017, from Plaintiff's bank in Israel to 500 Group's bank, which Plaintiff claims was still located at that time in Connecticut. Doc. 24, ¶ 25.

---

[7] Although SWI is somehow affiliated with Stanley Black & Decker, Inc. ("SBD"), SWI is a separate corporate entity from other SBD entities, and generates its own profit and loss statements. Doc. 61-7 (Fixler Tr.), at 42; Doc. 61-8 (Albanese Tr.), at 28. SWI manufactures and markets storage products, including toolboxes, which are produced at its plants in Israel. Doc. 61-9 (Waysbort Tr.), at  10-11. The SBD business unit with which SWI is most closely affiliated is the GTS division, which is headquartered in Towson, Maryland. Doc. 61-8  (Albanesi Tr.), at  11-12, 15, 29.

[8]  The Court cites to the page numbers of the original transcript of Hamad Firooznia's deposition because Doc. 61-10, as filed, includes only a selection of pages from that transcript.

Because both Defendants were located in Nevada, their alleged unfair conduct in refusing to refund the alleged overpayment by Plaintiff in June 2017 took place in Nevada. Plaintiff is an Israeli company located Israel so any alleged harm caused by the Defendants' denial of Plaintiff's demand to refund the alleged overpayment took place in Israel.  Under these circumstances, the alleged unfair conduct by Defendants is by no means "intimately associated" with Connecticut.

Where the alleged unfair conduct took place outside of Connecticut —even when the plaintiff is a Connecticut entity and the harm has an impact in Connecticut— without more, courts have concluded that the conduct was not intimately associated with Connecticut. *See, e.g., CSL Silicones, Inc. v. Midsun Grp. Inc.,* 301 F. Supp. 3d 328, 374-79 (D. Conn. 2018) (granting defendant's summary judgment motion on plaintiff's CUTPA claim related to an intellectual property and unfair competition dispute, where the plaintiff was located in Connecticut, but the alleged disparaging statements by the defendant occurred in India).

Additionally, as previously discussed herein,  there is no issue that New York law explicitly governs the 2017 Settlement Agreement.  *See* Doc. 61-4, at 8 (¶ 6 (b)) ("The Parties further agree that this Agreement and Mutual Release shall, in all respects, be interpreted, enforced, and governed under the laws of the State of New York without regard to its conflicts of laws principles."). Plaintiff alleges that Defendants' "unfair retention of and refusal to return the $600,000" violated the Settlement Agreement to which New York law applies. Doc. 24, ¶¶ 45, 50.   Absent unfair conduct intimately associated with Connecticut and/or application of Connecticut choice of law principles, dictating application of Connecticut law, Plaintiff SWI's CUTPA claim fails as a matter of law.

## V.   CONCLUSION

For the foregoing reasons, pursuant to Federal Rule of Civil Procedure 56(a), Defendants'

Motion for Summary Judgment [Doc. 61] is **GRANTED** as to all claims contained in the Amended

Complaint [Doc. 24].   Defendants are entitled to judgment as a matter of law. The Amended

Complaint is  Dismissed with Prejudice.   The Clerk is directed to close the case.

It is So Ordered.

Dated:    New Haven, Connecticut
          August 1, 2024


                                        */s/Charles S. Haight, Jr.*
                                        CHARLES S. HAIGHT, JR.
                                        Senior United States District Judge